WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| Stephen Edward May, | ) | CIV 14-0409-PHX-NVW (MHB) |
|---|---|---|
| Petitioner, | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | |
| Charles L. Ryan, et al., | ) | |
| Respondents. | ) | |

TO THE HONORABLE NEIL V. WAKE, UNITED STATES DISTRICT COURT:

Petitioner Stephen Edward May, who is represented by counsel, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) and Memorandum of Law in Support of Petition (Doc. 2). Following a jury trial, Petitioner was convicted in Maricopa County Superior Court, case #CR2006-030290-001, of five counts of molestation and was sentenced to a 75-year term of imprisonment. In his Petition and supporting 162-page Memorandum, Petitioner names Charles L. Ryan as Respondent and the Arizona Attorney General as an additional Respondent. Petitioner raises 14 grounds for relief – most of which have multiple components. In total, Petitioner has alleged over 35 constitutional violations. Respondents filed their 463-page Answer on September 22, 2014, and Petitioner filed his Reply three months later. (Docs. 22, 29.)

1

## BACKGROUND[1]

2       On February 15, 2006, the Maricopa County Grand Jury returned in CR2006-030290

3   an indictment charging Petitioner with eight counts of child molestation, class 2 felonies and

4   dangerous crimes against children, in violation of A.R.S. §§ 13-1410 and 13-604.01. (Exh.

5   A: Photostatted Instruments [hereinafter "P.I."], Item 1.) The indictment identified the

6   victims as five children under the age of 15: Taylor S. (Counts 1 and 2), Danielle A. (Counts

7   3 and 4), Sheldon H. (Counts 5 and 6), Luis A. (Count 7), and Nicholas M. (Count 8). (Id.)

8   The State alleged that Petitioner committed: (1) all of his crimes against Taylor and Danielle

9   (Counts 1 through 4) between June 1, 2005, and September 30, 2005; (2) both offenses

10  against Sheldon (Counts 5 and 6) between July 1, 2005, and July 31, 2005; (3) the crime

11  against Luis (Count 7) between January 11, 2005, and May 17, 2005; and (4) the offense

12  against Nicholas (Count 8) on or about October 8, 2001. (Id.)

13      On February 23, 2006, Joel Thompson, the Chief Trial Attorney for Phillips &

14  Associates, entered his appearance as Petitioner's counsel. Thompson filed numerous pretrial

15  motions on Petitioner's behalf, including a motion to dismiss Count 7. (Exh. A: P.I., Items

16  31, 41, 50.) Thompson also moved to dismiss Count 8 on the ground that the police either

17  lost or destroyed evidence after the State initially declined prosecution, namely all audio and

18  videotapes memorializing the pretrial interview statements made by Petitioner and Nicholas,

19  the recording of Petitioner's confrontation call, and the photographs taken of Nicholas' penis.

20  (Exh. A: P.I., Items 32, 38, 49.) The trial court denied both motions. (Exh. B: M.E., Item 43.)

21      Thompson also argued that he was entitled to severance of counts, pursuant to Arizona

22  Rule of Criminal Procedure 13.4, because the charged offenses were consolidated for trial

23  solely by virtue of their similar nature, were committed at different places and times, and had

24  no eyewitnesses in common. (Exh. A: P.I., Item 29, at 2-3; Exh. C: R.T. 11/13/06, at 3-5,

25

26  ――――――――――――――

27      [1] Unless otherwise noted, the following facts are derived from the exhibits submitted
    with Doc. 22 – Respondents' Answer.

28                                           - 2 -

10-12.) On November 13, 2006, the trial court partially granted this motion by severing Count 8 from Counts 1 through 7. (Exh. A: P.I., Item 32, at 1-2; Exh. B: M.E., Item 43, at 2.) However, Judge Stephens also ruled that the seven remaining charges were properly consolidated because evidence of the charged offenses against Taylor, Danielle, Sheldon, and Luis would be cross-admissible at separate trials, pursuant to Arizona Rule of Evidence 404(b), to prove motive opportunity, intent, preparation, plan, identity, and absence of mistake or accident, and pursuant to Arizona Rule of Evidence 404(c), to demonstrate that Petitioner had an aberrant sexual propensity to commit the charged offenses. (Exh. B: M.E., Item 43, at 2; Exh. C: R.T. 11/13/06, at 5-10.)

Petitioner's trial commenced with jury selection on January 2, 2007, and concluded with the jury returning its verdicts on January 16, 2007. (Exh. B: M.E., Items 47, 233.) The following constituted the evidence supporting the prosecution's allegations against Petitioner:

Born in New York in September 1971, Petitioner learned to swim as an 18-month-old toddler, swam competitively during his grade school years, became an American Red Cross certified life guard when he was 15 years old, and offered swimming lessons since 1990—all despite having a "neurological condition," the main symptoms of which included "clumsiness," poor vision, and "nervous ticks" that "mostly" caused him to make "uncontrollable head-type movements" and "shake [his] head left and right ... and up and down." (Exh. G: R.T. 1/8/07, at 42; Exh. I: R.T. 1/10/07, at 25-27, 33, 36-37, 64-65, 82-83, 87.) Although this condition purportedly rendered the left side of his body weaker and smaller than the right, Petitioner testified at trial that: (1) he had "fairly average" motor skills on the right side of his body; (2) this neurological condition defied "a medical diagnosis per se"; (3) Petitioner never suffered dizziness or sudden losses of consciousness; (4) he never disclosed his condition to prospective employers; (5) he had not seen a "specialist" for his condition since he was a college student in his late teens or early 20's; and (6) he became a

1    certified life guard when he was 15 years old, later taught CPR classes, and gave swimming

2    lessons to children. (Exh. I: R.T. 1/10/07, at 26-27, 33, 85-86, 90-91.)

3         Petitioner attended college at the Regents State University of New York, graduated

4    in 1994 with a Bachelor of Arts degree with a concentration in recreation and education,

5    began his professional career by becoming a certified Montessori teacher for children aged

6    between 3 and 6 years old, and moved to Arizona in late 2000. (Id. at 25-27, 56-57.)

7         Petitioner rented an apartment at Gentry Walk Apartments, located in Mesa at 1313

8    South Val Vista Drive. (Exh. E: R.T. 1/3/07, at 77; Exh. F: R.T. 1/4/07, at 86; Exh. G: R.T.

9    1/8/07, at 40-42; Exh. H: R.T. 1/9/07, at 5; Exh. I: R.T. 1/10/07, at 26, 32.) Petitioner

10   ultimately came to befriend numerous pre-adolescent children—including three of the four

11   charged victims (Danielle, Taylor, and Sheldon)—and their parents at this complex because

12   he spent "just about every day" at the community pool, solicited tenants to attend his

13   swimming lessons, brought balls and other water toys to pool parties, and played games like

14   Marco Polo, hide-and-seek, and shark with the children. (Exh. E: R.T. 1/3/07, at 67-68, 73;

15   Exh. F: R.T. 1/4/07, at 41-42, 44-46, 61, 64, 78, 93, 108; Exh. G: R.T. 1/8/07, at 41-44, 62;

16   Exh. H: R.T. 1/9/07, at 13-18, 24; Exh. I: R.T. 1/10/07, at 36-42, 52-53, 65-68, 72-74.)

17   Petitioner also threw these children into the water and let them ride his back. (Exh. E: R.T.

18   1/3/07, at 89-90; Exh. F: R.T. 1/4/07, at 51, 64, 69-70, 72-73, 78, 80; Exh. H: R.T. 1/9/07,

19   at 17; Exh. I: R.T. 1/10/07, at 39-40, 52.)

20        According to the record, Petitioner spent at least some time with children in the water

21   in the absence of their parents, including Denise S. and Dan A., who allowed their daughters

22   (Taylor and Danielle, respectively) to play in the pool after learning that Petitioner had

23   agreed to supervise them on their behalf. (Exh. E: R.T. 1/3/07, at 67, 110-12; Exh. F: R.T.

24   1/4/07, at 94-95, 100; Exh. G: R.T. 1/8/07, at 42-43, 57-58, 68, 70; Exh. I: R.T. 1/10/07, at

25   40-41.)

26   \\\

27   \\\

28                                          - 4 -

1

### a.     Luis A. (Count 7)

2      Born in June 1998, Luis attended the first grade at Tavan Elementary School in

3   Scottsdale, Arizona, while Petitioner worked there as an assistant instructional assistant in

4   the computer classroom. (Exh. E: R.T. 1/3/07, at 17-18, 20-21, 47-49, 60-61; Exh. F: R.T.

5   1/4/07, at 9; Exh. I: R.T. 1/10/07, at 30-31.) Luis knew Petitioner as "Mr. May," recalled that

6   Petitioner was tall and wore eyeglasses, and recognized that Petitioner was "a helper of the

7   computers" who came to his classroom "once in a while." (Exh. E: R.T. 1/3/07, at 20-21, 24,

8   30, 35, 94; Exh. F: R.T. 1/4/07, at 6-7.)

9      One day in early May 2005, Luis had a question during computer class, raised his

10  hand, and Petitioner—one of the adults serving the room's 20 students—came to his desk.

11  (Exh. E: R.T. 1/3/07, at 21-24, 37-38; Exh. F: R.T. 1/4/07, at 7, 9.) The record indicates that

12  while moving the computer's mouse with his right hand, Petitioner used his other hand to do

13  what Luis termed "a nasty thing." (Exh. E: R.T. 1/3/07, at 24-26, 36, 51-52; Exh. F: R.T.

14  1/4/07, at 7.) Luis testified that Petitioner "reached under the computer" and momentarily

15  rested his left hand over Luis' "private part," the part which Luis goes to the bathroom "to

16  pee" or do a "number one." (Exh. E: R.T. 1/3/07, at 26-29, 33, 36, 41.)

17     Luis "moved out of the desk because [Petitioner] was touching [his] private parts and

18  [asked] the teacher if [he] could go to the bathroom ... so [that he] could run." (Id. at 33, 40.)

19  Luis did not immediately report to his teacher what Petitioner had done because Luis was

20  "scared of telling him" and feared that "[he] was going to be embarrassed." (Id. at 40.)

21     Upon coming home from school that very day, Luis did tell his mother, Sandra, that

22  Petitioner (whom he called "Mr. May") had "touched his private part" and even mimicked

23  Petitioner's conduct by covering his "forbidden parts" with his left hand, wiggling his

24  fingers, and withdrawing his hand a short time afterwards. (Id. at 34-35, 42, 49-52, 58, 60.)

25  When Sandra inquired whether Petitioner's physical contact was accidental, Luis responded,

26  "No, mom, he did it on purpose." (Id. at 57.)

27

28

1    Although Sandra did not call the police, she did report the incident to the Tavan

2    Elementary School's principal the following day. (Id. at 53-54, 63-64.) After personally

3    interviewing Luis, the principal reported this molestation incident to law enforcement. (Id.

4    at 96-97, 99; Exh. F: R.T. 1/4/07, at 2-3, 24, 35-37.) Consequently, on May 17, 2005,

5    Phoenix Police Detective Phil Shores visited the school in civilian attire to interview Luis.

6    (Exh. F: R.T. 1/4/07, at 2-3, 5-6, 13.)

7    When Detective Shores asked Luis whether he knew the reason for their meeting, Luis

8    responded, "Is it about Mr. May?" (Id. at 6.) This question prompted Shores to ask Luis why

9    he had mentioned "Mr. May," and Luis answered that "he had done some nasty stuff to him"

10   during computer class. (Id. at 7, 20.) Shores subsequently testified that Luis elaborated that

11   Petitioner "came over and, in the process of helping him, placed his hand on his zipper area."

12   (Id. at 7-8.) To demonstrate what Petitioner had done, Luis pointed to his crotch and then

13   "laid his hand over the zipper area of his pants." (Id. at 8, 17.)

14   Detective Shores did not submit this case for prosecution because Luis, then a

15   6-year-old first-grader, could not recall any peripheral details (such as the names of the

16   students who sat next to him at the time of the incident), and because none of Luis'

17   classmates and teachers reported witnessing the molestation. (Id. at 9-10, 35-37.)

18   Nonetheless, the school district placed Petitioner on administrative leave during Shores'

19   investigation. (Exh. I: R.T. 1/10/07, at 51, 63.) Petitioner testified at trial that his employment

20   at Tavan Elementary terminated at the conclusion of his administrative leave, "due to the

21   investigation regarding Luis and [his] lack of interest in staying there and [his] lack of

22   interest in participating in the investigation there." (Id. at 86-87.)

23   When asked about Luis during his post-arrest interview with Mesa Police Detective

24   Manuel Verdugo on November 9, 2005, Petitioner responded that "he wished he could tell

25   [Verdugo] more than he could tell [Verdugo], but left it at that." (Exh. G: R.T. 1/8/07, at 86,

26   93.) At trial, Petitioner testified that he vaguely remembered Luis as a student in computer

27

28                                              - 6 -

1    class at Tavan Elementary, but claimed that he had no recollection of any one-on-one time

2    with Luis. (Exh. I: R.T. 1/10/07, at 47-49.)

3        **b.     Taylor S. and Danielle A. (Counts 1-4)**

4        Taylor and Danielle, who were best friends and only one school-grade apart, were two

5    of the many child residents at Gentry Walk who befriended Petitioner at the pool and knew

6    him as "Steve." (Exh. E: R.T. 1/3/07, at 66-69, 71, 113-16; Exh. F: R.T. 1/4/07, at 41-43;

7    Exh. G: R.T. 1/8/07, at 43, 45-46.) Taylor was born in December 1996, and Danielle was

8    born in September 1997. (Exh. E: R.T. 1/3/07, at 66, 70-71, 83, 108; Exh. F: R.T. 1/4/07, at

9    91-92; Exh. G: R.T. 1/8/07, at 40.)

10       During the summer months of 2005, Petitioner molested both girls at least twice by

11   touching their vaginas over their bathing suits while they sat on his lap inside Gentry Walk's

12   community swimming pool. (Exh. E: R.T. 1/3/07, at 70-77, 83-84, 105-06, 118-25, 135-36;

13   Exh. G: R.T. 1/8/07, at 83-85; Exh. H: R.T. 1/9/07, at 44-49; Exh. XX: DVD of Taylor's

14   forensic interview [Trial Exh. 25]; Exh. YY: DVD of Danielle's forensic interview [Trial

15   Exh. 26].) Petitioner molested both girls at Danielle's birthday pool party on the afternoon

16   of September 10, 2005. (Exh. E: R.T. 1/3/07, at 70-74, 83-84, 116-21.) Danielle's father,

17   Dan, invited Petitioner among 40 other guests to attend the party. (Id. at 116-118; Exh. F:

18   R.T. 1/4/07, at 91-93, 114.)

19       Upon seeing Petitioner at the shallow end of the pool, Taylor swam over to Petitioner

20   and sat on his lap. (Exh. E: R.T. 1/3/07, at 72-73.) While Taylor was sitting on his lap,

21   Petitioner placed his right hand "on top" of her "private" (her vagina). (Id. at 73-74, 81, 84;

22   R.T. 1/8/07, at 49; Exh. I: R.T. 1/10/07, at 9; Exh. XX: DVD of Taylor's forensic interview

23   [Trial Exh. 25].) Taylor testified that: (1) she and Petitioner were neither tickling nor playing

24   with each other at the time of the touching; (2) Petitioner said nothing to her while his hand

25   was on her vagina; and (3) Petitioner neither apologized for touching her vagina, nor ever

26   claimed that the contact was accidental in nature. (Exh. E: R.T. 1/3/07, at 77, 100, 105.) At

27   the time of this first incident, Taylor did not realize that Petitioner's touching was "bad at

28

1    all," but instead thought that Petitioner "didn't mean it," and even attributed the contact to

2    Petitioner "just being clumsy" and "playful"—even despite the fact Petitioner "would hold

3    [Taylor] by [her] private" whenever he threw her into the water. (Id. at 74, 77, 105.)

4         Taylor subsequently changed her mind, for several reasons: (1) she had matured,

5    "took the time to think about it," and better understood the sexual nature of Petitioner's

6    physical contact; (2) no one else had ever touched her vagina like Petitioner did; (3)

7    Petitioner touched her vagina again in the swimming pool when she again sat on his lap on

8    a subsequent afternoon after school; and (4) Taylor later learned that Petitioner touched

9    Danielle in the same fashion. (Id. at 75-77, 85, 87-88, 103-04, 124-25; Exh. XX: DVD of

10   Taylor's forensic interview [Trial Exh. 25].)

11        During her birthday party, Danielle saw Petitioner in the Jacuzzi, decided to join him,

12   and sat in a corner across from him. (Exh. E: R.T. 1/3/07, at 117-19.) Petitioner then moved

13   to Danielle's corner, put her on his lap, and manually touched her "down where he shouldn't

14   be touching [her]," specifically the "private parts" that she uses "to go to the bathroom" and

15   "pee," over her bathing suit. (Id. at 119-22, 123-24.) When Danielle tried to swim away and

16   indicated that she "didn't want to do that," Petitioner grabbed her and continued touching

17   her. (Id. at 119-20, 130.) Danielle did not immediately disclose this incident to her father

18   because she was afraid that he might become angry with her. (Id. at 124.)

19        The record indicates that this was not the first time that Petitioner had touched

20   Danielle's vagina because he engaged in the same behavior on an earlier occasion during a

21   barbeque pool party in the beginning of the summer of 2005. (Id. at 121-23.) Although

22   Danielle no longer had a recollection of the prior incident at the time of trial, she told Mesa

23   Police Detective Carman Johnson during a videotaped interview (Exh. YY: DVD of

24   Danielle's forensic interview [Trial Exh. 26]) that Petitioner came over, "put her" on "his

25   lap," and used his hand to touch her vagina over her bathing suit. (Id. at 122-24; Exh. F: R.T.

26   1/4/07, at 109, 114; Exh. G: R.T. 1/8/07, at 83; Exh. H: R.T. 1/9/07, at 44-49, 54-55.)

27

28                                        - 8 -

1    During both of these incidents, Petitioner continued to touch Danielle's vagina,

2    despite her demands to "stop." (Exh. E: R.T. 1/3/07, at 130, 135-37; Exh. F: R.T. 1/4/07, at

3    109.) Danielle told Detective Johnson that Petitioner touched her "every time she went to the

4    pool." (Exh. H: R.T. 1/9/07, at 54; Exh. YY: DVD of Danielle's forensic interview [Trial

5    Exh. 26].)

6    Neither Dan nor Denise—single parents and friends who took turns babysitting each

7    other's daughters—suspected that Petitioner had been molesting Danielle and Taylor until

8    November 3, 2005, when a former Gentry Walk resident, Mary Jimenez-Cruz, mentioned

9    Denise's name to Mesa Police Department Officer Barbara Marquez while reporting that she

10   had witnessed Petitioner engaging in misconduct (unrelated to the charges in this case) at the

11   community pool that past summer. (Exh. F: R.T. 1/4/07, at 86-87, 94-95, 101-03, 107; Exh.

12   G: R.T. 1/8/07, at 43-44, 47, 53, 55, 64-66, 75, 95-96.) While questioning Denise later that

13   day, Officer Marquez obtained Dan's telephone number. (Exh. F: R.T. 1/4/07, at 86-87; Exh.

14   G: R.T. 1/8/07, at 47-48, 59.)

15   At 10:00 p.m. that night, Marquez related to Dan the information that Mary had

16   provided; when Dan announced his plan to speak with Danielle, Marquez asked Dan to call

17   the police if Danielle disclosed "something different." (Exh. F: R.T. 1/4/07, at 87, 94,

18   103-04, 115-16.) Dan then called Denise to report that he was coming to her apartment to

19   pick up Danielle, whom Taylor and Denise were hosting for a sleepover that night. (Exh. F:

20   R.T. 1/4/07, at 116-17; Exh. G: R.T. 1/8/07, at 59-60.) After returning home, Danielle finally

21   told her father that Petitioner molested her during two summer pool parties—the first

22   celebrating the end of the school year and the second celebrating her birthday in early

23   September 2005: (1) Petitioner made Danielle sit on his lap while they were in the Jacuzzi

24   together; (2) Danielle told Petitioner that she did not want to stay and swam away; (3)

25   Petitioner captured Danielle and made her sit on his lap again, even though she told him to

26   stop; and (4) Petitioner manually touched Danielle's "private parts" (vagina) over her bathing

27   suit. (Exh. F: R.T. 1/4/07, at 97, 102, 108-10, 114, 116.)

28

1    The following morning, Dan reported Danielle's disclosure to Officer Marquez, who

2    advised Dan to not confront Petitioner and to keep Danielle from discussing this topic with

3    anyone else, including Taylor. (Id. at 98, 110.) Dan also telephoned Denise and told her to

4    speak with Taylor, but did not inform her that Danielle had reported being molested by

5    Petitioner. (Id. at 99; Exh. G: R.T. 1/8/07, at 49, 51.) When Denise spoke with Taylor, she

6    was likewise surprised to learn belatedly that Petitioner had molested Taylor in the

7    swimming pool. (Exh. G: R.T. 1/8/07, at 48-49, 51, 53-54, 75.)

8    On November 8, 2005, Dan and Denise drove their daughters to the Mesa Police

9    Department's headquarters for forensic interviews by Detective Carmen Johnson (Danielle)

10    and Detective Quihuiz (Taylor). (Exh. G: R.T. 1/8/07, at 61, 74-75, 81-84; Exh. H: R.T.

11    1/9/07, at 44-49; Exh. I: R.T. 1/10/07, at 6-7; Exh. XX: DVD of Taylor's forensic interview

12    [Trial Exh. 25]; Exh. YY: DVD of Danielle's forensic interview [Trial Exh. 26].) Danielle

13    and Taylor's parents prevented them from speaking with each other before these forensic

14    interviews and avoided any discussion about Petitioner during the ride to the police station.

15    (Exh. F: R.T. 1/4/07, at 110; Exh. G: 1/8/07, at 70-71, 74-75, 82.) Denise did tell Taylor,

16    however, the reason why they were driving to the police station that day. (Exh. G: R.T.

17    1/8/07, at 70-71.)

18    On November 9, 2005, Detective Verdugo arrested Petitioner, who waived his rights

19    and agreed to answer questions during a videotaped post-arrest interview. (Exh. G: R.T.

20    1/8/07, at 86-88, 112-13; Exh. ZZ: DVD of Petitioner's Interview [Trial Exh. 27].) Verdugo

21    later testified that Petitioner "had trouble maintaining eye contact" with him during the

22    post-arrest interview. (Exh. G: R.T. 1/8/07, at 118-19.) Verdugo found Petitioner's demeanor

23    "atypical" in that Petitioner seemed "not concerned" throughout the entire interview,

24    remained silent whenever Verdugo ceased asking questions, never became angry or

25    emotional when Verdugo revealed the nature of the allegations and accused Petitioner of

26    falsely denying them, and even asked Verdugo questions about which children were involved

27    in the investigation. (Id. at 88-92, 114.) Petitioner claimed that he did not know why he was

28    - 10 -

being accused, stated that he had no reason to be remorseful, and denied any recollection of such episodes. (Id. at 94, 99, 103-05, 109-111.)

Although Danielle and Taylor were the only Gentry Walk residents who had reported being molested, Verdugo mentioned several other children who also frequented the complex's community pool—including Ryder, Sheldon, Mary, and Kevin—and asked Petitioner whether he had touched them inappropriately. (Exh. G: R.T. 1/8/07, at 89, 122; Exh. I: R.T. 1/10/07, at 39, 65-66; Exh. ZZ: DVD of Petitioner's Post-Arrest Interview.) At one point during the interview, Petitioner claimed that "he didn't even know a half a dozen children," a misstatement that Petitioner later admitted at trial, but which he could not explain. (Exh. I: R.T. 1/10/07, at 65-66.) Petitioner also told Verdugo during the interview that he did not know Sheldon. (Id. at 67; Exh. ZZ: DVD of Petitioner's Interview [Trial Exh. 27].)

While relating Petitioner's response to the question whether he had ever touched Taylor in the swimming pool, Detective Verdugo testified:

> Due to the allegations, I asked him if he had any reason to touch her while she was swimming pool or helping her. He said he accidentally had. He said when he did touch ... her ... that it was by the feet and shoulder and the knees when he was throwing her in the pool. At one point, I asked if he could have accidentally touched her when he was throwing her, and he stated that he had not.

(Exh. G: R.T. 1/8/07, at 89-90.) When asked about how he threw children in the pool, Petitioner answered that "he picked them up from the knees, feet, and shoulders." (Id. at 120.) In response to Verdugo's inquiry whether "he touched them in such a manner where … it would be perceived [as] touching them inappropriately," Petitioner said that "he did not." (Id.)

When Detective Verdugo asked Petitioner whether he had ever touched Danielle, Petitioner simply responded, "[N]o, I didn't." (Id. at 90.) Petitioner told Verdugo that he did not touch Danielle and Taylor "in such a manner [while throwing them in the pool that] would be perceived [as] touching them inappropriately." (Id. at 120.) At trial, however,

1    Petitioner abandoned these pretrial statements by testifying that he might "have touched
2    [them] in the general areas of their genitals," albeit not intentionally, knowingly, or with any
3    sexual motivation. (Exh. I: R.T. 1/10/07, at 39-41, 56.)

4           The State called Linda Cano—who supervised and befriended Petitioner during his
5    employment with the City of Tempe's Special Olympics program—to testify that when she
6    had lunch with Petitioner in mid-April 2006, she broached the topic of Petitioner's
7    sexual-misconduct charges, but Petitioner answered all inquiries with the reply, "I don't
8    remember." (Exh. G: R.T. 1/8/07, at 6-10, 26.)

9           **c.       Sheldon H. (Counts 5-6)**

10          Born in mid-March 1996, Sheldon and his family resided at Gentry Walk Apartments.
11   (Exh. F: R.T. 1/4/07, at 40, 58-59; Exh. G: R.T. 1/8/07, at 33-34.) When Sheldon and his
12   older brother, Parlo, went to the community pool in August 2004, they met Petitioner playing
13   hide-and-seek with Danielle, Taylor, and other children in the Jacuzzi. (Exh. F: R.T. 1/4/07,
14   at 40-42.) Unlike many other children in the complex, Sheldon and Parlo were rarely ever
15   accompanied by their parents when they frequented the pool. (Id. at 60; Exh. I: R.T. 1/10/07,
16   at 41-42.)

17          Almost always at Sheldon's request, Petitioner picked Sheldon up and threw him into
18   the water several times. (Exh. F: R.T. 1/4/07, at 51, 69, 73.) Sheldon alleged that Petitioner
19   had manual contact with his penis on two separate occasions—first in mid-August 2004, and
20   second shortly after July 4, 2005. (Id. at 46-56, 60, 72.) While using the water pitcher kept
21   near the witness stand as a prop to illustrate his testimony, Sheldon testified that: (1)
22   Petitioner picked him up with the left hand on the middle of Sheldon's back and the right
23   hand resting on his "front private spot," the body part that Sheldon used to "pee" and called
24   his "dick"; and (2) during the "second" time during which he was airborne and about to be
25   thrown into the water, Sheldon shifted Petitioner's right hand to his stomach area, but
26   Petitioner then replaced his hand over Sheldon's genitals. (Id. at 46-50, 67-69, 72; Exh. G:
27   R.T. 1/8/07, at 33.) Sheldon additionally claimed that Petitioner caused Sheldon to rub his

28

penis against Petitioner's buttocks on several non-charged occasions by placing Sheldon against his back and suddenly shifting positions to make Sheldon slide down his back. (Exh. F: R.T. 1/4/07, at 63-64, 67-68, 70-71, 80.)

Sheldon initially believed that Petitioner's manual contact with his penis was accidental and continued to ask Petitioner to throw him into the water, even though he had witnessed Petitioner employing different holding techniques while throwing other children into the water. (Id. at 63, 66, 78-83.) Sheldon changed his mind about the inadvertent nature of Petitioner's manual contact with his penis, allegedly because Denise (Taylor's mother) told him that the touching was not accidental. (Id. at 79, 82-83.)

Sheldon's mother, Tisha, did not learn that Petitioner had touched Sheldon inappropriately until she had a conversation with a neighbor sometime after the police arrested Petitioner on November 9, 2005. (Exh. G: R.T. 1/8/07, at 32, 38, 85-87.) Because Sheldon became upset and refused to talk when Tisha broached this topic, she had her husband and Sheldon's stepfather, Fernando, question Sheldon about Petitioner. (Id. at 32.) Sheldon told Fernando that: (1) he estimated that Petitioner had touched his "privates" four times while they were in the swimming pool; (2) Sheldon did not initially believe that Petitioner touched his penis intentionally, but changed his mind because whenever Sheldon pushed Petitioner's hand away from his genitals, Petitioner returned his hand to Sheldon's penis; and (3) he did not tell anyone sooner because he was frightened. (Id. at 32-33, 38.)

On November 16, 2006, Detective Verdugo interviewed Sheldon, who reported: (1) Petitioner placed his hand on Sheldon's genitals while throwing him in the pool; (2) although Sheldon removed Petitioner's hand from his penis, Petitioner returned his hand to its prior location; (3) Petitioner's contact with Sheldon's penis was with an open hand; (4) Sheldon initially thought this contact was accidental; and (5) Petitioner made Sheldon rub his penis against Petitioner's back by forcing Sheldon to slide downward while on Petitioner's shoulders. (Exh. G: R.T. 1/8/07, at 85-86, 90-91, 99-102.)

1   The following constituted the evidence and arguments presented by defense counsel
2   on Petitioner's behalf:

3   Attorney Thompson presented Petitioner's defense by cross-examining every
4   prosecution witness, except Officer Marquez (Exh. F: R.T. 1/4/07, at 85-87), and presenting
5   the testimony of three witnesses—Desiree Wells, Detective Quihuiz, and Petitioner. (Exh.
6   E: R.T. 1/3/07, at 36-44 [Luis A.]; id. at 57-62 [Sandra Martinez]; id. at 80-103 [Taylor S.];
7   id. at 126-33, 138 [Danielle A.]; Exh. F: R.T. 1/4/07, at 11-25 [Detective Shores]; id. at
8   57-71, 82-83 [Sheldon H.]; id. at 100-08, 117 [Dan A.]; Exh. G: R.T. 1/8/07, at 10-23, 28-30
9   [Linda Cano]; id. at 34-36 [Fernando Lopez]; id. at 55-67, 76-77 [Denise S.]; id. at 93-108
10  [Detective Verdugo]; Exh. H: R.T. 1/9/07, at 5-19, 28-31 [Desiree Wells]; id. at 50-56, 63
11  [Detective Johnson]; Exh. I: R.T. 1/10/07, at 5-13, 18-19 [Detective Quihuiz] 25-56, 74-76,
12  97 [Petitioner].)

13  Because Judge Stephens did not grant his motion to sever all counts, Thompson had
14  to counter two different sets of victims: (1) Luis—the sole child to allege that Petitioner
15  touched his penis in a classroom setting; and (2) Taylor, Danielle, and Sheldon—children
16  who lived in the same apartment complex and claimed to have been molested in the Gentry
17  Walk community swimming pool. The Phoenix Police Department investigated Luis'
18  molestation report, while the Mesa Police Department was responsible for the charges
19  involving the three Gentry Walk children.

20  Although Thompson subsequently testified at Petitioner's PCR proceeding that he told
21  Petitioner's parents that he could not "bring in witnesses to testify that [Petitioner] had 15
22  other opportunities to molest children and didn't" (Exh. CC: R.T. 9/7/11, at 19), Thompson
23  nonetheless presented trial testimony that informed the jurors that other people had observed
24  Petitioner interacting with children, but had not observed Petitioner initiating sexual contact
25  with any minor. On cross-examination, Thompson elicited Linda Cano's testimony that: (1)
26  she had hired Petitioner to work in the Special Olympics program, wherein approximately
27  80% of the athletes were under 18 years of age; (2) Petitioner worked for Linda from October

28

2004 to December 2005; (3) Petitioner not only helped coach athletes in swimming, speed skating, golf, and ice skating, but also attended basketball games and practices; and (4) Linda never received any complaints about Petitioner from any of the athletes, their parents, or other staff members who attended or participated in these events. (Exh. F: R.T. 1/4/07, at 6, 10-13, 18-22.) During closing argument, Thompson reminded the jurors that Linda had received no complaints about Petitioner during his employment at her program. (Exh. I: R.T. 1/10/07, at 144.)

Thompson also called a Gentry Walk resident, Desiree Wells, to testify that: (1) she allowed Petitioner to play with and give swim lessons to her 6-year-old daughter, Teagan; (2) she had watched Petitioner interact with children in the community swimming pool on many occasions, but had never seen Petitioner "focusing" on or "isolating a specific child"; (3) on more than 20 occasions, Desiree saw Petitioner playing with Taylor, Danielle, and Sheldon, and never saw "any inappropriate conduct or inappropriate touching"; and (4) Desiree noted that at least 30 people, including at least 10 adults, attended the birthday pool party at which Petitioner was accused of molesting Taylor and Danielle. (Exh. H: R.T. 1/9/07, at 5, 17-18, 29-31.) During closing argument the very next day, Thompson revisited Desiree's testimony that she also has a daughter who never saw Petitioner engage in any inappropriate touching. (Exh. I: R.T. 1/10/07, at 140.)

Although Petitioner denied any recollection of ever touching any child's genitals, Thompson nevertheless sought to alternatively establish that any such contact was accidental, unintentional, and therefore misconstrued as sexually motivated by eliciting testimony that:

(1) Petitioner neither told the charged victims not to tell anyone that he had touched their genitals, nor threatened them with adverse consequences should they disclose such contact; instead, Petitioner said nothing at all during and immediately after the incident. (Exh. E: R.T. 1/3/07, at 42 [Luis]; id. at 100-01 [Taylor]; id. at 131 [Danielle]; Exh. F: R.T. 1/4/07, at 18-19 [Luis]; id. at 67-69 [Sheldon]; Exh. G: R.T. 1/8/07, at 99-100 [Sheldon]; Exh. I: R.T. 1/10/07, at 146, 153 [closing argument].)

(2) Petitioner never rubbed, penetrated, or pinched the victims' genitalia. Instead, Petitioner placed his open hand over the crotch area of their pants or bathing suit, where it remained stationary for a brief period of time. (Exh. E: R.T. 1/3/07, at 41, 60, 62 [Luis]; id. at 87 [Taylor]; id. at 130 [Danielle]; Exh. F: R.T. 1/4/07, at 17-18

- 15 -

[Luis]; id. at 102 [Danielle]; Exh. G: R.T. 1/8/07, at 102 [Sheldon]; Exh. H: R.T. 1/9/07, at 55 [Danielle]; Exh. I: R.T. 1/10/07, at 9, 12 [Taylor]; id. at 153 [closing argument].)

(3) Two of the three Gentry Walk victims initially believed that Petitioner had accidentally touched their genitals. (Exh. E: R.T. 1/3/07, at 80-81, 84-85, 87 [Taylor]; Exh. F: R.T. 1/4/07, at 66 [Sheldon]; Exh. G: R.T. 1/8/07, at 102 [Sheldon]; Exh. I: R.T. 1/10/07, at 8, 11 [Taylor]; id. at 152 [closing argument].)

(4) All four victims testified that Petitioner touched their genitals on occasions when other adults and children were present. (Exh. E: R.T. 1/3/07, at 37-38 [other students and teachers in Luis' classroom]; id. at 112 [Taylor] id. at 129-31, 133 [Danielle]; Exh. F: R.T. 1/4/07, at 65 [Sheldon]; Exh. H: R.T. 1/9/07, at 29-31 [Danielle's birthday pool party]; id. at 54 [Danielle]; Exh. I: R.T. 1/10/07, at 146 [closing argument].) Petitioner also testified that he never threw any children in the water unless there were other adults present, that Dan and Denise were frequently at the pool when he played with their daughters, and that there were other students and teachers in Luis' classroom. (Exh. I: R.T. 1/10/07, at 39-40, 43, 46-47, 52, 88.)

(5) Although he previously denied ever touching any child inappropriately, Petitioner testified that any possible manual contact with their genitals was accidental and therefore neither intentional nor sexually motivated. (Exh. G: R.T. 1/8/07, at 89-90, 103-05, 109-11, 120; Exh. I: R.T. 1/10/07, at 34-35, 49, 56.)

While cross-examining all four victims and/or during closing argument, Thompson elicited testimony or made closing remarks that emphasized the following flaws in the victims' accounts:

• Luis had given inconsistent statements about whether Petitioner had squeezed his penis or merely rested his open hand over his genitals. (Exh. E: R.T. 1/3/07, at 15, 33, 41, 44, 51-52, 58-60; Exh. I: R.T. 1/10/07, at 135.)

• Luis seemed uncertain about whether Petitioner had facial hair at the time of the incident. (Exh. E: R.T. 1/3/07, at 28-29, 99; Exh. I: R.T. 1/10/07, at 135.)

• Luis did not tell his mother the name of the man who molested him. (Exh. E: R.T. 1/3/07, at 65; Exh. I: R.T. 1/10/07, at 135.)

• The State did not call Luis' teacher (whose name Luis could not recall at trial) to corroborate Luis' testimony that he asked to go to the bathroom after the incident. (Exh. E: R.T. 1/3/07, at 37; Exh. I: R.T. 1/10/07, at 136.) Nor did Luis tell his teacher what happened when he returned. (Exh. E: R.T. 1/3/07, at 37, 40.)

• Luis could not make an in-court identification of Petitioner at trial. Thompson argued that Luis identified Petitioner from one of the several photographs shown to him during trial only because he had seen Petitioner, but none of the other depicted men, in the courtroom. (Id. at 31-32, 93-95; Exh. I: R.T. 1/10/07, at 137.)

• Luis did not recall speaking with Detective Shores at school. (Exh. E: R.T. 1/3/07, at 43-44.) Shores testified that he did not even submit Luis' case to the county attorney for charging because Luis could not recall peripheral details, and there was

no corroborating evidence. (Exh. F: R.T. 1/4/07, at 10, 15-16; Exh. I: R.T. 1/10/07, at 137.)

• Luis had not only spoken with the prosecutor, Deputy County Attorney John Beatty, by telephone before trial, but had also visited Beatty that day at the Maricopa County Attorney's office. (Exh. E: R.T. 1/3/07, at 43.)

• Danielle's recall of events changed during her forensic interview, which contained inconsistent statements. (Exh. I: R.T. 1/10/07, at 138; Exh. YY: DVD of Danielle's forensic interview [Trial Exh. 26].)

• Danielle could not recall during trial: (1) whether the September pool party during which Petitioner molested her was on a school Friday or a weekend day; (2) whether she had told Detective Johnson that Petitioner touched her every time she went to the pool; (3) whether she told Petitioner to stop; and (4) how many people attended her birthday pool party. (Exh. E: R.T. 1/3/07, at 127-30.)

• Taylor could not recall the charged incidents very clearly during trial and therefore was uncertain about: (1) which days of the week Petitioner molested her; (2) whether Petitioner rested or moved his hand while it was touching her vagina; and (3) whether she sat on Petitioner's lap; and (4) which bathing suit she wore during the charged events. (Exh. E: R.T. 1/3/07, at 82-87, 102-03; Exh. G: R.T. 1/8/07, at 67.)

• Taylor initially believed that Petitioner had accidentally touched her, but attributed her change of mind to growing older and maturing. (Exh. E: R.T. 1/3/07, at 80, 84-85, 87; Exh. I: R.T. 1/10/07, at 11, 138-39.)

• Sheldon initially told Detective Verdugo that Petitioner had touched his penis just once, but later reported additional incidents; Sheldon also gave different dates for when these incidents occurred. (Exh. F: R.T. 1/4/07, at 67, 99-100; Exh. G: R.T. 1/8/07, at 105.)

• Sheldon initially believed that Petitioner touched him accidentally, but changed his mind after talking to Denise, who allegedly told him that it was not an accident. (Exh. F: R.T. 1/4/07, at 82-83; Exh. I: R.T. 1/10/07, at 137, 142.)

In support of his opening statement's assertion that "children's memories are fragile"

(Exh. E: R.T. 1/3/07, at 9), Thompson launched a three-pronged defense against the charges

involving Taylor, Danielle, and Sheldon by presenting evidence and argument suggesting

that their allegations were the false products of three factors:

(1) By participating in "playground gossip" about Petitioner allegedly molesting other children, Taylor, Danielle, and Sheldon convinced themselves that Petitioner had purposefully touched their genitals while in the swimming pool.

(2) The first adults to speak with these children were their parents who had "loaded agendas," lacked training in proper forensic interview techniques, and therefore reinforced the allegations against Petitioner with suggestive questions.

(3) While forensically interviewing Taylor and Danielle, Detectives Quihuiz and Johnson deviated from the protocol that Detective Shores detailed by asking unduly suggestive questions that "plant[ed] information in a big way" in the recollections of both victims.

To counter the State's evidence that Petitioner seemed "unconcerned" and failed to offer any information whatsoever about the charged incidents during his post-arrest interview, Thompson elicited testimony to support the theory that Petitioner's repeated professions of ignorance were attributable to two factors:

(1) Detective Verdugo withheld necessary details about the allegations and choosing instead to ask Petitioner very general questions, such as, "Why do you think you are here?" "What's going on at the pool?" and "Tell me about Taylor?" (Exh. G: R.T. 1/8/07, at 94, 99, 103-04 [cross-examination of Detective Verdugo]; Exh. I: R.T. 1/10/07, at 34-35, 97 [Petitioner's testimony explaining that he answered, "I don't know," because Verdugo did not provide sufficient information to answer his questions, not because Petitioner was trying to be evasive]; id. at 149-50 [closing remarks criticizing Verdugo's opened-ended questioning techniques].)

(2) Petitioner had no reason to recall specifics about his frequent interaction with children in the swimming pool. (Exh. E: R.T. 1/3/07, at 16 [opening statement reporting that Petitioner could not provide Detective Verdugo with any detailed information regarding the charged victims because there was "nothing memorable" about playing with children in the pool "months" before the interview].)

Thompson also elicited Petitioner's testimony that he was "very nervous" during the interview because he had no prior arrests, and that Petitioner's trembling was attributable to an untreatable neurological condition that caused his head to move from side to side involuntarily. (Exh. I: R.T. 1/10/07, at 33-35.) Verdugo conceded that Petitioner mentioned this neurological condition at the end of questioning, but Verdugo terminated the interview without obtaining additional information. (Exh. G: R.T. 1/8/07, at 106-08.)

As to the jury instructions, Petitioner asked Judge Stephens to charge the jury that the State had the burden of proving, beyond a reasonable doubt, that Petitioner intentionally or knowingly, and with the motivation of a sexual interest, directly or indirectly touched the genitals of a child under 15 years of age. (Exh. H: R.T. 1/9/07, at 71-73.) In support of his position that "the State [was] obligated to prove a motivation of sexual interest as an element of the offense" (id. at 71-72), Petitioner relied exclusively upon Arizona Senate Bill 1145's

- 18 -

amendments to the statutory definition of "affirmative defense" set forth in A.R.S. § 13-103(B):

> My reference is to the amended Senate Bill 1145, effective date April 24, '06, which, in effect, abolishes common law and affirmative defenses. In pertinent part, the amended Arizona Revised Statutes 13-103B states [that an] affirmative defense does not include any justification defense or [a] defense that either denies an element of the offense charged or denies responsibility, including misidentification or lack of intent.
>
> My view is that that establishes that there is no necessity remaining as there was under the previous circumstance where lack of intent would be an affirmative defense for the defendant to prove by a preponderance of the evidence that allegation. I believe that with the amendment to the statute, the State is obliged to prove beyond a reasonable doubt that the defendant was motivated by sexual interest. I think that is part of the offense that's charged.

(Id. at 72-73.)

The prosecutor ultimately opposed this instruction on three grounds: (1) A.R.S. § 13-1410 (A) did not include sexual motivation as an element of child molestation; (2) A.R.S. § 13-1407(E) established "lack of sexual motivation" as an affirmative defense that A.R.S. § 13-205(A) required Petitioner to prove by a preponderance of the evidence; and (3) the recent amendments to Sections 13-103 and 13-205(A) affected only the justification defenses set forth in Chapter 4 of Arizona's criminal code. (Exh. A: P.I., Item 212.) Petitioner responded by reiterating his position that, under "the current state of [Section] 13-103, it is the state's burden to prove a lack of sexual motivation beyond a reasonable doubt." (Exh. I: R.T. 1/10/07, at 100.)

Judge Stephens sustained the State's objection to Petitioner's proposed instruction. (Id. at 100-01.) Because Petitioner intended to argue his lack of sexual motivation to the jury, Judge Stephens gave the following jury instructions, over his objection:

> The crime of molestation of a child requires proof that the defendant knowingly touched, directly or indirectly, the genitals of a child under the age of 15. It's a defense to child molestation that the defendant was not motivated by sexual interest.
>
> The defendant has raised the affirmative defense of lack of sexual motivation with respect to the charged offense of child molestation. The burden of proving each element of the offense beyond a reasonable doubt always remains on the State. However, the burden of proving the affirmative defense of lack of sexual

- 19 -

1
2
3

> motivation is on the defendant. The defendant must prove the affirmative defense of lack of sexual motivation by a preponderance of the evidence. If you find that the defendant has proved the affirmative defense of lack of sexual motivation by a preponderance of the evidence, you must find the defendant not guilty of the offense of molestation of a child.

4   (Id. at 107-08.)

5       Judge Stephens also instructed the jurors that they could not convict Petitioner without

6   finding, beyond a reasonable doubt, that he performed a voluntary act:

7
8
9

> Before you may convict the defendant of the charged crimes, you must find the State proved beyond a reasonable doubt that the defendant committed a voluntary act or omitted to perform a duty imposed upon the defendant by law that the defendant was capable of performing.

10
11

> A voluntary act means a bodily movement performed consciously and as a result of effort and determination. You must consider all the evidence in deciding whether the defendant committed the act voluntarily or failed to perform the duty imposed on the defendant.

12   (Id. at 107.)

13       To nullify the risk that the jury might convict Petitioner on one charge merely because

14   it found him guilty on another count, Judge Stephens instructed the jurors:

15
16
17

> Each count charges a separate and distinct offense. You must decide each count separately on the evidence with the law applicable to it uninfluenced by your decision on any other count. You may find that the State has proved beyond a reasonable doubt all, some, or none of the charged offenses. Your finding for each count must be stated in a separate verdict.

18   (Id. at 106-07.)

19       During the second day of deliberations, the jury submitted several questions

20   acknowledging this separate-counts instruction, but inquiring whether evidence regarding

21   one crime could serve as corroboration with respect to other charged offenses:

22
23

> Can we use [corroborating] evidence? Yes or no[?] (In reference to page 7 of the final instructions that each count is a separate and distinct offense?)

24

> Is the information labelled "separate counts" on page 7 of the final instructions one and the same with the term [corroboration]?

25
26

> All 7 counts are distinct and separate counts but they involve the same subject. Can we use [corroboration]?

27

> The evidence we have heard on certain counts appears to [corroborate] the information on the other counts. The instructions say, "Each count charges a

28

separate and distinct offense. You must decide … on any other count." (Page 7 of the final instructions.) Can the evidence provided to support one allegation lend support to a separate allegation?

(Exh. A: P.I., Items 213-17; Exh. J: R.T. 1/12/07, at 4-6.)

In response, Judge Stephens provided the following supplemental instruction:

Evidence of other acts has been presented. You may consider this evidence only if you find the State has proved by clear and convincing evidence that the defendant committed these acts. You may only consider this evidence to establish the defendant's motive, opportunity, intent, plan, [or] absence of mistake or accident. You must not consider this evidence to determine the defendant's character or character trait, or to determine that the defendant acted in conformity with the defendant's character or character trait and therefore committed the charged offense.

(Id.)

On January 12, 2007, and after almost 2 full days of deliberations, the jurors sent the court a note indicating that they were deadlocked. (Exh. A: P.I., Item 218; Exh. B: M.E., Item 220; Exh. J: R.T. 1/12/07, at 8.) At 2:55 p.m., Judge Stephens gave the jurors the following instructions to help them address their impasse:

Ladies and gentlemen, I … have received your note indicating that you are at deadlock in your deliberations. I have some suggestions to help you in your deliberations but not to force you to reach a verdict. I am trying to be responsive to your apparent need for help. I do not wish or intend to force a verdict. Each juror has a duty to consult with one another to deliberate with a future reading, an agreement if it can be done without violence to individual judgment[.] … [H]owever you may want to identify areas of agreement and disagreement and discuss the law and the evidence as they relate to those areas of disagreement.

If you still disagree, you may wish to tell the attorneys and me which issues you need assistance with. If you decide to follow this suggestion, please write down those questions of fact or law and give the note to the bailiff.

(Exh. J: R.T. 1/12/07, at 8.) The court then asked the foreman to "go back with your fellow jurors and discuss the most recent instructions that I have given and you can send a note back to me through the bailiff and let us know how you would like to proceed." (Id. at 9.)

Less than 30 minutes later, the foreman sent another note that Judge Stephens construed as a report of continued deadlock. (Id.; Exh. A: P.I., Item 219; Exh. B: M.E., Item

- 21 -

220.) After reassembling the jurors in the courtroom, Judge Stephens made the following statements:

> Ladies and gentlemen, I have received your most recent note and based upon the information contained in that note and discussing it with the attorneys, I'm going to declare a mistrial. I know you are disappointed not to be able to reach a verdict, but sometimes that happens. Some cases are more difficult to resolve than others.
>
> On behalf of the members of the participants in this trial, I want to thank you for your service to the community. You have gone above and beyond what we typically ask jurors to do and [are] most grateful for your time and attention. The attorneys indicated that they may wish to speak with you. You are certainly under no obligation to do so.
>
> If you are willing to speak with the lawyers, I would ask that you wait back in the jury room, and they will be in shortly.
>
> Again, thank you very much for your time and attention. You are excused. Have a good weekend.

(Exh. J: R.T. 1/12/07, at 9-10.) The jurors then left the courtroom. (Id. at 10; Exh. B: M.E., Item 220.)

While Judge Stephens, counsel, and Petitioner were rescheduling the retrial date inside the vacated courtroom, the jurors advised "the bailiff ... that they do not wish to have a hung jury and wish to continue deliberating and wish to communicate that [desire] to counsel." (Exh. B: M.E., Item 220; Exh. J: R.T. 1/12/07, at 10-11.) The bailiff related this development to the trial court, but not before the proceedings had adjourned at 3:27 p.m. (Exh. B: M.E., Item 220.)

Judge Stephens then had an off-the-record discussion with counsel, made an on-the-record announcement at 3:29 p.m. that the jurors wished to resume their deliberations, and inquired whether either party objected. (Id.; Exh. J: R.T. 1/12/07, at 10-11.) Because neither Petitioner nor the State opposed the jurors' request, Judge Stephens vacated her mistrial declaration and allowed the jurors to resume deliberating at 3:47 p.m. (Exh. B: M.E., Item 220; Exh. J: R.T. 1/12/07, at 11.) The jurors adjourned for the weekend recess at 4:47 p.m. (Id.)

On January 16, 2007, the jury resumed its deliberations, recessed for lunch at 12:11 p.m., resumed deliberating at 1:37 p.m., and reconvened in the courtroom at 3:16 p.m. to announce its verdicts on all seven counts. (Exh. B: M.E., Item 233.) The jurors found Petitioner guilty as charged on the charges involving Taylor S. (Counts 1 and 2), Danielle A. (Counts 3 and 4), and Luis A. (Count 7), but acquitted him of the two counts involving Sheldon H. (Counts 5 and 6). (Exh. A: P.I., Items 224-30; Exh. B: M.E., Item 233; Exh. L: R.T. 1/16/07, at 3-6.) Judge Stephens polled the jurors individually to verify that each juror personally assented to these verdicts. (Exh. B: M.E., Item 233; Exh. L: R.T. 1/16/07, at 5-6.) After thanking the jurors for their service, Judge Stephens told them, "If you wish to speak with the attorneys, you can wait back in the jury room, and they will be in shortly. You are certainly under no obligation to do so, and you are free to leave." (Exh. L: R.T. 1/16/07, at 8.)

On January 18, 2007, Judge Stephens dismissed Count 8 without prejudice because Nicholas' parents reported their inability to procure counseling before the trial date and expressed grave concern that forcing Nicholas to testify as scheduled would cause significant emotional harm. (Exh. B: M.E., Item 240; Exh. M: R.T. 2/16/07, at 4-12.)

On January 26, 2007, Petitioner filed a motion for new trial, pursuant to Arizona Rule of Criminal Procedure 24.1, arguing: (1) the verdicts were contrary to the weight of the evidence; (2) Judge Stephens erroneously denied Petitioner's motion for direct verdicts of acquittal; (3) Count 7 involving Luis should have been severed from Counts 1 through 6; and (4) the final jury instructions violated Arizona law by mischaracterizing the defense of lack of sexual motivation as an affirmative defense. (Exh. A: P.I., Item 241.) Judge Stephens found these arguments groundless and accordingly denied this motion. (Exh. M: R.T. 2/16/07, at 6-7.)

On February 8, 2007, Thompson submitted for Judge Stephens' consideration a mitigation package, including letters from more than 40 friends and relatives and photocopies of seven medical records that Petitioner's pediatrician, Dr. Arnold Gold, authored between

April 15, 1974, and December 9, 1983. (Exh. A: P.I., Item 244; Exh. M: R.T. 2/16/07, at 4-6.) On February 16, 2007, Thompson filed a sentencing memorandum that recommended the imposition of mitigated 10-year prison terms per count, with Petitioner receiving concurrent prison terms for each set of "paired counts relating to Taylor and Danielle," so that Petitioner would receive the mandatory minimum aggregate sentence of 30 calendar years' imprisonment. (Exh. A: P.I., Item 246, at 4.)

Prior to imposing sentence, Judge Stephens acknowledged the statutorily available option of ordering concurrent prison sentences for the molestation counts involving the same victims (Taylor and Danielle), but nonetheless concluded that "justice" warranted the imposition of consecutive sentences on all five convictions "because of the nature of these offenses." (Exh. M: R.T. 2/16/07, at 29.) Consequently, Judge Stephens imposed five consecutive, flat, and slightly mitigated 15-year prison terms, with credit for 170 days of pretrial incarceration on Count 1. (Id. at 29-30; Exh. B: M.E., Item 253.)

On February 16, 2007, Petitioner filed a timely notice of appeal from the judgments and sentences. (Exh. A: P.I., Item 251.) Petitioner retained Tracey Westerhausen to represent him on appeal. (Exh. CC: R.T. 9/7/11, at 50.)

On October 11, 2007, Westerhausen filed an opening brief raising four issues:

1. "The jury instructions [regarding child molestation] unconstitutionally placed the burden of proof on the defendant." (Doc. 1-2: Opening Brief, 1 CA-CR 07-0144, at 13.) Petitioner argued that Arizona's child-molestation statute required the State to prove, beyond a reasonable doubt, the specific-intent element "that the touching was motivated by sexual interest," and that the trial court's instructions requiring Petitioner to prove by a preponderance of the evidence that he lacked sexual motivation improperly shifted the burden of proof of an element of the crime from the prosecution to the defense. (Id. at 12-16.)

2. "Having declared a mistrial and discharged the jurors, the trial court violated [Petitioner's] constitutional rights by permitting the jurors to reconvene and deliberate further." (Id. at 16.) Petitioner identified the state and federal constitutional rights at issue as "the right to an impartial jury, the right to due process, and the guarantee against double jeopardy," with the thrust of his argument being that the jurors might have been exposed to improper outside influences during the interval between the trial court's declaration of mistrial and the subsequent resumption of deliberations. (Id. at 16-20.)

- 24 -

(3) "The trial court abused its discretion in imposing only 'slightly mitigated' sentences, ignoring the fact that [Petitioner's] conduct was milder than the usual child molest case." (Id. at 20-22.)

(4) "The individual sentence for each count and their and cumulative effect of 75 years violated the protection against cruel and unusual punishment." (Id. at 23-32.)

On January 29, 2008, the State filed its answering brief, to which Petitioner filed a reply on March 6, 2008. (Exh. N: Answering Brief, 1 CA-CR 07-0144; Doc.1-3: Reply Brief, 1 CA-CR 07-0144.)

On July 24, 2008, the Arizona Court of Appeals rejected these arguments and affirmed Petitioner's convictions and sentences. (Doc. 1-4: Memorandum Decision, 1 CA-CR 07-0144.)

On September 29, 2008, Petitioner, through Westerhausen, filed with the Arizona Supreme Court a petition for review on the following two claims:

A. A.R.S. § 13-1407, entitled "Defenses," enumerates defenses to child molestation. Subpart E provides that, "it is a defense" to child molestation "that the defendant was not motivated by a sexual interest." The Court of Appeals held that A.R.S. § 13-1407.E created an affirmative defense, thus shifting the burden of proof to the defendant. Did the Court of Appeals erroneously shift the burden of proof to the defendant, to prove that he was not sexually motivated?

B. Under the state and federal constitutions, a defendant is guaranteed a trial by a fair and impartial jury, including a jury free from taint by outside sources. The jurors here were discharged, minutes passed, and the dismissed jurors were allowed to re-deliberate. Is Mr. May entitled to a new trial because the trial court failed to explore jury taint that may have deprived Mr. May of a fair trial?

(Doc. 1-5: Petition for Review, at 2-3.)

On November 4, 2008, the State filed its opposition to this petition for review. (Exh. O: Opposition to Petition for Review by Arizona Supreme Court, CR008-0281-PR.)

On February 10, 2009, the Arizona Supreme Court summarily denied review. (Doc. 1-6: Arizona Supreme Court Order, CR-08-0281-PR, at 2.)

On March 24, 2009, Petitioner moved the Arizona Supreme Court to reconsider this ruling. (Exh. P: Motion for Reconsideration of Denial of Review, CR-08-0281-PR.) For the

first time on direct review, Petitioner challenged the constitutionality of the child-molestation statute:

> The child molestation statute violates due process because it relieves the state from proving every element of the charged crime beyond a reasonable doubt. First, the statute does this by making too many every day and innocent acts fall within its definition of child molestation. Second, although the Legislature has broad authority to define the elements of a crime, it may not lower the state's burden of proof by calling an "element" something else. The Legislature has unconstitutionally done that here.

(Id. at 4, citing Apprendi v. New Jersey, 530 U.S. 466, 476 (2000)).

On March 29, 2009, the Arizona Supreme Court denied Petitioner's motion for reconsideration of its prior order denying review. (Exh. Q: Arizona Supreme Court Order, CR-08-0281-PR.)

On May 8, 2009, Petitioner petitioned the United States Supreme Court to grant a writ of certiorari on the issue of "[w]hether Arizona's child molestation statutes violate an accused's Fourteenth Amendment right to due process because they 'manipulate the prosecutor's burden of proof by … placing the affirmative defense label on at least some elements of traditional crimes.'" (Doc. 1, at 4, quoting Apprendi, 530 U.S. at 475.)

In its court-ordered brief in opposition, the State argued that certiorari should be denied because: (1) Petitioner had never presented this constitutional challenge to A.R.S. §§ 13-1410(A) and 13-1407(E) to the Arizona judiciary—an omission that would effectively transform the Supreme Court from a court of final review to one of first review; (2) "the conflict that Petitioner claims to exist among lower courts is illusory and inapposite to A.R.S. § 13-1410(A)"; and (3) "Petitioner's reliance on Apprendi and its progeny is misplaced." (Exh. R: PCR's Exh. ["Tab"] 109: Brief in Opposition, Supreme Court No.08-1393, at 17, 30, 32; Exh. CC: R.T. 9/7/11, at 125, 142-43.)

On October 5, 2009, the Supreme Court denied certiorari. See May v. Arizona, 558 U.S. 819 (2009).

On November 13, 2009, Petitioner, through retained counsel, filed a timely PCR notice. (Doc. 1-7.)

On March 30, 2010, Petitioner filed his PCR petition with a contemporaneous request for an evidentiary hearing. (Docs. 1-8, 1-9.) Petitioner sought relief on the following grounds:

• PCR Ground I: Petitioner "was deprived of his right to trial by jury when the trial court, following an unrecorded, undocumented communication between the judge and the jury, allowed unsworn jurors to pass judgment on [Petitioner's] guilt." (Id. at 19.) This claim's component arguments included the following allegations: (a) "[t]he twelve people in the jury room lacked the power to return a verdict" after the trial court declared a mistrial and dismissed the jurors; (2) "[b]y allowing the dismissed, unsworn former jurors to continue deliberating, the court denied [Petitioner] his structural right to an impartial jury"; and (3) "[t]he judge, through her agent, the bailiff, had substantive unrecorded *ex parte* communications with the jury." (Id. at 22, 24, 25.)

• PCR Ground II: "The trial judge coerced guilty verdicts by allowing jurors to continue deliberations after a mistrial had been declared." (Id. at 27.)

• PCR Ground III: "[Petitioner's] right to be convicted only upon proof beyond a reasonable doubt was violated by the jurors' pledging their votes in a quid pro quo that had nothing to do with the evidence." (Id. at 30.)

• PCR Ground IV: "The failure of the trial judge to properly instruct the jury, once it expressed confusion numerous times over a critical element of its task, denied [Petitioner] his jury trial rights under the Arizona and United States Constitutions and violated Arizona's Constitutional command that judges shall declare the law." (Id. at 34.) This claim alleged that the trial court "did not fulfill its duty to explain, in understandable terms, the critical concept that the jury was required to consider each count separately, under the reasonable doubt standard, and not group it all together and decide by clear and convincing evidence decide he must have done them all." (Id.)

• PCR Ground V: "The jury foreperson introduced extrinsic material and information into the jury's deliberations, violating [Petitioner's] rights to an impartial jury and to confront witnesses against him," specifically: (1) a teddy bear that Foreman Richardson brought into the jury room to conduct "illicit experiments" and evaluate reports regarding how Petitioner touched his victims; and (2) Richardson's alleged statement that Petitioner would "probably only get a year or two" if convicted of the charges. (Id. at 40-42.)

• PCR Ground VI: "The numerous and serious interferences with the impartiality of the jury cumulatively violated [Petitioner's] right to a jury trial." (Id. at 42.)

• PCR Ground VII: "[Petitioner's] convictions violate due process principles of the Arizona and United States Constitutions because Arizona's child molestation statute does not require the State to prove every element of the crime beyond a reasonable doubt." (Id. at 44.)

• PCR Ground VIII: "No reasonable fact finder could have found [Petitioner] guilty of child molestation beyond a reasonable doubt because the child molestation statute

unconstitutionally relieves the State of its burden to prove the core element of sexual motivation." (Id. at 48.)

• PCR Ground IX: "The application of Arizona Rules of Evidence 404(b) and 404(c) in this case unconstitutionally lowered the State's burden of proof and allowed the convictions by a non-unanimous jury." (Id. at 49.) Petitioner argued herein that Judge Stephens: (1) failed to make the requisite clear-and-convincing-evidence findings before denying his severance motion; and (2) gave final jury instructions that (a) inadequately addressed the jury's confusion over whether evidence offered to prove one count could be used to corroborate the other charges and (b) allowed the jury to convict him of each count based upon the lower standard of clear and convincing evidence. (Id. at 49-51.)

• PCR Ground X: "There is sufficient evidence of possible improper conduct by the prosecutor, making it impossible to rule out prosecutorial misconduct." (Id. at 52.) The component claims of this ground alleged that: (1) after the trial court granted Petitioner's motion to remand his case to the grand jury for a new probable-cause determination, the State engaged in prosecutorial vindictiveness by presenting evidence of his crimes against three additional victims and thereby obtaining an indictment that doubled the original number of counts; (2) the prosecutor unethically charged Petitioner with molesting Luis, allegedly because Luis could not recall the charged event; (3) the prosecutor allegedly coached Luis, who was unable to identify Petitioner in the courtroom during direct-examination, but positively identified Petitioner on redirect-examination when shown a photograph taken of Petitioner in 2005, closer in time to the charged incident; (4) the prosecutor manifested his "greater-than-normal level of interest in this case" by persuading Linda Cano, a prospective defense witness, to testify for the State instead; and (5) the prosecutor attended the defense investigator's post-trial interview of Foreman Richardson and was allegedly responsible for Detective Verdugo's refusal to submit to an interview with Petitioner's PCR investigator. (Id. at 52-55.)

• PCR Ground XI.A: "Trial counsel was constitutionally ineffective for failing to raise the issue of prosecutorial vindictiveness." (Id. at 56.)

• PCR Ground XI.B: "Counsel was ineffective for failing to require compliance with Arizona Rule of Evidence 404(b) and 404(c)." (Id. at 60.) This claim alleged that both trial and appellate counsel rendered deficient performance by failing to object to the sufficiency of the trial court's findings regarding the cross-admissibility of evidence of the crimes against each victim at separate trials. (Id. at 60-62.)

• PCR Ground XI.C: "Counsel failed to argue and preserve the issue that the child molestation statute unconstitutionally shifts the burden of proof to the defendant." (Id. at 62.)

• PCR Ground XI.D: "Trial Counsel was deficient in his investigation and in presenting information that was learned through investigation," allegedly because: (1) "he failed to retain an expert to assist him" to develop "critical areas of inquiry [regarding] pretrial interviews of the detectives and civilian investigators that were central to the investigation," "educate [himself] as to children's memory formation as well as internal and external factors that can affect children's reports;" (2) he did not present medical evidence to corroborate Petitioner's testimony regarding his "long battle with ataxia," "a medical condition that causes clumsiness and involuntary movements"; and (3) he failed to investigate and present lay witness testimony to

"corroborate [Petitioner's] testimony regarding his dedicated service to education and his behavior around children." (Id. at 65-76.)

• PCR Ground XI.E: "Trial counsel provided ineffective assistance by failing to consult with [Petitioner] before agreeing to allow deliberations to continue." (Id. at 76.)

• PCR Ground XI.F: "Counsel was deficient in failing to object to continued deliberations." (Id. at 77.) Maintaining that allowing the mistrial declaration to stand would have allowed him to remain free on bond and proceed to trial with the benefit of having heard the State's case, Petitioner argued that trial counsel lacked a tactical basis for allowing the jurors to resume their deliberations—especially without renewing their oaths and receiving further instructions. (Id. at 77-78.) Petitioner also challenged the performance of appellate counsel, whom he faulted for not advocating "a bright-line rule that jurors may not return a verdict after a mistrial is declared and jurors are absolved of their oaths" and for not arguing that structural error resulted from the denial of his right to an impartial jury and the trial court's lack of jurisdiction to render a judgment following the declaration of mistrial. (Id. at 79.)

• PCR Ground XI.G: "Counsel was ineffective in failing to develop and present expert and character evidence at sentencing." (Id. at 80.)

• PCR Ground XI.H: "The cumulative impact of counsel's deficiencies amount to prejudicial substandard representation." (Id. at 81.)

• PCR Ground XII: "The cumulative errors at trial and on appeal violated [Petitioner's] right to due process." (Id. at 81.)

On July 26, 2010, the State filed its response to Petitioner's PCR petition arguing that: (1) PCR Grounds II, II, IV, VI, VII, IX, X were precluded, pursuant to Arizona Rule of Criminal Procedure 32.2(a), and failed on their merits in any event; and (2) PCR Grounds III, V, VIII, XI.A through XI.H, and XII lacked merit. (Exh. S: State's PCR Response, filed on 7/26/10, at 14-75.)

On August 20, 2010, Petitioner filed his reply, arguing that: (1) newly discovered evidence rendered non-precluded, pursuant to Arizona Rule of Criminal Procedure 32.1(e), the claims he had not raised at trial and/or on appeal; (2) all of his claims warranted post-conviction relief; and (3) the trial court should conduct an evidentiary hearing. (Doc. 1-10: Reply to State's PCR Response, at 3-35.)

On January 4, 2011, the Honorable Kristin Hoffman issued the following rulings:

• PCR Grounds I, II, IV, VI, VII, IX, X, and XII were precluded under Rule 32.2(a)(2) and/or Rule 32.2(a)(3), because: (1) Petitioner either previously presented the claim to the Arizona Court of Appeals on direct review or failed to raise the claim at trial

- 29 -

1    and/or on appeal; and (2) Rule 32.1(e) exception for newly discovered evidence was
     inapplicable because Petitioner failed to exercise due diligence.

2

3    • Petitioner's claim of actual innocence (PCR Ground VIII), pursuant to Arizona Rule
     of Criminal Procedure 32.1(h), was meritless.

4    • An evidentiary hearing would be conducted to address the following non-precluded
     claims: (1) PCR Ground III, wherein Petitioner alleged that the jurors had traded votes

5    on the verdicts; (2) PCR Ground V, wherein Petitioner alleged that the jurors
     considered extrinsic evidence; and (3) all of Petitioner's ineffective assistance of

6    counsel claims (PCR Grounds XI.A through XI.H).

7    (Doc. 1-11: Minute Entry, filed on January 4, 2011.)

8        On January 18, 2011, Petitioner moved for reconsideration of Judge Hoffman's

9    preclusion ruling with respect to: (1) PCR Grounds I, II, IV, and XII, which concerned claims

10   regarding the jury's post-mistrial deliberations, alleged jury coercion, allegedly improper

11   instructions, and cumulative error, respectively; and (2) a prosecutorial-misconduct

12   sub-claim, PCR Ground X.2, which questioned the propriety of the State's decision to charge

13   Petitioner with molesting Luis, despite his inability to recall the incident. (Exh. T: Motion,

14   filed on 1/18/11, at 1-5.) The State filed its opposition on February 3, 2011 (Exh. U), and

15   Petitioner replied on February 9, 2011 (Exh. V). After oral argument, Judge Hoffman denied

16   Petitioner's motion for reconsideration. (Exh. W: Minute Entry, filed on 2/16/11.)

17       On March 24, 2011, Petitioner's attorneys, Mr. Cabou and Ms. O'Meara, filed a

18   notice announcing that undisclosed ethical obligations mandated their withdrawal as counsel.

19   (Exh. X: Notice of Mandatory Withdrawal of Counsel.) Consequently, on April 13, 2011,

20   JoAnn Falgout entered her appearance as local counsel, contingent upon admission of *pro*

21   *hac vice* counsel for Petitioner. (Exh. Y: Notice of Appearance [Falgout].)

22       On August 11, 2011, Petitioner, through Ms. Falgout, supplemented the pending PCR

23   petition by alleging that: (1) Juror Melton, whom Petitioner had recently deposed, had a

24   vague recollection that the subject of punishment had been "broached" during deliberations;

25   and (2) the jury lacked jurisdiction to render a verdict after the court declared a mistrial and

26   discharged them from service. (Doc. 1-12: Supplemental PCR, at 1-5.)

27

28                                    - 30 -

On August 15, 2011, the State moved to vacate the evidentiary hearing on any non-precluded claim because "there is no issue of fact or law that entitle[d] [Petitioner] to any evidentiary hearing." (Exh. Z: Amended Motion to Vacate Evidentiary Hearing.) Judge Hoffman, however, denied this motion, despite observing, "To the extent that defendant's allegations of ineffective assistance of counsel rely on undisputed facts regarding what defense counsel did or did not do, the testimony of defense counsel is not needed at an Evidentiary Hearing." (Exh. AA: Minute Entry, filed on September 2, 2011.)

On September 6, 2011, Judge Hoffman commenced a 3-day evidentiary hearing to adjudicate Petitioner's unresolved extrinsic-evidence and ineffective-assistance-of-counsel claims. (Exh. BB: R.T. 9/6/11; Exh. CC: R.T. 9/7/11; Exh. DD: R.T. 9/8/11.) In lieu of calling any jurors to testify, Petitioner and the State agreed that the judge could consider instead the transcripts of Petitioner's post-verdict interviews or depositions of the jurors whom retained counsel or their investigators were able to locate and question between May 18, 2008, and June 23, 2011. (Exh. BB: R.T. 9/6/11, at 9-16.) Thus, transcripts of the following jurors' post-verdict statements were admitted in evidence by the parties' stipulation:

• Hearing Exh. 27: Juror Lisa Diane Mayhew (a.k.a. Lisa Mayhew), whom defense investigator Martin Gonzalez interviewed on May 18, 2008. (Exh. EE: Transcript of First Interview of Juror Mayhew-Proeber, dated 5/18/08.)

• Hearing Exh. 28: Juror Lisa Proeber (a.k.a. Proeber), whom defense investigator Lew Ruggiero interviewed on December 3, 2009. (Exh. FF: Transcript of Second Interview of Juror Mayhew-Proeber, dated 12/3/09.)

• Hearing Exh. 29: Juror Bill Richardson, the foreman whom defense investigator Lew Ruggiero interviewed on December 10, 2009, with the trial prosecutor, Deputy County Attorney John Beatty in attendance. (Exh. HH: Transcript of Interview of Foreman Richardson, dated 12/10/09.)

• Hearing Exh. 30: Juror John Rout, whom defense investigator Lew Ruggiero interviewed on December 5, 2009. (Exh. II: Transcript of Interview of Juror Rout, dated 12/5/09.)

• Hearing Exh. 31: Juror Jacob Harris, whom defense investigator Lew Ruggiero interviewed on February 23, 2011. (Exh. JJ: Transcript of Interview of Juror Harris, dated 2/23/11.)

1  • Hearing Exh. 32: Juror Daniel Melton, whom Petitioner's retained PCR counsel
2  deposed on June 22, 2011. (Exh. KK: Reporter's Transcript of Juror Melton's
   Deposition, dated 6/23/11.)

3  • Hearing Exh. 46: Juror Michael Lieb, whom Petitioner's retained counsel deposed
4  on June 22, 2011. (Exh. LL: Reporter's Transcript of Juror Lieb's Deposition, dated
   6/22/11.)

5  • Hearing Exh. 47: Juror Dallas Andrews, whom Petitioner's investigator Lew
6  Ruggiero interviewed on March 5, 2011. (Exh. MM: Transcript of Interview of Juror
   Andrews, dated 3/5/11.)

7  • Hearing Exh. 48: Juror Lynwood Carey, whom Petitioner's investigator Lew
8  Ruggiero interviewed on December 4, 2009. (Exh. NN: Transcript of Interview of
   Juror Carey, dated 12/4/09.)

9  • Hearing Exh. 49: Juror Helen Jo Reeves, whom Petitioner's investigator Lew
10 Ruggiero interviewed on December 2, 2009. (Exh. OO: Transcript of Interview of
   Juror Reeves, dated 12/2/09.)

11 • Hearing Exh. 50: Juror Joanna Rzucidlo, whom Petitioner's investigator Lew
12 Ruggiero interviewed on December 18, 2009. (Exh. PP: Transcript of Interview of
   Juror Rzucidlo, dated 12/18/09.)

13 • Hearing Exh. 51: Juror Tina Lyn Spradlin, whom Petitioner's investigator Lew
14 Ruggiero interviewed on January 5, 2010. (Exh. QQ: Transcript of Interview of Juror
   Spradlin, dated 1/5/10.)

15 The parties also stipulated to the admission of un-notarized declarations signed by

16 Angela Cazel-Jahn and Kelley Ames Fitzsimmons, who were employed at the Children's

17 Museum of Phoenix, met Petitioner when he volunteered to help set up exhibits at the

18 museum, and reported that they had neither seen Petitioner have inappropriate interactions

19 with children, nor received complaints about Petitioner from other museum staff members,

20 children, or their parents. (Exh. RR: Declaration of Angela Cazel-Jahn [Hearing Exh. 38];

21 Exh. SS: Declaration of Kelley Ames Fitzsimmons [Hearing Exh. 39].)

22 During the evidentiary hearing, Petitioner called the following witnesses: (1) his trial

23 attorney, Joel Thompson (Exh. CC: R.T. 9/7/11, at 5-48); (2) his appellate counsel, Tracey

24 Westerhausen (id. at 49-71); (3) Dr. Harvey Goodman, whose testimony concerned

25 Petitioner's ataxia-related medical records from the early 1970s to 1989 and an MRI

26 performed in 2008 (id. at 71-115); (4) Michael Piccaretta, a defense attorney who opined that

27 Thompson and Westerhausen rendered ineffective assistance, based upon his examination

28

- 32 -

of the trial record (id. at 115-53); (5) Dr. Philip Esplin, a psychologist with a long history of testifying on behalf of the defense, and who opined that this case was complex and therefore necessitated at least consultation with an expert on the reliability of the memories of child witnesses (Exh. DD: R.T. 9/8/11, at 3-62); and (6) Terry Borden, Petitioner's step-father, who detailed his communications and interactions with Thompson and Westerhausen during the course of their representation of Petitioner at trial and on appeal (id. at 64-93).

Instead of closing arguments, the parties were permitted to file post-hearing memoranda in support of their respective positions on October 28, 2011. (Exh. TT: Defendant's Post-Hearing Memorandum; Exh. UU: State's Post-Hearing Memorandum.)

On November 10, 2011, Judge Hoffman issued a 7-page minute entry order denying post-conviction relief on all of Petitioner's non-precluded claims, reasoning that: (1) Petitioner offered insufficient proof that the jurors considered punishment during deliberations; (2) Petitioner likewise failed to prove his allegation of "vote trading," which is nonetheless not juror misconduct because federal and Arizona law tolerates compromise verdicts; (3) although the jurors considered extrinsic evidence (a teddy bear), the court found beyond a reasonable doubt that the verdicts were not tainted thereby; and (4) Petitioner failed to prove deficient performance and prejudice on any ineffectiveness claim. (Doc. 1-13: Minute Entry, filed on 11/10/11.)

On March 2, 2012, Petitioner petitioned the Arizona Court of Appeals to review Judge Hoffman's denial of post-conviction relief on the following claims:

> • Petitioner "was deprived of his state and federal constitutional rights to due process, confrontation, an impartial jury, and a fair trial, where the jurors received and considered extrinsic evidence during their deliberations—a child's Teddy Bear—which was presumptively prejudicial and, since that presumption of prejudice was never rebutted, the Defendant is entitled to a new trial." (Doc. 1-14: Petition for Review by Arizona Court of Appeals, at 1.) Significantly, Petitioner focused exclusively upon his prior argument that the teddy bear at issue constituted improper extrinsic evidence and therefore did not seek review of his other juror-misconduct claims—the jurors "traded votes," engaged in *ex parte* communications with the bailiff, and improperly considered (and grossly underestimated) potential punishment during deliberations. (Id. at 4-9.)

• Petitioner "was denied his state and federal rights to trial by jury, due process and a fair trial where, after a mistrial had been granted, the jurors reassembled on their own and recommenced their deliberations without ever being re-sworn or placed under oath and, thus, were without jurisdiction to render a valid verdict." (Id. at 1.) Petitioner elaborated, "[W]hen the jurors were discharged of their duties, they were relieved of their Oath. And once that happened, the twelve individuals, no longer legally a jury, had no power to return a verdict." (Id. at 10.)

• Petitioner's "convictions violate the due process clauses of the state and federal constitutions because Arizona's child molestation statutes (A.R.S. § 13-1410 and § 13-1407(E)) are unconstitutional on their face, and as applied, where they require the Defendant to prove that any touching lacked sexual motivation, thereby relieving the State of its burden to prove each essential element beyond a reasonable doubt, and no reasonable jury would have found [Petitioner] guilty without the burden having been shifted to the defense." (Id. at 1, 12-13.)

• Petitioner "was deprived of his state and federal constitutional rights to the effective assistance of trial and appellate counsel where, among other things, counsel failed to undertake an investigation and did not confer with or call necessary expert witnesses." (Id. at 1.) Petitioner specifically alleged that Thompson was ineffective because: (1) he did not "minimally consult with an expert concerning the reliability of children's testimony," and "the jurors would have benefitted from expert testimony on the fallibility of child witnesses," (2) Thompson did not offer medical testimony regarding Petitioner's ataxia to explain his unusual ("creepy and unordinary") appearance and support his defense that any touching was unintentional; (3) after the court declared a mistrial and discharged the jurors, Thompson should have objected to the jury's request to continue deliberations on the ground that the jurors lacked "jurisdiction"; (4) Thompson should have likewise conducted some investigation and consulted with Petitioner before agreeing to allow the jury to resume deliberations; (5) Thompson did not offer lay witnesses to testify that Petitioner behaved appropriately with children; (6) Thompson did not object to videotape footage of Detective Verdugo mentioning "another police investigation of [Petitioner] in New York" during his post-arrest interview; and (7) both Thompson and Westerhausen were ineffective for not challenging the constitutionality of Arizona's child-molestation statutes—an omission that allegedly prejudiced Petitioner because the State argued in its brief in opposition to his petition for certiorari that Petitioner never raised this argument at trial or on direct review, and the Supreme Court denied the writ. (Id. at 14-20.)

• Petitioner "was deprived of his state and federal constitutional rights to due process and a fair trial based upon significant prosecutorial misconduct, including, but not limited to, calling and coaching a witness [Luis] who had no recollection of the alleged incident." (Id. at 1.) Besides allegedly coaching Luis, Petitioner argued that the State engaged in prosecutorial vindictiveness after the trial court remanded the case to the grand jury by obtaining a new indictment that added three new victims and four additional counts. (Id. at 23-24.)

• Petitioner "was deprived of his state and federal constitutional right to be convicted only upon proof beyond a reasonable doubt and an impartial jury when the jurors were compelled to vote guilty under undue influence of the Foreman, who believed that [Petitioner] was guilty and, thus, reassembled the jurors, on his own initiative, after they had been discharged, despite a mistrial being declared." (Id. at 1.)

- 34 -

• "The trial court's failure to properly instruct the jurors, on a critical legal principle concerning how they could use evidence of other acts charged in the multi-count indictment to assess guilt or innocence, denied [Petitioner] his state and federal constitutional rights to due process and a fair trial and violated the constitutional command that judges shall declare the law." (Id. at 2, 22.)

• Petitioner "was deprived of his state and federal constitutional rights to due process and an impartial jury where Arizona Rules of Evidence 404(b) and 404(c) were impermissibly employed to deny a severance of the counts, lessen the prosecution's burden, and allowed evidence of each of the other alleged sexual offense[s] to be admitted at trial as proof of the other counts." (Id. at 2, 21-23.)

• "The cumulative effect of multiple trial errors violated due process and rendered the resulting criminal trial fundamentally unfair." (Id. at 2, 25.)

On April 23, 2012, the State filed its response opposing Petitioner's petition for review, to which Petitioner filed his reply on May 3, 2012. (Exh. VV: Response to Petition for Review; Doc. 1-15: Reply in Support of Petition for Review, at 1-10.)

On September 7, 2012, the Arizona Court of Appeals granted review, but denied relief in a memorandum decision, stating:

(1) Petitioner's constitutional challenge to A.R.S. § 13-1410(A) is precluded, pursuant to Rule 32.2(a)(3), because Petitioner failed to raise this claim on direct review. (Doc. 1-17: Arizona Court of Appeals' Memorandum Decision, at 2-3, ¶ 2.)

(2) Rule 32.2(a)(3) also precluded Petitioner's "claims that he was entitled to relief due to prosecutorial misconduct and the court's erroneous application of Rule 404(b) and (c)." (Id. at 3, ¶ 3.)

(3) Petitioner's claim that the trial court erred by allowing the jurors to continue deliberating after its mistrial declaration was precluded under Rule 32.2(a) "because it had been addressed and rejected on appeal." (Id. at 3-4, ¶ 4.)

(4) Petitioner's "subject matter jurisdiction" challenge to the jury's resumption of deliberations and subsequent verdicts would not be considered on appeal because Petitioner did not raise a jurisdictional argument in his PCR petition, but instead made this claim for the first time in his petition for review. (Id. at 4, ¶ 5.) Alternatively, Petitioner's claim lacked merit because "this is not a subject matter jurisdiction issue," because this term "refers to a court's statutory or constitutional power to hear and determine a particular type of case." (Id.)

(5) If brought pursuant to Arizona Rule of Criminal Procedure 32.1(a), Petitioner's claim of juror misconduct involving the stuffed animal "clearly was precluded [under Rule 32.2(a)] because it could have been raised on appeal." (Id. at 5, ¶ 7.) If raised instead pursuant to Arizona Rule of Criminal Procedure 32.1(e), which allows otherwise precluded claims supported by newly-discovered evidence, this juror-misconduct claim remains precluded because Petitioner "did not show that he exercised the requisite due diligence in attempting to secure the new evidence." (Id., citing Ariz. R. Crim. P. 32.1(e)(2)).

- 35 -

(6) Petitioner waived two ineffectiveness claims by failing to present them adequately to the trial court in his PCR petition and at the evidentiary hearing—to wit: (1) Thompson should have raised a jurisdictional challenge to the jury continuing to deliberate after the mistrial's declaration; and (2) trial counsel should have objected to videotape footage referencing another investigation. (Id. at 7, ¶ 11 & n.3.)

(7) Petitioner had not carried his burden of proving that Thompson's failure to object to the jury's resumed deliberations constituted deficient performance or resulted in prejudice, particularly because the court of appeals had rejected the underlying claim on direct appeal. (Id. at 7-8, ¶ 12.)

(8) Petitioner's claim, that Thompson failed to consult with him adequately before agreeing to allow the jury to resume deliberations, was groundless because this decision was "tactical" in nature (and apparently not one that required Petitioner's consent), and Petitioner had not asserted that he would have objected to this course of action, had there been lengthier consultations. (Id. at 8, ¶ 13.)

(9) The court of appeals adopted the trial court's rulings on the balance of Petitioner's ineffective-assistance claims. (Id. at 8, ¶ 14.)

On November 8, 2012, Petitioner petitioned the Arizona Supreme Court to review the denial of post-conviction relief, based upon the following arguments:

(1) "The court of appeals misapplied the law and created a harrowing new rule relating to when a claim of extrinsic evidence may be raised." (Doc. 1-18: Petition for Review by Arizona Supreme Court, CR-12-0416-PR, at 5-7.)

(2) "The hearing judge misapprehended the presumption of prejudice, and this case presents questions left open in the wake of State v. Hall regarding the prosecution's burden to rebut the presumption of prejudice," a claim that challenged Judge Hoffman's ultimate determination that the teddy bear at issue did not prejudice Petitioner beyond a reasonable doubt. (Id. at 8-10.)

(3) "Allowing a jury, which was released from its oath and no longer had jurisdiction, to reach a verdict is fundamental error that should have been reviewable in a post-conviction proceeding." (Id. at 11-12.)

(4) Petitioner "was convicted under an unconstitutional statute." (Id. at 12-13.)

(5) "Trial and appellate counsel were ineffective" because they did not raise claims challenging the constitutionality of Arizona's child-molestation statutes, did not allege prosecutorial vindictiveness, did not call experts to testify at trial. (Id. at 14-16.)

(6) "Was Petitioner deprived of his state and federal constitutional right to be convicted only upon proof beyond a reasonable doubt and an impartial jury when the jurors were compelled to vote guilty under undue influence of the Foreman, who, on his own, reassembled the jurors after they had been discharged, and had them recommence deliberations, even though a mistrial had been declared?" (Id. at 16.)

(7) "Did the trial court's failure to properly instruct the jurors, on a critical legal principle concerning how they could use evidence of other acts charged in the multi-count indictment to assess guilt or innocence, deny Petitioner his state and

federal constitutional rights to due process and a fair trial, and violate the constitutional command that judges shall declare the law?" (<u>Id.</u>)

(8) "Whether Petitioner was deprived of his state and federal constitutional rights to due process and an impartial jury where Arizona Rules of Evidence 404(b) and 404(c) were impermissibly employed to deny a severance of the counts, lessen the prosecution's burden, and allowed evidence of each of other sexual offenses to be admitted at trial as proof of the charged offenses?" (<u>Id.</u>)

On February 21, 2013, the State filed its opposition to the petition for review, to which Petitioner filed a reply on (Exh. WW: Response to Petition for Review; Doc. 1-19: Reply in Support of Petition for Review, CR-12-0416-PR.) On April 24, 2013, the Arizona Supreme Court summarily denied review. (Doc. 1-20: Order, Arizona Supreme Court CR-12-0416-PR.)

On October 7, 2013, the United States Supreme Court denied Petitioner's petition for writ of certiorari. <u>See</u> <u>May v. Arizona</u>, 134 S.Ct. 295 (2013); Doc. 1-21: Supreme Court letter, <u>Stephen Edward May v. Arizona</u>, No. 13-102.

In the instant habeas petition and supporting memorandum, Petitioner alleges the following:

(1) "Stephen May is being held in violation of his federal constitutional rights, including his right to confront the witnesses against him, right to an impartial jury, right to a fair trial and due process, where the jury foreman introduced extrinsic material, in the form of his daughter's 'large fluffy white stuff bear,' into the jury deliberations and the jurors conducted unauthorized experiments with the extrinsic evidence (teddy bear) on the ultimate issue of Stephen May's intent. U.S. Const. amends. V, VI and XIV."

(2) "Stephen May was denied his federal constitutional rights to trial by jury, due process and a fair trial where, after a mistrial had been granted, the jurors reassembled on their own and recommenced their deliberations without ever being re-sworn or placed under oath and, thus, were without jurisdiction to render a valid verdict. U.S. Const. amends. V, VI and XIV."

(3) "Stephen May's convictions violate his federal constitutional right to due process and a fair trial because Arizona's child molestation statutes (A.R.S. § 13-1410 and § 13-1407[E]) are unconstitutional on their face, and as applied, where they require the defendant, who is actually innocent, to prove that any touching lacked sexual motivation, thereby relieving the State of its burden to prove each essential element beyond a reasonable doubt, and no reasonable jury would have found the defendant guilty without the burden having been shifted to the defense. U.S. Const. amends. V, VI and XIV."

(4) "Stephen May was deprived of his federal constitutional right to the effective assistance of trial counsel. U.S. Const. amends. VI and XIV." Ground 4 includes the following sub-claims:

• Ground 4A: Thompson rendered ineffective assistance because: (1) he did not consult with experts regarding suggestive interview techniques, potential flaws in child-witness testimony, and the psychological profile of child molesters ("Ground 4A.1"); (2) he should have called an expert to testify about suggestive interview techniques ("Ground 4A.2"); (3) he should have called Dr. Esplin to testify about how certain factors might render children's memories genuine, but wrong, such as the incident's non-complex nature, the reinterpretation of a past event upon learning new information, and "the vulnerability of a child's memory to suggestions" and "memory contamination" ("Ground 4A.3"); and (4) he should have called an expert because one juror did not know how child molesters think and whether they are attracted to minors of both genders ("Ground 4A.4").

• Ground 4B: Thompson should have called an expert to testify about Petitioner's "lifelong battle with a neurological condition called Ataxia," in order to demonstrate that any touching was unintentional ("Ground 4B.1") and to explain his abnormal physical appearance, which led two jurors to believe that he looked "fidgety," "odd," "very scared he got caught doing something," "creepy and unordinary" and "like a child molester" ("Ground 4B.2").

• Ground 4C: Thompson did not allege that the State engaged in prosecutorial vindictiveness by obtaining a second indictment that added four new counts involving three additional victims (Luis A., Sheldon H., and Nicholas M.)

• Ground 4D: Thompson did not object when Judge Stephens did not make the findings required by Arizona Rules of Evidence 404(b) and 404(c).

• Ground 4E: Thompson did not object to the admission of videotape footage of Petitioner's post-arrest interview that included oblique references to a New York investigation that (according to Petitioner) were "allowed to permeate the trial" and were "unsettling" to one juror.

• Ground 4F: Thompson "failed to identify" that Arizona's child-molestation statutes are unconstitutional for allegedly shifting the burden of an element to the defendant.

• Ground 4G: Thompson should have consulted with Petitioner to a greater extent before announcing his lack of opposition ("Ground 4G.1"), Thompson should have objected to the jurors continuing to deliberate after Judge Stephens declared a mistrial ("Ground 4G.2"), and Thompson failed to make an adequate record when the jurors announced their desire to resume deliberations ("Ground 4G.3").

• Ground 4H: Thompson did not call any lay witnesses to offer testimony regarding Petitioner's appropriate non-sexual behavior with children.

• Ground 4I: "Trial counsel's representation was conflicted by and corrupted by his contractual relationship with the overburdened Phillips' firm."

• Ground 4J: Thompson's omissions should be viewed cumulatively.

(5) "Stephen May was deprived of his federal constitutional right to the effective assistance of appellate counsel. U.S. Const. amends. VI and XIV." Ground 5 contains two sub-claims:

• Ground 5A: Westerhausen did not challenge the constitutionality of Arizona's child-molestation statutes.

• Ground 5B: Westerhausen did not argue on appeal that the jury lacked jurisdiction to resume deliberations and return a verdict after the declaration of a mistrial.

(6) "Stephen May was deprived of his federal constitutional rights to due process and a fair trial based upon prosecutorial misconduct. U.S. Const. amends. V, VI and XIV." The components of Ground 6 include the following:

• Ground 6A: The State engaged in prosecutorial vindictiveness by obtaining a second indictment charging Petitioner with four new counts of child molestation against three additional victims (Luis A., Sheldon H., and Nicholas M.) while Petitioner's motion to remand the original indictment to the grand jury for a new probable-cause determination was still pending decision.

• Ground 6B: The prosecutor allegedly coached Luis A. during a recess in his testimony so that he could identify him from a photo array on redirect examination.

(7) "Stephen May was denied his federal constitutional right to be convicted only upon proof beyond a reasonable doubt and an impartial jury when the jurors were compelled to vote guilty under undue influence of the foreman, who believed that Stephen May was guilty and, thus, reassembled the jurors, on his own initiative, after they had been discharged, and had them recommence deliberations, despite a mistrial having been declared. U.S. Const. amends. V, VI and XIV." This ground has two subcomponents:

• Ground 7A: Foreman Richardson's pressure forced the holdout jurors (Root and Mayhew-Proeber) to swap votes with the majority as part of a "quid pro quo" whereby guilty verdicts would be returned on five counts and acquittals on the other two charges.

• Ground 7B: Foreman Richardson allegedly told one holdout juror (Mayhew-Proeber) that Petitioner would likely be imprisoned for just 1-to-2 years.

(8) "The trial court's failure to properly instruct the jurors, on a critical legal principle concerning how they could use evidence of other acts charged in the multi-count indictment to assess guilt or innocence, denied Stephen May his federal constitutional rights to due process and a fair trial. U.S. Const. amends. V, VI and XIV."

(9) "Stephen May was deprived of his federal constitutional rights to due process and an impartial jury where Arizona Rules of Evidence 404(b) and 404(c) were impermissibly employed to deny a severance of the counts, lessen the prosecution's burden, and allowed evidence of each of the other alleged sexual offenses to be admitted at trial as proof of the other counts. U.S. Const. amends. V, VI and XIV." Ground 9 alleges two different errors relating to Petitioner's consolidated trial:

• Ground 9A: The trial court's non-compliance with Arizona law, including its alleged failure to make "the four specific findings required to admit other-act evidence under Rule 404(b)," rendered its denial of Petitioner's severance motion reversible error.

• Ground 9B: The trial court's other-act-evidence instruction allegedly confused the jurors and led them to return guilty verdicts, based upon the clear-and-convincing-evidence standard.

(10) "The cumulative effect of the errors at trial and on appeal deprived Stephen May of his federal constitutional rights to due process, a fair trial and the effective assistance of counsel. U.S. Const. amends. V, VI and XIV."

(11) "Stephen May's federal constitutional right to due process was violated when the trial court's instructions to the jury on Arizona's child molestation statute, and the defense that any touching was not sexually motivated, placed the burden of proof on the Defendant. U.S. Const. amends. V and XIV."

(12) "Stephen May's federal constitutional right to an impartial jury, right to due process and guarantee against double jeopardy were violated when the trial judge permitted the jury to reconvene and deliberate further after declaring a mistrial and discharging the jurors. U.S. Const. amends. V, VI and XIV [Ground 12A]." Petitioner tacks three additional claims to this ground: (1) the jurors' communication with the bailiff was an ex parte communication with the court [Ground 12B]; (2) Judge Stephens never explored sua sponte whether the jurors had been exposed to outside influences [Ground 12C]; and (3) Judge Stephens "tacitly influenced the verdict by sending a loud and clear message that [she] wanted the jury to reach a decision" by "failing to take [the] rudimentary actions" of asking the jurors why they wanted to resume deliberations, re-charging the jurors, re-administering their oath, and ensuing that the jurors understood the acceptability of not being able to return a verdict at all [Ground 12D].

(13) "The individual sentence for each count, and the cumulative effect of 75 years imprisonment, violated Stephen May's federal constitutional right to be free from cruel and unusual punishment. U.S. Const. amends. VIII and XIV."

(14) "Stephen May is actually innocent of the charges and, but for the trial errors and constitutional violations, no reasonable juror would have found him guilty beyond a reasonable doubt. U.S. Const. amends. V, VI and XIV."

## DISCUSSION

In their Answer, Respondents contend that Petitioner's claims are procedurally defaulted and/or fail on the merits. As such, Respondents request that the Court deny and dismiss Petitioner's habeas petition with prejudice.

### A.    Exhaustion and Procedural Default

A state prisoner must exhaust his remedies in state court before petitioning for a writ of habeas corpus in federal court. See 28 U.S.C. § 2254(b)(1) and (c); Duncan v. Henry, 513

U.S. 364, 365-66 (1995); McQueary v. Blodgett, 924 F.2d 829, 833 (9th Cir. 1991). To properly exhaust state remedies, a petitioner must fairly present his claims to the state's highest court in a procedurally appropriate manner. See O'Sullivan v. Boerckel, 526 U.S. 838, 839-46 (1999). In Arizona, a petitioner must fairly present his claims to the Arizona Court of Appeals by properly pursuing them through the state's direct appeal process or through appropriate post-conviction relief. See Swoopes v. Sublett, 196 F.3d 1008, 1010 (9th Cir. 1999); Roettgen v. Copeland, 33 F.3d 36, 38 (9th Cir. 1994).

Proper exhaustion requires a petitioner to have "fairly presented" to the state courts the exact federal claim he raises on habeas by describing the operative facts and federal legal theory upon which the claim is based. See, e.g., Picard v. Connor, 404 U.S. 270, 275-78 (1971) ("[W]e have required a state prisoner to present the state courts with the same claim he urges upon the federal courts."). A claim is only "fairly presented" to the state courts when a petitioner has "alert[ed] the state courts to the fact that [he] was asserting a claim under the United States Constitution." Shumway v. Payne, 223 F.3d 982, 987 (9th Cir. 2000) (quotations omitted); see Johnson v. Zenon, 88 F.3d 828, 830 (9th Cir. 1996) ("If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court.").

A "general appeal to a constitutional guarantee," such as due process, is insufficient to achieve fair presentation. Shumway, 223 F.3d at 987 (quoting Gray v. Netherland, 518 U.S. 152, 163 (1996)); see Castillo v. McFadden, 399 F.3d 993, 1003 (9th Cir. 2005) ("Exhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal theory."). Similarly, a federal claim is not exhausted merely because its factual basis was presented to the state courts on state law grounds – a "mere similarity between a claim of state and federal error is insufficient to establish exhaustion." Shumway, 223 F.3d at 988 (quotations omitted); see Picard, 404 U.S. at 275-77.

Even when a claim's federal basis is "self-evident," or the claim would have been decided on the same considerations under state or federal law, a petitioner must still present

1  the federal claim to the state courts explicitly, "either by citing federal law or the decisions

2  of federal courts." Lyons v. Crawford, 232 F.3d 666, 668 (9th Cir. 2000) (quotations omitted),

3  amended by 247 F.3d 904 (9th Cir. 2001); see Baldwin v. Reese, 541 U.S. 27, 32 (2004)

4  (claim not fairly presented when state court "must read beyond a petition or a brief ... that

5  does not alert it to the presence of a federal claim" to discover implicit federal claim).

6      Additionally, under the independent state grounds principle, a federal habeas court

7  generally may not review a claim if the state court's denial of relief rests upon an

8  independent and adequate state ground. See Coleman v. Thompson, 501 U.S. 722, 731-32

9  (1991). The United States Supreme Court has explained:

10      In the habeas context, the application of the independent and adequate state
        ground doctrine is grounded in concerns of comity and federalism. Without the
11      rule, a federal district court would be able to do in habeas what this Court
        could not do on direct review; habeas would offer state prisoners whose
12      custody was supported by independent and adequate state grounds an end run
        around the limits of this Court's jurisdiction and a means to undermine the
13      State's interest in enforcing its laws.

14  Id. at 730-31. A petitioner who fails to follow a state's procedural requirements for

15  presenting a valid claim deprives the state court of an opportunity to address the claim in

16  much the same manner as a petitioner who fails to exhaust his state remedies. Thus, in order

17  to prevent a petitioner from subverting the exhaustion requirement by failing to follow state

18  procedures, a claim not presented to the state courts in a procedurally correct manner is

19  deemed procedurally defaulted, and is generally barred from habeas relief. See id. at 731-32.

20      Claims may be procedurally barred from federal habeas review based upon a variety

21  of factual circumstances. If a state court expressly applied a procedural bar when a petitioner

22  attempted to raise the claim in state court, and that state procedural bar is both

23

24

25

26

27

28

1   "independent"[2] and "adequate"[3] – review of the merits of the claim by a federal habeas court

2   is barred. See Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991) ("When a state-law default

3   prevents the state court from reaching the merits of a federal claim, that claim can ordinarily

4   not be reviewed in federal court.") (citing Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977)

5   and Murray v. Carrier, 477 U.S. 478, 485-492 (1986)).

6        Moreover, if a state court applies a procedural bar, but goes on to alternatively address

7   the merits of the federal claim, the claim is still barred from federal review. See Harris v.

8   Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of

9   a federal claim in an *alternative* holding. By its very definition, the adequate and independent

10  state ground doctrine requires the federal court to honor a state holding that is a sufficient

11  basis for the state court's judgment, even when the state court also relies on federal law. ...

12  In this way, a state court may reach a federal question without sacrificing its interests in

13  finality, federalism, and comity.") (citations omitted); Bennett v. Mueller, 322 F.3d 573, 580

14  (9th Cir. 2003) ("A state court's application of a procedural rule is not undermined where, as

15  here, the state court simultaneously rejects the merits of the claim.") (citing Harris, 489 U.S.

16  at 264 n.10).

17       A procedural bar may also be applied to unexhausted claims where state procedural

18  rules make a return to state court futile. See Coleman, 501 U.S. at 735 n.1 (claims are barred

19  from habeas review when not first raised before state courts and those courts "would now

20  find the claims procedurally barred"); Franklin v. Johnson, 290 F.3d 1223, 1230-31 (9th Cir.

21  2002) ("[T]he procedural default rule barring consideration of a federal claim 'applies only

22  when a state court has been presented with the federal claim,' but declined to reach the issue

23  _____

24       [2] A state procedural default rule is "independent" if it does not depend upon a federal
    constitutional ruling on the merits. See Stewart v. Smith, 536 U.S. 856, 860 (2002).

25

26       [3] A state procedural default rule is "adequate" if it is "strictly or regularly followed."
    Johnson v. Mississippi, 486 U.S. 578, 587 (1988) (quoting Hathorn v. Lovorn, 457 U.S. 255,

27  262-53 (1982)).

28                                   - 43 -

1    for procedural reasons, or 'if it is clear that the state court would hold the claim procedurally

2    barred.'") (quoting <u>Harris</u>, 489 U.S. at 263 n.9).

3           In Arizona, claims not previously presented to the state courts via either direct appeal

4    or collateral review are generally barred from federal review because an attempt to return to

5    state court to present them is futile unless the claims fit in a narrow category of claims for

6    which a successive petition is permitted. <u>See</u> Ariz.R.Crim.P. 32.1(d)-(h), 32.2(a) (precluding

7    claims not raised on appeal or in prior petitions for post-conviction relief), 32.4(a) (time bar),

8    32.9(c) (petition for review must be filed within thirty days of trial court's decision). Arizona

9    courts have consistently applied Arizona's procedural rules to bar further review of claims

10   that were not raised on direct appeal or in prior Rule 32 post-conviction proceedings. <u>See,</u>

11   <u>e.g.</u>, <u>Stewart</u>, 536 U.S. at 860 (determinations made under Arizona's procedural default rule

12   are "independent" of federal law); <u>Smith v. Stewart</u>, 241 F.3d 1191, 1195 n.2 (9th Cir. 2001)

13   ("We have held that Arizona's procedural default rule is regularly followed ["adequate"] in

14   several cases.") (citations omitted), <u>reversed on other grounds</u>, <u>Stewart v. Smith</u>, 536 U.S.

15   856 (2002); <u>see also</u> <u>Ortiz v. Stewart</u>, 149 F.3d 923, 931-32 (rejecting argument that Arizona

16   courts have not "strictly or regularly followed" Rule 32 of the Arizona Rules of Criminal

17   Procedure); <u>State v. Mata</u>, 185 Ariz. 319, 334-36, 916 P.2d 1035, 1050-52 (Ariz. 1996)

18   (waiver and preclusion rules strictly applied in post-conviction proceedings).

19          The federal court will not consider the merits of a procedurally defaulted claim unless

20   a petitioner can demonstrate that a miscarriage of justice would result, or establish cause for

21   his noncompliance and actual prejudice. <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 321 (1995);

22   <u>Coleman</u>, 501 U.S. at 750-51; <u>Murray</u>, 477 U.S. at 495-96. Pursuant to the "cause and

23   prejudice" test, a petitioner must point to some external cause that prevented him from

24   following the procedural rules of the state court and fairly presenting his claim. "A showing

25   of cause must ordinarily turn on whether the prisoner can show that some objective factor

26   external to the defense impeded [the prisoner's] efforts to comply with the State's procedural

27   rule. Thus, cause is an external impediment such as government interference or reasonable

28                                              - 44 -

1   unavailability of a claim's factual basis." <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1052 (9th Cir.

2   2004) (citations and internal quotations omitted). Ignorance of the State's procedural rules

3   or other forms of general inadvertence or lack of legal training and a petitioner's mental

4   condition do not constitute legally cognizable "cause" for a petitioner's failure to fairly

5   present his claim. Regarding the "miscarriage of justice," the Supreme Court has made clear

6   that a fundamental miscarriage of justice exists when a Constitutional violation has resulted

7   in the conviction of one who is actually innocent. <u>See</u> <u>Murray</u>, 477 U.S. at 495-96.

8   **B.     Merits**

9          Pursuant to the AEDPA[4], a federal court "shall not" grant habeas relief with respect

10  to "any claim that was adjudicated on the merits in State court proceedings" unless the state

11  court decision was (1) contrary to, or an unreasonable application of, clearly established

12  federal law as determined by the United States Supreme Court; or (2) based on an

13  unreasonable determination of the facts in light of the evidence presented in the state court

14  proceeding. <u>See</u> 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000)

15  (O'Connor, J., concurring and delivering the opinion of the Court as to the AEDPA standard

16  of review). "When applying these standards, the federal court should review the 'last

17  reasoned decision' by a state court ... ." <u>Robinson</u>, 360 F.3d at 1055.

18         A state court's decision is "contrary to" clearly established precedent if (1) "the state

19  court applies a rule that contradicts the governing law set forth in [Supreme Court] cases,"

20  or (2) "if the state court confronts a set of facts that are materially indistinguishable from a

21  decision of [the Supreme Court] and nevertheless arrives at a result different from [its]

22  precedent." <u>Williams</u>, 529 U.S. at 404-05. "A state court's decision can involve an

23  'unreasonable application' of Federal law if it either 1) correctly identifies the governing rule

24  but then applies it to a new set of facts in a way that is objectively unreasonable, or 2)

25

26  _____

27     [4] Antiterrorism and Effective Death Penalty Act of 1996.

28                                            - 45 -

1  extends or fails to extend a clearly established legal principle to a new context in a way that

2  is objectively unreasonable." Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002).

3          Throughout Petitioner's habeas petition, he raises multiple claims alleging ineffective

4  assistance of trial and appellate counsel. The two-prong test for establishing ineffective

5  assistance of counsel was established by the Supreme Court in Strickland. In order to prevail

6  on an ineffective assistance claim, a convicted defendant must show (1) that counsel's

7  representation fell below an objective standard of reasonableness, and (2) that there is a

8  reasonable probability that, but for counsel's unprofessional errors, the result of the

9  proceeding would have been different. See id. at 687-88.

10         Regarding the performance prong, a reviewing court engages a strong presumption

11  that counsel rendered adequate assistance, and exercised reasonable professional judgment

12  in making decisions. See id. at 690. "[A] fair assessment of attorney performance requires

13  that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the

14  circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

15  perspective at the time." Bonin v. Calderon, 59 F.3d 815, 833 (9th Cir. 1995) (quoting

16  Strickland, 466 U.S. at 689). Moreover, review of counsel's performance under Strickland

17  is "extremely limited": "The test has nothing to do with what the best lawyers would have

18  done. Nor is the test even what most good lawyers would have done. We ask only whether

19  some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel

20  acted at trial." Coleman v. Calderon, 150 F.3d 1105, 1113 (9th Cir.), judgment rev'd on other

21  grounds, 525 U.S. 141 (1998). Thus, a court "must judge the reasonableness of counsel's

22  challenged conduct on the facts of the particular case, viewed as of the time of counsel's

23  conduct." Strickland, 466 U.S. at 690.

24         If the prisoner is able to satisfy the performance prong, he must also establish

25  prejudice. See id. at 691-92; see also Smith, 528 U.S. at 285 (burden is on defendant to show

26  prejudice). To establish prejudice, a prisoner must demonstrate a "reasonable probability that,

27  but for counsel's unprofessional errors, the result of the proceeding would have been

28                                          - 46 -

1  different." Strickland, 466 U.S. at 694. A "reasonable probability" is "a probability sufficient

2  to undermine confidence in the outcome." Id. A court need not determine whether counsel's

3  performance was deficient before examining whether prejudice resulted from the alleged

4  deficiencies. See Smith, 528 U.S. at 286 n.14. "If it is easier to dispose of an ineffectiveness

5  claim on the ground of lack of sufficient prejudice, which we expect will often be so, that

6  course should be followed." Id. (quoting Strickland, 466 U.S. at 697).

7      In reviewing a state court's resolution of an ineffective assistance of counsel claim,

8  the Court considers whether the state court applied Strickland unreasonably:

9      For [a petitioner] to succeed [on an ineffective assistance of counsel claim], ...
       he must do more than show that he would have satisfied Strickland's test if his
10     claim were being analyzed in the first instance, because under § 2254(d)(1),
       it is not enough to convince a federal habeas court that, in its independent
11     judgment, the state-court decision applied Strickland incorrectly. Rather, he
       must show that the [state court] applied Strickland to the facts of his case in an
12     objectively unreasonable manner.

13  Bell v. Cone, 535 U.S. 685, 698-99 (2002) (citations omitted); see also Woodford v.

14  Visciotti, 537 U.S. 19, 24-25 (2002) ("Under § 2254(d)'s 'unreasonable application' clause,

15  a federal habeas court may not issue the writ simply because that court concludes in its

16  independent judgment that the state-court decision applied Strickland incorrectly. Rather, it

17  is the habeas applicant's burden to show that the state court applied Strickland to the facts

18  of his case in an objectively unreasonable manner.") (citations omitted).

19  **C.    Petitioner's Grounds for Relief**

20      **1.    Ground 1**

21      In Ground 1, Petitioner contends that he "is being held in violation of his [Fifth, Sixth,

22  and Fourteenth Amendment] federal constitutional rights, including his right to confront the

23  witnesses against him, right to an impartial jury, right to a fair trial and due process,

24  [because] the jury foreman introduced extrinsic material, in the form of his daughter's 'large

25  fluffy white stuffed bear,' into the jury deliberations and the jurors conducted unauthorized

26  experiments with the extrinsic evidence (teddy bear) on the ultimate issue of [Petitioner's]

27  intent." (Doc. 1, at 8; Doc. 2, at 24-52.)

28                                  - 47 -

1    According to the record, nine jurors who were interviewed or deposed pursuant to

2    PCR counsels' investigation between May 18, 2008, and June 23, 2011, reported that the

3    foreman had brought a stuffed animal to the jury room to serve as a visual aide and proxy for

4    a child while discussing the trial evidence during deliberations. Ground 1, however, does not

5    warrant habeas relief as the Arizona Court of Appeals found this claim precluded, pursuant

6    to Arizona Rule of Criminal Procedure 32.2(a)(3)—a procedural bar that constitutes an

7    independent and adequate state-law basis for denying relief on claims that a defendant could

8    have presented at trial or on direct review, but failed to do so.

9    On October 11, 2007, Petitioner, through Attorney Westerhausen, filed an opening

10   brief that presented four arguments to the Arizona Court of Appeals, none of which alleged

11   juror misconduct. (Doc. 1-2: Opening Brief, at 1-34.) Petitioner's subsequent pleadings on

12   direct review likewise omitted any allegations of juror misconduct. (Doc. 1, at 4; Doc. 1-3:

13   Reply Brief, at 2-10; Doc. 1-4: Memorandum Decision, at 1-7; Doc. 1-5: Petition for Review

14   by Arizona Supreme Court, at 1-6.)

15   The March 30, 2010 PCR petition raised the claim that Foreman Richardson had

16   engaged in jury misconduct by bringing a stuffed animal into the jury room, stating:

17       There is no dispute that Mr. Richardson brought a large white teddy bear into
         the jury room, without the knowledge or permission of the judge or the parties.
18       The jury conducted experiments with the teddy bear to evaluate the evidence
         about how [Petitioner] touched the children. These illicit experiments with the
19       teddy bear were particularly prejudicial to [Petitioner's] defense because the
         jurors viewed the video-taped interviews of two of the child-accusers, who
20       were asked by the interviewers to demonstrate the alleged touchings by using
         a teddy bear.
21
22   (Doc. 1-9: PCR, at 41.)

23   Following an evidentiary hearing on the issue, Judge Hoffman denied relief on

     Ground 1 in a minute entry order that made the following factual findings and legal
24
     conclusions:
25
         The jury foreman brought a stuffed bear (or rabbit according to one juror
26       [Mayhew-Proeber]) into the jury room during deliberations and used it briefly
         to demonstrate how defendant might have touched the victims and how he
27       reached his conclusions in the case. (Hearing Exhibit 29 [Richardson] at 13:14;

28

14:11). Several other jurors handled the stuffed animal, and one juror also used it to give a visual of "what possibly could have happened." (Hearing Exhibit 31 [Harris] at 11:12-13). One of the jurors said the presence of the stuffed animal helped the jurors to see "how he was holding the kids on his lap and how he put his hands between their legs and different things like that." (Hearing Exhibit 49 [Reeves] at 17:22-24). Another said, "he was just showing how different ways that could have been, if he could have held it on his lap or how things could have happened this way." (Separate Appendix to Defendant's Memorandum in Support of Petition for Post-Conviction Relief, Tab 73 [Reeves], 17:6-17:8). Another said, "we brought it in to kind of discuss about it to kind of look at specifics where if a child points here does that really mean this and just kind of see exactly what that translates to in person instead of on the video." (*Id.*, Tab 76 [Rzucidlo], 10:6-9). It was used "just to develop a visual of, you know, different way that that—the person's hand could be if they were going to toss a child in a pool, for instance, and try to elaborate on how the children said that they had been touched as he threw them in a pool or that sort of thing." (*Id.*, Tab 77 [Spradlin], 22:26-23:1).

Evidence presented during the trial established that a stuffed bear was used during forensic interviews of the alleged victims to demonstrate how they were touched by defendant. The stuffed animal in the jury room was used in the same manner as the stuffed bear was during the interviews of the alleged victims.

Because the jury considered extrinsic evidence (the stuffed bear), prejudice is presumed unless the State proved beyond a reasonable doubt that the extrinsic evidence did not taint the verdict. *State v. Hall*, 204 Ariz. 442, 447, ¶ 16, 65 P. 3d 90, 95 (2003); *State v. Poland*, 132 Ariz. 269, 283, 645 P. 2d 784, 798 (1982).

There is no evidence that the presence of the stuffed animal was either favorable or unfavorable to defendant. The stuffed animal was a neutral object used by some of the jurors for demonstrative purposes. Because there is no evidence that the presence of the stuffed animal influenced the verdicts, the Court finds beyond a reasonable doubt that extrinsic evidence did not taint the verdicts.

…

THE COURT FINDS no evidence that juror misconduct influenced the verdicts they reached in this case.

(Doc. 1-13: Minute Entry, filed on November 7, 2011, at 2-3.)

In his petition for review by the Arizona Court of Appeals, Petitioner argued that Judge Hoffman improperly denied post-conviction relief on Ground 1 because: "(1) the jury considered presumptively prejudicial extrinsic evidence; (2) the prosecution failed to rebut the presumption; and (3) the hearing judge misapprehended the presumption of prejudice."

(Doc. 1-14: Petition for Review, at 4-9.) The Arizona Court of Appeals, however, found

Ground 1 to be precluded because Petitioner did not raise this claim on direct appeal, stating:

> ¶ 6 May next contends the trial court erred in rejecting his claim of juror misconduct. The jury foreman brought a stuffed animal into deliberations for demonstrative purposes. May argues, as he did below, that the stuffed animal was "extrinsic evidence" and should not have been permitted in the jury room. He contends the court erred by finding he was not prejudiced by its use.
>
> In neither his petition for post-conviction relief nor in his petition for review did May specify the subsection of the rule under which he was seeking relief for this purported misconduct. *See* Ariz. R. Crim. P. 32.5 ("The defendant shall include every ground known to him or her for vacating, reducing, correcting or otherwise changing all judgments or sentences imposed upon him...."). To the extent the claim fell under Rule 32.1(a), it clearly was precluded because it could have been raised on appeal. Ariz. R. Crim. P. 32.2(a). But May seemed to assert this claim under Rule 32.1(e) based on newly discovered evidence. In his petition for post-conviction relief, he stated that "significant relevant facts were not available until after trial and appeal." "Evidence is not newly discovered unless ... at the time of trial ... neither the defendant nor counsel could have known about its existence by the exercise of due diligence." *State v. Saenz*, 197 Ariz. 487, ¶ 13, 4 P.3d 1030, 1033 (App. 2000). Thus, even assuming May was attempting to raise a claim of newly discovered evidence, he did not show he exercised the requisite due diligence in attempting to secure the new evidence. *See* Ariz. R. Crim. P. 32.1(e)(2). Consequently, May has not sustained his burden of establishing the trial court abused its discretion by denying relief on this ground.

(Doc. 1-17: Memorandum Decision, 2 CA-CR 2012-0257-PR, at 5, ¶ 7.)

In his petition for review by the Arizona Supreme Court, Petitioner not only reiterated

his prior challenges to Judge Hoffman's ruling, but also argued that the Arizona Court of

Appeals had "adopted a harrowing new approach whereby a defendant is barred from raising

a challenge to the jury's use of new evidence in a PCR proceeding." (Doc. 1-18: Petition for

Review, at 5-12.) On April 24, 2013, however, the Arizona Supreme Court summarily denied

review. (Doc. 1-20: Order, Arizona Supreme Court CR-12-0416-PR.)

The Court finds that Ground 1 does not warrant habeas relief because the Arizona

Court of Appeals found this claim precluded, pursuant to Rule 32.2(a) because Petitioner

could have raised Ground 1 on direct appeal, but failed to do so. Arizona Rule of Criminal

Procedure 32.2(a) is an independent and adequate state ground that bars federal habeas

review of constitutional claims. See, e.g., Stewart, 536 U.S. at 860 (determinations made

1  under Arizona's procedural default rule are "independent" of federal law); <u>Smith</u>, 241 F.3d

2  at 1195 n.2 ("We have held that Arizona's procedural default rule is regularly followed

3  ["adequate"] in several cases.") (citations omitted), <u>reversed on other grounds</u>, <u>Stewart v.</u>

4  <u>Smith</u>, 536 U.S. 856 (2002); <u>see also</u> <u>Ortiz</u>, 149 F.3d at 931-32 (rejecting argument that

5  Arizona courts have not "strictly or regularly followed" Rule 32 of the Arizona Rules of

6  Criminal Procedure).

7        Petitioner's conclusory attempt to argue that Rule 32.2(a) does not constitute a

8  regularly applied or well-established state procedural rule because – (1) "[t]here is no

9  established authority in Arizona requiring defendants to raise an unknown claim of juror

10 misconduct on direct appeal," (2) "the Arizona Court of Appeals' decision does not cite to

11 a single decision in support of its aberrant assertion that juror misconduct must be asserted

12 on direct appeal," (3) the Arizona Supreme Court "recently confirmed [that] a defendant who

13 learns of juror misconduct more than 10 days after trial … may still seek post-conviction

14 relief pursuant to Rule 32," and (4) juror-misconduct claims, like allegations of ineffective

15 assistance of counsel, should be reserved for PCR proceedings, (Doc. 2, at 46-48) – is

16 unpersuasive. <u>See</u> <u>Stewart</u>, 536 U.S. at 860; <u>Murray</u>, 745 F.3d at 1016; <u>Ortiz</u>, 149 F.3d at

17 931-32. <u>See also</u> <u>State v. Karpin</u>, 2013 WL 6040376 *2, ¶ 7 (Ariz. App. Nov. 13, 2013)

18 (applying Rule 32.2(a)(3) to preclude post-conviction relief on jury-misconduct claims that

19 the defendant had not raised on direct appeal).

20       Although a procedural default may be overcome upon a showing of cause and

21 prejudice or a fundamental miscarriage of justice, <u>see</u> <u>Coleman</u>, 501 U.S. at 750-51,

22 Petitioner has not established that any exception to procedural default applies.

23       Further, Petitioner cannot establish cause for procedurally defaulting Ground 1 by

24 blaming Thompson and/or Westerhausen for not presenting this claim since Petitioner never

25 presented the state courts with the claim that his trial and appellate attorneys rendered

26 ineffective assistance by failing to raise this juror-misconduct issue; and a federal habeas

27

28                                          - 51 -

petitioner trying to excuse his procedural default by showing ineffective assistance of counsel as cause must first have presented the ineffective assistance claim to the state court.

Consequently, Ground 1 is procedurally barred.

## 2. Grounds 2, 4G.2, and 5B

Grounds 2, 4G.2, and 5B are all premised upon the following series of events: (1) after Judge Stephens declared a mistrial and excused the jury, the bailiff conveyed the jurors' request to resume deliberations; (2) Judge Stephens instructed the bailiff to advise the jurors that they could resume deliberations; and (3) Judge Stephens never summoned the jurors into the courtroom for a second administration of their oaths. (Exh. J: R.T. 1/12/07, at 9-12.) Petitioner contends that three distinct federal constitutional violations stem from the fact that the jurors were not re-sworn before they resumed deliberations. Specifically, Petitioner claims:

> Ground 2: "Stephen May was denied his federal constitutional rights to trial by jury, due process and a fair trial where, after a mistrial had been granted, the jurors reassembled on their own and recommenced their deliberations without ever being re-sworn or placed under oath and, thus, were without jurisdiction to render a valid verdict. U.S. Const. amends. V, VI and XIV."[5] (Doc. 1, at 10.)

> Ground 4G.2: Trial counsel rendered ineffective assistance because he did not object to the jury resuming its deliberations, based upon the rationale that Judge Stephens' mistrial declaration and her verbal discharge absolved the jurors of their oath and their "jurisdiction to reach a verdict." (Doc. 1, at 17; Doc. 2, at 70.)

> Ground 5B: "Stephen May was deprived of his federal constitutional right to the effective assistance of appellate counsel [Tracey Westerhausen] U.S. Const. amends. VI and XIV," because Westerhausen did not argue on appeal that the jury lacked

---

[5] Like many of Petitioner's claims, Grounds 2 and 12A, which were raised during Petitioner's PCR proceeding and direct appeal, respectively, appear to overlap. Ground 2, however, asserts that the jury lacked jurisdiction to return a valid verdict, allegedly because the jurors had not undertaken a second oath after Judge Stephens rescinded her mistrial declaration. In contrast, Ground 12A alleges that Petitioner's "federal constitutional right to an impartial jury, right to due process and guarantee against double jeopardy were violated when the trial judge permitted the jury to reconvene and deliberate further after declaring a mistrial and discharging the jurors," in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

jurisdiction to resume deliberations and return a verdict after the declaration of a mistrial. (Doc. 1, at 19.)

### a.      Ground 2

In its memorandum decision affirming Judge Hoffman's denial of post-conviction relief, the Arizona Court of Appeals stated, in pertinent part:

¶ 4 May contends for the first time on review that he is entitled to relief because "the jury did not have jurisdiction to reach a verdict." He bases this argument on the fact that the jurors continued deliberating after a mistrial initially was declared. [FN2] The propriety of the continued deliberations was raised in May's direct appeal. *May*, No. 1 CA-CR 2007-0144, ¶¶ 7-11.[6] And the trial court correctly found that his claim [alleging that] it had erred by permitting the jury to continue deliberating was precluded because it had been addressed and rejected on appeal. Consequently, to the extent May argues he is entitled to relief due to the jury's continued deliberations, his argument is precluded. *See* Ariz. R. Crim. P. 32.2(a)(3).

> FN2. After extensive deliberations, the jury informed the trial court that it was deadlocked. The court dismissed the jury and declared a mistrial. A few minutes later, the jury asked to begin deliberations again, and both the prosecutor and May's attorney stated they did not object.

¶ 5 May nevertheless contends he can raise this issue in his petition for review because, given the initial declaration of a mistrial, the jury lacked subject matter jurisdiction to decide his case. But in his petition for post-conviction relief before the trial court, May did not base his argument on subject matter jurisdiction. We will not consider May's argument because we do not consider issues raised for the first time on review. *State v. Ramirez*, 126 Ariz. 464, 468, 616 P.2d 924, 928 (App. 1980); *see also* Ariz. R. Crim. P. 32.9(c)(1)(ii) (petition for review shall contain "[t]he issues which were decided by the trial court and which the defendant wishes to present" for review). Moreover, this is not a subject matter jurisdiction issue. *See State v. Maldonado*, 223 Ariz. 309, ¶ 14, 223 P.3d 653, 655 (2010) ("'subject matter jurisdiction' refers to a court's statutory or constitutional power to hear and determine a particular type of case").

(Doc. 1-17: Memorandum Decision, at 3-4, ¶¶ 4-5.)

---

[6] On direct review, Petitioner presented the argument now advanced as Ground 12A of his habeas petition: "Reconvening a jury, after having declared a mistrial and excusing the jury, violates a number of state and federal constitutional rights, specifically, the right to an impartial jury; the right to due process; and, the guarantee against double jeopardy." (Doc. 1-2: Opening Brief, 1 CA-CR 07-0144, at 17.)

1    Thus, the Arizona Court of Appeals upheld the denial of post-conviction relief on

2    Ground 2 because any claim based on lack of subject matter jurisdiction was raised for the

3    first time in his petition for review. Ariz.R.Crim.P. 32.9(c)(1)(ii) confines claims considered

4    in a petition for review to the Arizona Court of Appeals to those claims presented in the trial

5    court. Petitioner's failure to raise this claim in his original petition in the trial court means

6    this claim was not "fairly presented" in state court and has not been properly exhausted. See

7    Roettgen, 33 F.3d at 38 ("A petitioner has not satisfied the exhaustion requirement unless he

8    has fairly presented his claim to the highest state court. [Citation omitted]. Submitting a new

9    claim to the state's highest court in a procedural context in which its merits will not be

10   considered absent special circumstances does not constitute fair presentation. [Citation

11   omitted]."). Because the time to present this claim in a state post-conviction proceeding has

12   passed, the claim is procedurally defaulted. See Ariz.R.Crim.P. 32.2(a), 32.4(a).

13   Petitioner has not established that any exception to procedural default applies. To the

14   extent Petitioner attempts to establish cause by asserting ineffective assistance of trial and

15   appellate counsel (Grounds 4G.2 and 5B), said claims will be discussed below.

16   **b.    Grounds 4G.2 and 5B**

17   Petitioner is also not entitled to habeas relief on Grounds 4G.2 and 5B, which

18   challenge the performance of trial and appellate counsel, respectively, on the ground that they

19   did not object to the jury's jurisdiction to return a verdict after Judge Stephens' mistrial

20   declaration and verbal discharge of the jurors, because the Arizona Court of Appeals found

21   these ineffectiveness claims to be barred. Specifically, the Arizona Court of Appeals found,

22   in pertinent part:

23       ¶ 11 May advances several claims of ineffective assistance of trial and
         appellate counsel. Two of his claims—that counsel was ineffective for failing
24       to raise a jurisdiction challenge to the continued deliberations and failing to
         object to a video of post-arrest questioning—are being raised for the first time
25       on review.[] Therefore, we do not address these claims. See Ramirez, 126 Ariz.
         at 468, 616 P.2d at 928; see also Ariz. R. Crim. P. 32.9(c)(1)(ii).
26

27   (Doc. 1-17: Memorandum Decision, 2 CA-CR 2012-0257-PR, at 7, ¶ 11.)

28                                          - 54 -

By raising Grounds 4G.2 and 5B for the first time on appellate review, these claims were not fully and fairly presented to state courts. <u>See</u> 28 U.S.C. § 2254(b). Failure to fairly present these grounds has resulted in procedural default because Petitioner is now barred from returning to state courts. <u>See</u> Ariz.R.Crim.P. 32.2(a), 32.4(a). And, Petitioner has not established that any exception to procedural default applies.

Moreover, as to the merits of his claims, the Court notes that throughout his habeas petition, Petitioner alleges multiple grounds of ineffective assistance of trial and/or appellate counsel, most of which consist of bald assertions and conclusory suggestions that counsel failed to employ tactics that Petitioner would have chosen with respect to witnesses, evidence, and strategy. "In determining whether the defendant received effective assistance of counsel, '[the court] will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight,' but rather, will defer to counsel's sound trial strategy." <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 939 (9th Cir. 2001) (quoting <u>Strickland</u>, 466 U.S. at 689). "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." <u>Strickland</u>, 466 U.S. at 681.

Here, Petitioner cannot prevail on the merits of these ineffectiveness challenges. Specifically, the Arizona Court of Appeals determined that the jury retained authority to return verdicts in Petitioner's case, (Doc. 1-4: Memorandum Decision, 1 CA-CR 07-0144, at 4, ¶ 10), which eviscerates any argument that Thompson and Westerhausen rendered deficient performance when they did not raise a jurisdictional challenge at trial and on appellate review. Moreover, had Thompson or Westerhausen raised the jurisdictional question at trial and on appellate review, Petitioner has failed to demonstrate the reasonable probability of a different outcome. Thus, the Court finds that the state court's rejection of these claims was neither contrary to, nor an unreasonable application of federal law.

\\\

\\\

### 3.    Grounds 3, 4F, and 5A

Grounds 3, 4F, and 5A are premised upon the alleged unconstitutionality of Arizona's child-molestation statutes. Petitioner alleges as follows:

Ground 3: "Stephen May's convictions violate his federal constitutional right to due process and a fair trial because Arizona's child molestation statutes (A.R.S. § 13-1410 and § 13-1407[E]) are unconstitutional on their face, and as applied, where they require the defendant, who is actually innocent, to prove that any touching lacked sexual motivation, thereby relieving the State of its burden to prove each essential element beyond a reasonable doubt, and no reasonable jury would have found the defendant guilty without the burden having been shifted to the defense. U.S. Const. amends. V, VI and XIV." (Doc. 1, at 12.)

Ground 4F: Thompson rendered ineffective assistance of trial counsel because he "failed to identify" that Arizona's child-molestation statutes are unconstitutional for allegedly shifting the burden of an element to the defendant. (Doc. 1, at 17.)

Ground 5A: Westerhausen rendered ineffective assistance of appellate counsel because she did not challenge the constitutionality of Arizona's child-molestation statutes on direct review. (Doc. 1, at 19.)

### a.    Ground 3

In its memorandum decision affirming Judge Hoffman's denial of post-conviction relief, the Arizona Court of Appeals found that Ground 3 was precluded, pursuant to Arizona Rule of Criminal Procedure 32.2(a), because Petitioner had not challenged the constitutionality of Arizona's child-molestation statute at trial or on direct appeal. (Doc. 1-17: Arizona Court of Appeals' Memorandum Decision, 2 CA-CR 2012-0257-PR, at 2-3, ¶ 2.) Accordingly, Ground 3 is procedurally defaulted because preclusion under Rule 32.2(a) constitutes an adequate and independent procedural bar.

Petitioner has not established that any exception to procedural default applies. To the extent Petitioner attempts to establish cause by asserting ineffective assistance of trial and appellate counsel (Grounds 4F and 5A), said claims will be discussed below.

### b.    Grounds 4F and 5A

Petitioner's claims as alleged in Grounds 4F and 5A are denied on the merits, as the Court finds that the state court's rejection of these claims was neither contrary to, nor an unreasonable application of federal law.

1    Initially, the Court finds that Petitioner has failed to establish a reasonable probability

2    that the outcome of his case would have been different, had Thompson and Westerhausen

3    actually challenged the constitutionality of Arizona's child-molestation statutes at trial and

4    on direct appeal and prevailed. The facts demonstrate that Petitioner was motivated by sexual

5    interest when he touched the genitals of Danielle, Luis, and Taylor. The repetition and

6    deliberate nature of sexual contact with these children demonstrates Petitioner's sexual

7    motivation and diminishes any contention that the touching was inadvertent or otherwise

8    innocent. Specifically, Danielle reported that: (1) Petitioner "grabbed" her and seated her on

9    his lap before he began touching her vagina over her bathing suit; (2) when Danielle tried to

10   escape by swimming away, Petitioner caught her and returned her to his lap; (3) although

11   Danielle told Petitioner to stop when he touched her vagina, he continued doing so; and (4)

12   Petitioner touched her vagina every time she saw him at the pool. (Exh E: R.T. 1/3/07, at

13   119-21, 124-25, 128, 130, 137; Exh. F: R.T. 1/4/07, at 97, 109; Exh. H: R.T. 1/9/07, at 54.)

14   Taylor similarly recalled that: (1) Petitioner touched her vagina over her bathing suit while

15   she was sitting on his lap in the pool's Jacuzzi area; and (2) Taylor had been touched in this

16   manner "20 times." (Exh. E: R.T. 1/3/07, at 73-77, 82-84, 87, 106; Exh. I: R.T. 1/10/07, at

17   9, 11-12, 22, 90-91.) Luis reported that Petitioner placed his open palm on the zipper area of

18   his pants and rested it over his genitals while Petitioner was helping him with a computer in

19   the classroom. (Exh. E: R.T. 1/3/07, at 7-8, 16-17; Exh. F: R.T. 1.4.07, at 7-8.) However,

20   when Luis told his mother, Sandra, that Petitioner had touched his genitals, he demonstrated

21   the act by wiggling his fingers over his crotch and maintained that Petitioner had done this

22   "on purpose." (Exh. E: R.T. 1/3/07, at 52, 55, 57-58, 60.)

23   Significantly, the Court also notes that the jurors in this case were given the following

24   voluntary-act instruction, which implicated Petitioner's accidental or unintentional-related

25   evidence:

26   Before you may convict the defendant of the charged crimes, you must find the
     State proved beyond a reasonable doubt that the defendant committed a

27

28                                           - 57 -

> voluntary act or omitted to perform a duty imposed upon the defendant by law that the defendant was capable of performing.
>
> A voluntary act means a bodily movement performed consciously and as a result of effort and determination. You must consider all the evidence in deciding whether the defendant committed the act voluntarily or failed to perform the duty imposed on the defendant.

(Exh. A: P.I., Item 165, at 8; Exh. I: R.T. 1/10/07, at 107.) And, the following instruction on the elements of child molestation also informed the jury that the prosecution was required to prove beyond a reasonable doubt that Petitioner "knowingly" touched the children's genitals—a burden the State could not meet with proof that Petitioner had accidentally done so:

> The crime of molestation of a child requires proof that the defendant knowingly touched, directly or indirectly, the genitals of a child under the age of 15. It's a defense to child molestation that the defendant was not motivated by sexual interest.

(Exh. A: P.I., Item 165, at 8; Exh. I: R.T. 1/10/07, at 107-08.)

The jury was instructed that "knowingly" meant that "a defendant acted with awareness of or the belief in the existence of conduct or circumstances constituting an offense," that "knowingly" could be proven with evidence showing that Petitioner acted "intentionally," and that "intentionally" meant that "a defendant's objective is to cause that result or to engage in that conduct." (Exh. A: P.I., Item 165, at 9-10; Exh. I: R.T. 1/10/07, at 108-09.)

Thus, the jury would have still convicted Petitioner on the child-molestation counts involving Danielle, Luis, and Taylor, even had Thompson successfully prevailed on a motion to declare Arizona's child-molestation statutes unconstitutional and thereafter obtained jury instructions requiring the State to prove Petitioner's sexual motivation beyond a reasonable doubt. This conclusion also demonstrates that Petitioner's convictions would have been affirmed, even had Westerhausen raised this constitutional argument before the Arizona Court of Appeals on direct review.

1      Next, Petitioner cannot demonstrate that Thompson and Westerhausen rendered

2  deficient performance. Thompson and Westerhausen reasonably forewent challenging

3  Arizona's child-molestation statutes on federal constitutional burden-shifting grounds and,

4  instead, made the tactical decision to make statutory-based arguments that the State had the

5  burden of disproving Petitioner's defense of lack of sexual motivation beyond a reasonable

6  doubt. As noted above, Thompson argued that the State had to carry the burden of proving

7  sexual interest beyond a reasonable doubt because several months before Petitioner's trial,

8  the Legislature had amended Sections 13-103(B) and 13-205(A) to reassign the burden of

9  proving certain defenses to the State, and the Arizona Court of Appeals held that this

10  amendment retroactively applied to defendants who committed their offenses before this

11  legislation, but had yet to be tried. (Exh. A: P.I., Item 241, at 3; Exh. G: R.T. 1/9/07, at

12  72-73; Exh. I: R.T. 1/10/07, at 100.) On appeal, Westerhausen likewise advanced a

13  statutory-based argument to challenge Judge Stephens' final instructions, namely that Section

14  13-1407(E)'s defense of lack of sexual motivation did not fall within Section 13-103(B)'s

15  definition of affirmative defense, and that Section 13-205(A)'s allocation of the burden of

16  proof to the defendant therefore did not apply to this defense. These tactical decisions were

17  objectively reasonable especially considering that the Arizona judiciary had already rejected

18  burden-shifting federal constitutional challenged to Section 13-1407(E):

19          The defendant argues that the statutes defining child molestation are
            unconstitutional because they impermissibly shift to him the burden of
20          disproving an element of the offense. He also argues that the jury instructions
            in this case inadequately informed the jury of the state's burden of proof. We
21          reject both contentions.
            …
22
            The defendant asserts that these statutes effectively created a presumption
23          regarding the existence of sexual motivation which he was required to
            disprove. He argues that this violated due process. *See Mullaney v. Wilbur*, 421
24          U.S. 684 [ ] (1975). …

25          In any event, we find the argument to be without merit. The statutes in
            question did not allocate the burden of proof on any element to the defendant
26          but, rather, created an affirmative defense regarding motive. This is
            constitutionally permissible. *Patterson v. New York*, 432 U.S. 197, 205-07 [ ]
27          (1977); *Gretzler*, 126 Ariz. at 89, 612 P.2d at 1052.

28                                      - 59 -

> We likewise reject the suggestion that the statutes, which contain no reference at all to a presumption, nevertheless create a presumption on the "element" of motivation by sexual interest. *See Patterson*, 432 U.S. at 205 [ ]. Contrary to the defendant's implication, proving the existence of such motivation was not necessary to establish guilt of child molestation under the statute at issue.

Sanderson, 898 P.2d at 490-91. See also State v. Getz, 944 P.2d 503, 505-08 (Ariz. 1997) (holding that statute defining sexual abuse under A.R.S. § 13-1404 must be applied "as written" because its text is "plain on its face," and refusing to "inject" any affirmative defense under § 13-1407 into the crime's elements); State v. Sandoval, 857 P.2d 395, 399 (Ariz. App. 1993) ("A.R.S. section 13-1407(E) makes it a defense to prosecutions brought pursuant to A.R.S. section 13-1410 or to A.R.S. section 13-1404 involving a victim under fifteen years of age that the defendant was not motivated by a sexual interest.").

Because Petitioner cannot establish deficient performance or prejudice, he is not entitled to relief on Grounds 4F and 5A. Moreover, Ground 3 remains procedurally defaulted.

### 4.    Ground 4

In Ground 4, Petitioner raises 10 grounds for relief claiming that his attorney, Joel Thompson, was ineffective. Grounds 4A, 4B, 4E, 4G.1, 4G.3, 4H, 4I, and 4J will be addressed in this section. Grounds 4C, 4D, 4F, and 4G.2 are addressed in the sections of this Recommendation discussing Grounds 2, 3, 6A, and 9A.

### a.    Ground 4A

Ground 4A has four components: (1) the contention that Thompson rendered deficient performance because he did not consult with experts regarding suggestive interview techniques, potential flaws in child-witness testimony, and the psychological profile of child molesters ("Ground 4A.1"); (2) the claim that Thompson should have called an expert to testify about suggestive interview techniques ("Ground 4A.2"); (3) the argument that Thompson should have called Dr. Esplin to testify about how certain factors might render children's memories genuine, but wrong ("Ground 4A.3"); and (4) the contention that Thompson should have called an expert because one juror did not know how child molesters think and whether they are attracted to minors of both genders ("Ground 4A.4"). (Doc. 1, at

14-15; Doc. 2, at 60-68.) The Court finds that the state court's rejection of these claims was neither contrary to, nor an unreasonable application of, clearly established federal law.

After conducting an evidentiary hearing, Judge Hoffman denied relief on Ground 4A, reasoning as follows:

> Defendant claims his trial counsel was ineffective in failing to investigate and present testimony from expert witnesses and character witnesses. Trial counsel testified that he thought he could point out any deficiencies in the forensic interviews of the victims through cross-examination of the officer who conducted the forensic interviews and through closing argument. (Hearing Exhibit 1, at ¶¶ 8-9, 12-13, R.T. of Sept. 7, 2011 at 39.)
>
> He cross-examined each of the child victims, tested their memories of the events, pointed out inconsistencies in their testimony and elicited testimony that supported the defense theory of the case. Dr. Esplin, defendant's expert in the area of child witnesses, testified that he rarely testified for the prosecution. (R.T. of Sept. 8, 2011 at 20-21.) He also testified that trial counsel brought issues regarding credibility of the victims to the attention of the jury. (*Id.* at 34-37.) The Court has considered his testimony at the evidentiary hearing and does not find that his testimony established a reasonable likelihood of a different result had he testified at trial.…
>
> THE COURT FINDS that there is no evidence that the performance of either trial or appellate counsel fell below prevailing objective standards. Even if it had, the Court finds no evidence of any resulting prejudice to the defendant.
>
> IT IS HEREBY ORDERED denying defendant's Petition for Post-Conviction Relief as to all grounds raised at the evidentiary hearing.

(Doc. 1-13: Minute Entry, filed on November 7, 2011, at 5-7.)

- **Ground 4A.1**

Petitioner has failed to demonstrate that Thompson's failure to consult experts on forensic interviews, child witnesses, and the internal thought patterns of pedophiles while preparing for Petitioner's trial constituted deficient performance. Petitioner predicates Ground 4A.1 upon the opinions of Dr. Esplin and his legal expert, Michael Piccarreta, that Thompson should have at least consulted with an expert because the State would call four different children to testify at his consolidated trial. (Exh. CC: R.T. 9/7/11, at 126-27; Exh. DD: R.T. 9/8/11, at 10-11, 62.)

In this case, however, Judge Hoffman received sworn testimony and an affidavit from Thompson establishing that: (1) the Arizona Board of Legal Specialization certified him as

1  a specialist in criminal law; (2) Thompson practiced criminal law exclusively since 1976 and

2  served as a *pro tem* judge for an 8-year period between 1987 and 1995; (3) he had "wide

3  experience representing clients charged with sex offenses" and conservatively estimated that

4  he had "35 to 50 trials" involving such charges; and (4) based upon the aforementioned prior

5  experience, Thompson "consider[ed] himself well-versed and current on literature

6  concerning children's testimony in child sexual abuse cases, with sufficient recognized

7  expertise that [he] had presented a 1992 CLE seminar for the State Bar of Arizona entitled

8  'The Child Witness.'" (Exh. R: PCR Exhibits [Tab 119], Thompson's Affidavit, at ¶¶ 3, 12;

9  Exh. CC: R.T. 9/7/11, at 6, 26-27.)

10      Moreover, the prosecution's pretrial disclosure statements failed to notice any experts,

11  let alone one who would offer testimony regarding the characteristics of child molesters and

12  their victims. (Exh. A: P.I., Items 7, 34, 35.) Additionally, because Luis, Danielle, Sheldon,

13  and Taylor had alleged only that Petitioner had touched their genitals indirectly and over

14  their clothing, neither he nor the prosecution could offer expert testimony regarding any

15  physical, forensic, or medical evidence—such as latent prints, DNA comparisons, or

16  post-assault medical examinations—to bolster or refute these victims' allegations.

17      Petitioner has also failed to establish prejudice. Indeed, to the extent that Petitioner

18  complains that Thompson's decision not to consult an expert before trial adversely impacted

19  his cross-examination of the victims and the State's other witnesses, Petitioner fails to

20  identify what additional favorable testimony Thompson could have elicited from the State's

21  witnesses, had he consulted with experts on forensic interviews, child witnesses, and the

22  internal thought patterns of pedophiles. And, self-serving speculation is insufficient to prove

23  ineffectiveness:

24      We have held that "a defendant has a 'burden of supplying sufficiently precise
        information,' of the evidence that would have been obtained had his counsel
25      undertaken the desired investigation, and of showing 'whether such
        information ... would have produced a different result.'" *United States v.*
26      *Kamel*, 965 F.2d 484, 499 n.45 (7th Cir.1992) (quoting *United States ex rel.*
        *Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987), *cert. denied*, 498
27      U.S. 842 [ ] (1990)). Rodriguez has explained neither what Santos's responses

28

1   to further cross-examination might have revealed nor how those responses
2   might have affected the result. Accordingly, his ineffective assistance of
    counsel claim must fail.

3   U.S. v. Rodriguez, 53 F.3d 1439, 1449 (7th Cir. 1995); see Day v. Quarterman, 566 F.3d 527,

4   539-40 (5th Cir. 2009) ("Day's argument again suffers from speculation. As with her claim

5   regarding counsel's failure to secure the assistance of a medical expert, Day merely 'point[s]

6   to trial counsel's neglect [in] his failure to properly challenge the State's experts via

7   cross-examination' and speculates that '[h]ad counsel investigated the case to any reasonable

8   degree, the inexactness of medicine and the differences of opinion among doctors entail that

9   he would easily have found something more than the perfunctory and peripheral things he

10  used to attempt to challenge the State's conclusions.' Day does not offer a concrete

11  explanation of the testimony that alleged proper cross-examination would have elicited.").

12          •       **Ground 4A.2**

13          Petitioner has failed to demonstrate that Thompson's failure call an expert to testify

14  about suggestive interview techniques constituted deficient performance. In his affidavit,

15  Thompson provided the following explanation for not calling a defense expert on this topic:

16          I felt that any deficiencies in the techniques of the forensic interviews
17          conducted in the May case (e.g., leading the children or implanting memories
            that did not happen) could be better pointed out by me in later argument based
18          upon simply cross-examining the police officer who testified about forensic
            interviewing (Phoenix Police Department Detective Phil Shores) rather than
19          an outside expert.

20  (Exh. R: PCR Exhibits [Tab 119], Thompson's Affidavit, at 3, ¶ 13.)

21          During the evidentiary hearing, the State elicited additional testimony from Thompson

22  on this point:

23          Q. How about an expert for analyzing police action, somebody to come
            educate you about whether the police did a good interview or talked to the
24          right people or something like that?

25          A. Well, certainly, you know, in confession cases, you know, coerced
            confessions and those types of things, experts as to police procedures are very
26          useful, there are areas where they are, and I have used them.

27          Q. Okay, How about in this case? Did you feel it was appropriate?

28                                          - 63 -

A. I felt that we had the best of both worlds, because one of the witnesses was a police officer who testified on just those issues about the bad way to question a witness and whatnot, so I felt that we had the benefit of what an expert would provide without the taint of my expert being a hired gun coming in.

(Exh. CC: R.T. 9/7/11, at 38-39.)

During trial, Thompson elicited Detective Shores' testimony that: (1) forensic interviewers should ask young children very general, open-ended, and non-leading questions in order to avoid suggesting desired responses; (2) the interviewer should avoid mentioning the person or event in question until the child has done so; and (3) police officers should never encourage parents to ask their own children about sexual abuse because parents have a tendency to suggest answers to their questions. (Exh. F: R.T. 1/4/07, at 11-13, 20-22, 24-25.)

Detective Shores' testimony on these points enabled Thompson at the end of trial to argue that the Gentry Walk victims were not worthy of belief because: (1) the first adults to speak with these children were their parents who had "loaded agendas," lacked training in proper forensic interview techniques, and therefore reinforced the allegations against Petitioner with suggestive questions (Exh. E: R.T. 1/3/07, at 86-87, 103, 126-28; Exh. F: R.T. 1/4/07, at 63-64, 103-04; Exh. G: R.T. 1/8/07, at 36, 65, 97-99; Exh. H: R.T. 1/9/07, at 53; Exh. I: R.T. 1/10/07, at 131, 143-44, 151); and (2) Quihuiz and Johnson deviated from the protocol that Detective Shores detailed by asking Taylor and Danielle, respectively, unduly suggestive questions that "plant[ed] information in a big way" in their recollections (Exh. F: R.T. 1/4/07, at 11-13, 20-22; Exh. I: R.T. 1/10/07, at 12-13, 18, 144-45, 148-49). Even Dr. Esplin's affidavit recognized that Thompson "destroyed" the Mesa Police Department detectives who interviewed the Gentry Walk victims. (Exh. DD: R.T. 9/8/11, at 36, citing Exh. R: PCR Exhibits, Vol. 6, Tab 116: Dr. Esplin's Affidavit, at 10.)

Petitioner also cannot establish resulting prejudice. Petitioner failed to meet this burden because he has never identified with particularity what testimony an uncalled expert would have offered the jury, above and beyond what Thompson had already presented

1    through cross-examination of the State's witnesses and highlighted during closing argument.

2    See Tinsley v. Million, 399 F.3d 796, 806 (6th Cir. 2005) ("Putting to the side the question

3    whether [relying on cross-examination to impeach the prosecution's blood-spatter expert]

4    was ineffective—it most probably was not—Tinsley has failed to establish prejudice arising

5    from the modest difference between the jury hearing this theory of defense through

6    cross-examination and hearing it through the mouth of another expert."); Babbitt v. Calderon,

7    151 F.3d 1170, 1174 (9th Cir. 1998) (recognizing that a defendant cannot prove prejudice

8    where his newly proffered evidence was cumulative to that which had already been presented

9    at trial).

10                              •    **Ground 4A.3**

11          Petitioner has failed to demonstrate that Thompson's rendered deficient performance

12    when he failed to call Dr. Esplin to testify about the factors that might render children's

13    memories genuine, but wrong. After the evidentiary hearing, Judge Hoffman found Ground

14    4A.3 was meritless, based on the following reasoning:

15          [Thompson] cross-examined each of the child victims, tested their memories
         of the events, pointed out inconsistencies in their testimony and elicited
16       testimony that supported the defense theory of the case. Dr. Esplin,
         defendant's expert in the area of child witnesses, testified that he rarely
17       testified for the prosecution. (R.T. of Sept. 8, 2011 at 20-21.) He also testified
         that trial counsel brought issues regarding credibility of the victims to the
18       attention of the jury. (Id. at 34-37.) The Court has considered his testimony at
         the evidentiary hearing and does not find that his testimony established a
19       reasonable likelihood of a different result had he testified at trial.

20    (Doc. No.1-13: Minute Entry, filed on November 7, 2011, at 5.)

21          Petitioner contends that Thompson rendered ineffective assistance because he did not

22    call Dr. Esplin to educate the jury about the possible scientific reasons why children might

23    encounter difficulties accurately recalling events, including sexual abuse. Petitioner argues,

24    for instance, that such testimony would have assisted the jury because: (1) all of the charged

25    offenses involved "a momentary touch over clothing in a pool or classroom"—events that

26    created "'simplistic' memories … more subject to 'alteration or malleability' than a more

27    'complex' event, such as an extended fondling or penetration," and (2) Taylor initially

28                                          - 65 -

believed that Petitioner's "alleged touch was 'clumsy' or accidental," but changed her mind about his sexual motivation after Danielle reported being touched in a similar manner. (Doc. 2, at 63.)

However, the record reflects that Thompson had made the jury aware of the significant memory problems plaguing Danielle, Luis, Sheldon, and Taylor through cross-examination and/or closing remarks demonstrating the following:

• Luis had given inconsistent statements about whether Petitioner had squeezed his penis or merely rested his open hand over his genitals. (Exh. E: R.T. 1/3/07, at 15, 33, 41, 44, 51-52, 58-60; Exh. I: R.T. 1/10/07, at 135.)

• Luis seemed uncertain about whether Petitioner had facial hair at the time of the incident. (Exh. E: R.T. 1/3/07, at 28-29, 99; Exh. I: R.T. 1/10/07, at 135.)

• Luis did not tell his mother the name of the man who molested him. (Exh. E: R.T. 1/3/07, at 65; Exh. I: R.T. 1/10/07, at 135.)

• The State did not call Luis' teacher (whose name Luis could not recall at trial) to corroborate Luis' testimony that he asked to go to the bathroom after the incident. (Exh. E: R.T. 1/3/07, at 37; Exh. I: R.T. 1/10/07, at 136.) Nor did Luis tell his teacher what happened when he returned. (Exh. E: R.T. 1/3/07, at 37, 40.)

• Luis could not make an in-court identification of Petitioner at trial, a deficiency the State remedied by showing Luis a series of photographs of several men, including one depicting Petitioner as he appeared several months after the charged molestation. (Id. at 31-32, 93-95.) Thompson thereafter argued that Luis identified Petitioner from one of these men only because Petitioner was the only depicted person in the courtroom. (Exh. I: R.T. 1/10/07, at 137.)

• Luis did not recall speaking with Detective Shores at school. (Exh. E: R.T. 1/3/07, at 43-44.) Shores testified that he did not submit Luis' case to the county attorney for charging because Luis could not recall peripheral details, and there was no corroborating evidence. (Exh. F: R.T. 1/4/07, at 10, 15-16; Exh. I: R.T. 1/10/07, at 137.)

• Danielle's recall of events changed during her forensic interview, which contained inconsistent statements. (Exh. I: R.T. 1/10/07, at 138; Exh. YY: DVD of Danielle's forensic interview [Trial Exhibit 26].)

• Danielle could not recall during trial: (1) whether the September pool party during which Petitioner molested her was on a school Friday or a weekend day; (2) whether she had told Detective Johnson that Petitioner touched her every time she went to the pool; (3) whether she told Petitioner to stop; and (4) how many people attended her birthday pool party. (Exh. E: R.T. 1/3/07, at 127-30.)

• Taylor could not recall the charged incidents very clearly during trial and therefore was uncertain about: (1) which days of the week Petitioner molested her; (2) whether Petitioner rested or moved his hand while it was touching her vagina; and (3) whether

she sat on Petitioner's lap; and (4) which bathing suit she wore during the charged events. (Exh. E: R.T. 1/3/07, at 82-87, 102-03; Exh. G: R.T. 1/8/07, at 67.)

• Taylor initially believed that Petitioner had accidentally touched her, but attributed her change of mind to growing older and maturing. (Exh. E: R.T. 1/3/07, at 80, 84-85, 87; Exh. I: R.T. 1/10/07, at 11, 138-39.)

• Sheldon initially told Detective Verdugo that Petitioner had touched his penis just once, but later reported additional incidents; Sheldon also gave different dates for when these incidents occurred. (Exh. F: R.T. 1/4/07, at 67, 99-100; Exh. G: R.T. 1/8/07, at 105.)

Thompson's cross-examination of the State's witnesses and his closing arguments also alerted the jury to the possibility that external influences might have altered victims' memories:

• Sheldon initially believed that Petitioner touched him accidentally, but changed his mind because Petitioner had contact with his penis on subsequent occasions, and Denise allegedly told him that it was not an accident. (Exh. F: R.T. 1/4/07, at 66, 82-83; Exh. I: R.T. 1/10/07, at 137, 142.)

• Taylor first thought that Petitioner had accidentally touched her genitals, but reconsidered her original interpretation as she "matured." (Exh. E: R.T. 1/3/07, at 80-81, 84-85, 87; Exh. I: R.T. 1/10/07, at 8, 11 [Taylor] id. at 152 [closing argument].)

• The three Gentry Walk victims—Danielle, Sheldon, and Taylor—were exposed to "playground gossip" about Petitioner allegedly molesting other children and therefore convinced themselves that Petitioner had purposefully touched their genitals while in the swimming pool. (Exh. E: R.T. 1/3/07, at 88, 127; Exh. G: R.T. 1/8/07, at 59-63, 69, 96; Exh. H: R.T. 1/9/07, at 50, 53-55; Exh. I: R.T. 1/10/07, at 7-8, 132, 138, 143, 148, 150.)

• While forensically interviewing Taylor and Danielle, Detectives Quihuiz and Johnson deviated from the protocol that Detective Shores detailed by asking unduly suggestive questions that "plant[ed] information in a big way" in the recollections of both victims. (Exh. F: R.T. 1/4/07, at 11-13, 20-22; Exh. I: R.T. 1/10/07, at 12-13, 18, 144-45, 148-49.)

The foregoing evidence and closing remarks demonstrate that counsel had made the jury aware that the victims had suffered memory problems and might have misinterpreted the charged events because of subsequent exposure to external influences or experiences. Under these circumstances, Thompson's reliance upon non-experts to undermine the victims' credibility was an objectively reasonable tactical decision.

- 67 -

1    Furthermore, Petitioner has failed to establish that the verdicts would have been

2    different, had Dr. Esplin testified and potentially given the jury a scientific explanation for

3    the memory flaws that Thompson had exposed through cross-examination.

4                                    • **Ground 4A.4**

5    Petitioner has failed to demonstrate that Thompson's rendered deficient performance

6    when he failed to call an expert because Juror Root had stated during his post-trial interview

7    that he did not know how child molesters "think" and whether they are attracted to children

8    of both sexes. In the affidavit he submitted during Petitioner's PCR proceeding, Thompson

9    indicated that he had considered presenting expert testimony regarding the psychological

10   makeup of a pedophile, but elected against this course of action:

11          The only expert I even considered was an expert to evaluate Mr. May's risk
            factors for aberrant sexual behavior. That said, if a defense expert somehow
12          found or felt that Mr. May did show an attraction to children, that fact could
            become a bad fact for the defense, while evidence that he was not attracted to
13          children (a pedophile) would have been irrelevant, hence inadmissible.

14   (Exh. R: PCR Exhibits [Tab 119], Thompson's Affidavit, at 2, ¶ 7.)

15   Elaborating on this affidavit during the evidentiary hearing, Thompson testified that

16   he had called Dr. Gene Abel, "the godfather of risk assessment," to testify at length in a

17   different trial "about what you can learn and not learn from [risk assessments]," but Maricopa

18   County Superior Court Judge Warren Granville later struck Abel's testimony in its entirety

19   because Abel responded, "You can't tell," when asked, "Can you tell whether this person on

20   this occasion did what they're charged with based on your testing?" (Exh. CC: R.T. 9/7/11,

21   at 37-38.) Because Thompson had the same experience in other cases, he further testified that

22   "judges that I've dealt with [routinely] hold that [this type of testimony] is not relevant." (Id.

23   at 38.) Thompson also reiterated his fear that results showing that Petitioner was in fact

24   attracted to children would harm the defense. (Id.)

25   Thus, Petitioner cannot establish that Thompson rendered deficient performance

26   because: (1) the Sixth Amendment does not obligate an attorney to proffer evidence that is

27   inadmissible; and (2) a lawyer does not render deficient performance by avoiding courses of

28

1  action that might be detrimental to his client's defense. See, e.g., Matylinsky v. Budge, 577

2  F.3d 1083, 1092 (9th Cir. 2009); Murtishaw, 255 F.3d at 939 (quoting Strickland, 466 U.S.

3  at 689).

4         **b.    Ground 4B**

5         In Ground 4B, Petitioner alleges that Thompson should have called an expert to testify

6  about Petitioner's "lifelong battle with a neurological condition called Ataxia," for two

7  different purposes: (1) to demonstrate that any touching was unintentional ("Ground 4B.1");

8  and (2) to explain his abnormal physical appearance, which led two jurors to describe

9  Petitioner as "fidgety," "odd," "very scared he got caught doing something," "creepy and

10  unordinary" and "like a child molester, which was the very offense for which he was on trial"

11  ("Ground 4B.2"). (Doc. 1, at 14-15; Doc. 2, at 57-60.) The Court finds that the state court's

12  rejection of these claims was neither contrary to, nor an unreasonable application of, clearly

13  established federal law.

14         •    **Ground 4B.1**

15         Thompson's decision not to present ataxia-related expert testimony was neither

16  deficient performance nor prejudicial. During the evidentiary hearing, Thompson testified

17  that he had discussed Petitioner's medical condition with Petitioner and his mother, and that

18  he had reviewed the medical records that had been prepared by Petitioner's childhood

19  doctors. (Exh. CC: R.T. 11/7/11, at 17-18, 33-34, 46.) Thompson made the tactical decision

20  not to offer expert testimony or medical records regarding this condition, based upon the

21  following reasoning:

22         First, because the doctor that [Petitioner] had been see[ing] and diagnosed and
           treated by was long since deceased. It had occurred when he was quite young.
23         My recollection from reviewing the records that his mother shared with me, I
           believe, he had indicated that it was a condition that [Petitioner] might outgrow
24         as he matured and developed. He had not—[Petitioner] had not been treated
           by a physician for that condition in his adulthood, there was no doctor locally
25         who had treated him for that condition and under those circumstances, [I] did
           not feel it was a strong point.
26
   (Exh. CC: R.T. 11/7/11, at 34.)
27

28                                         - 69 -

1       Moreover, the medical records and expert testimony that Petitioner offered at the

2   evidentiary hearing, as well as Petitioner's own testimony at trial, collectively verified that

3   Petitioner had not sought medical treatment for his ataxia since 1989, when he was 18 years

4   old, and approximately 15 years before the he committed the first of the seven charged

5   offenses. (Exh. I: R.T. 1/10/07, at 25 [Petitioner's testimony that he was born in September

6   1971], 33, 75-76 [Petitioner's testimony that Dr. Gold, a pediatrician, ceased treating him

7   when he became an adult]; id. at 91 [Petitioner's testimony that he could not recall the last

8   time he had seen a specialist for his neurological condition and estimating that his last

9   consultation transpired in his late teen years or very early twenties]; Exh. CC: R.T. 11/7/11,

10  at 81, 105, 109-10 [Dr. Goodman's testimony acknowledging the absence of any medical

11  records for Petitioner between 1989 and 2008].)

12      Further supporting Thompson's assessment that the ataxia-related testimony and

13  medical records he elected against presenting would not have been "a strong point" in

14  Petitioner's defense, the following evidence offered at trial and the PCR evidentiary hearing

15  demonstrates that Petitioner's ataxia affected only his head's movements and progressively

16  improved throughout his childhood:

17      • Although Petitioner's medical records from childhood were replete with references
        to his involuntary head movements and complaints about neck pain, neither Dr. Gold
18      nor any other physician reported that Petitioner complained about or manifested the
        inability to control his hand movements. (Exh. CC: R.T. 11/7/11, at 82-110.)

19
        • In a report prepared in January 1974, Dr. Gold indicated that he was "most pleased
20      with [Petitioner's] improvement and function." (Id. at 85.) This report contained no
        mention of Petitioner experiencing "movement" difficulties. (Id. at 86.)

21
        • Dr. Gold expressed optimism about Petitioner's progress once again in the report he
22      drafted in September 1974. (Id. at 90.)

23      • On October 25, 1974, Dr. Gold reported that his "motor examination" of Petitioner
        revealed "normal, bulk, tone, and strength of all muscle groups." (Id. at 90-91.)
24      Regarding Gold's entry, "It is of note that his strength in both hands [was] normal, as
        well as his prehension," Dr. Goodman defined "prehension" as "fine motor control,"
25      particularly the "function between the thumb and index finger." (Id. at 91.) This
        record also reported that Petitioner's "cranial nerve examination was within normal
26      limits." (Id.)

27

28                                      - 70 -

• In February 1975, Dr. Gold reported improvement since his evaluation during the prior October and was "most pleased" that Petitioner was "largely asymptomatic" and displayed "no evidence of paresis." (Id. at 92.) Referring to Petitioner as "this right handed child," Dr. Gold continued, "I could not delineate any evidence of ataxia with regular walking or on making sudden turns. Motor examination showed normal bulk, tone and strength of all muscle groups." (Id. at 93.) Petitioner also manifested "no evidence of a cerebellar deficit" "on finger/nose/finger function." (Id.)

• In March 1975, Dr. Gold reported, "At no time could I delineate any evidence of ataxia and he had no difficulty in making sudden turns. Again, motor examination showed normal bulk, tone and strength of all muscle groups." (Id.) Despite Petitioner's "limited cooperation," Gold found his performance on the finger/nose/finger function to be "grossly normal," that is, "what would be expected for an individual of that age." (Id. at 93-94.) Although this report memorialized Petitioner suffering from large circular movements of his head, Dr. Gold did not note that Petitioner also experienced involuntary hand or arm movements. (Id. at 94.)

• Although Petitioner had been prescribed Haldol for these head tics until May 1977, this drug was not administered to address any involuntary hand or arm movements. (Id. at 94-96.)

• In July 1978, Dr. Gold advised Petitioner's mother that he believed that Petitioner's condition might have improved. (Id. at 97.)

• In a letter to Dr. Gold written in September 1979, Dr. Stanley Fahn reported finding "no evidence of progressive neurological disease," described Petitioner's "head shaking as mild, hardly noticeable, [and as something that] should not be a major concern." Dr. Fahn did not report that Petitioner experienced involuntary movements in his hands and arms. (Id. at 97-98.) Dr. Fahn also reported, "I did not detect any ataxia." (Id. at 98.)

• In a letter to Petitioner's mother written in May 1980, Dr. Gold wrote, "Stephen, although slightly different in coordinative skill, has improved when compared to my prior evaluation." (Id. at 99-100.)

• In June 1981's report, Dr. Gold memorialized his finding that Petitioner's "detailed neurological examination was within normal limits." (Id. at 100.) Although Petitioner complained of neck pain and requested a neck brace, Dr. Gold did not record any involuntary arm or hand movements. (Id. at 100-01.)

• Dr. Gold's reports in June 1982 and November 1984 memorialized Petitioner's continued difficulties with his head's "most unusual movement disorder of obscure etiology," but omitted any allusion to involuntary hand and arm movements. (Id. at 101-02.)

• A report prepared by Dr. Gruver of the Mayo Clinic during the same time period found "no evidence of a progressive disorder" and indicated that Petitioner might be "able to control his head movements by simple maneuvers, such as touching the mandible or resting his head." (Id. at 102-03.) Dr. Gruver likewise made no mention of involuntary hand or arm movements. (Id.)

• The brain scan conducted in August 1988 was "essentially unchanged from the prior scan." (Id. at 103-04.)

• In September 1988, when Petitioner turned 17 years old, Dr. Gold reported that Petitioner's "isolated muscle testing did not show any evidence of weakness." (Id. at 104.)

• Not surprisingly in light of Dr. Gold's report in September 1988 that Petitioner's "isolated muscle testing" revealed no signs of weakness, Petitioner testified at trial that he first became a life guard when he was 15 years old (sometime in 1986), that he started teaching swim lessons for the American Red Cross in 1990 (when he was 18 and 19 years old), that he served as the aquatic director for a health club, that he continued teaching swimming lessons after he moved to Arizona, and that he provided swimming lessons at the Gentry Walk apartment complex's community swimming pool after 2001. (Exh. I: R.T. 1/10/07, at 26, 32, 36.)

• Petitioner demonstrated his ability to coordinate and control his hand movements by not only obtaining certification to perform CPR from American Red Cross, but also finding employment as a CPR instructor. (Id. at 26, 28.)

• Consistent with the medical reports detailed above, Petitioner testified that the most prominent symptoms of his neurological disorder affected his vision and caused involuntary head movements. (Id. at 33, 65.)

• Petitioner never listed involuntary hand movements as a symptom of his neurological condition—the name of which (ataxia) he could not recall during trial and therefore called a "condition that doesn't have a diagnosis per se." (Id. at 33-34.)

• Petitioner testified that he did not disclose his neurological disorder to his employers. (Id. at 85.)

• Petitioner testified at trial that his condition did not cause loss of memory or consciousness. (Id. at 86.)

• Petitioner testified that he had no issues driving a car. (Id. at 90.)

The aforementioned evidence supports the following conclusions: (1) Thompson did not render deficient performance when he elected against presenting ataxia-related evidence, above and beyond Petitioner's testimony, as the medical records and Petitioner's own testimony demonstrated that his condition had improved since childhood, no longer required treatment, and did not affect his ability to perform the hand movements underlying the charged offenses; and (2) there is no reasonable probability the jury would have acquitted Petitioner, had Thompson presented the evidence at issue.

\\\

\\\

\\\

• **Ground 4B.2**

The Court also finds that Thompson's failure to present medical testimony and records to explain Petitioner's appearance to the jury was neither deficient performance nor prejudicial.

During trial, Thompson elicited testimony from Petitioner about his neurological condition:

> Q. We have had access to the interview that you had with Detective Verdugo in November of 2005. You mentioned there that you had a neurological condition. Could you share with us some details about that neurological condition?
>
> A. Sure. From birth, I—some of this I remember, some of this I have been told, but from birth I experienced a lot of hospital stays, a lot of doctor's visits. I had a pediatric neurologist from Columbia Presbyterian that I saw from as young as I can remember all the way to the late teens, probably in the early 20s until I could no longer see a pediatrician, I guess.
>
> I visited the specialist at the Mayo Clinic on his request when I was about eight. I have a neurological condition that doesn't have a diagnosis per se. It doesn't have a treatment per se, but that soft spot at the top of your head where that's supposed to close when you're a baby, it never closed on me and I have nervous ticks and I tend to be clumsy and also shorter on my left side and making me even more clumsy and I have glasses and eye conditions that go along with that as well.
>
> Q. Okay. So among the symptoms that you have, are there any kinds of body movements that you have that are non-consciously [sic] controlled?
>
> A. Mostly head ticks. I tend to shake my head left and right and I am trying to do it, but don't know exactly how I do it. And up and down, but uncontrollable head-type movements.
>
> Q. While watching the video of your interview with Detective Verdugo, there seemed to be especially in period of times when you were by yourself in the [interview] room, you seemed to be moving your head side to side. Is that symptomatic of the neurological condition that you have?
>
> A. Yes.
>
> Q. Is that something that you are aware of and conscious of when it happens?
>
> A. No.
>
> Q. Were you nervous when you were talking to Detective Verdugo?
>
> A. Yes, very much.

Q. Why?

A. I had never been arrested before. It was very scary.

Q. When you are nervous, does that exacerbate or increase any of your neurological condition symptoms.

A. I have been told that it does.

Q. Are you aware of it?

A. No. Never.

(Exh. I: R.T. 1/10/07, at 33-34.)

During their interviews several years after Petitioner's trial, Jurors Andrews and Harris both recalled that Thompson had offered evidence that Petitioner's abnormal physical mannerisms were the manifestations of a neurological condition. Despite being unable to recall any specifics because of the passage of 4 years since Petitioner's trial, Juror Andrews—who reportedly found Petitioner "creepy and unordinary" and thought that Petitioner's "physical appearance, body language, and personality" comported with the "perfect profile of someone to do such a crime"—told Petitioner's investigator, "I remember there was something wrong of—there was some kind of condition or something was said that I cannot remember about this." (Exh. JJ: Transcript of Interview of Juror Harris, dated 3/5/11, at 3.) When asked whether he considered Petitioner's ataxia while determining whether any sexual contact was accidental, Juror Andrews responded, "Yeah, I took it into consideration. I think, I know a lot of us on the jury did." (Id.) Juror Harris—who told Petitioner's PCR investigator more than 4 years after trial that he had noticed Petitioner's "fidgety" mannerisms, admitted that Petitioner struck him as "a little odd," thought that "something's not right with this individual" upon viewing Petitioner, and recalled the videotape footage depicting Petitioner "constantly moving as if he was very, very scared that he got caught doing something" after Verdugo left the interview room—likewise demonstrated his recollection that Thompson had offered ataxia-related evidence at trial with the following post-trial interview statement:

Q. Do you remember anybody bringing up Stephen May's condition called ataxia, a neurological condition?

A. Yes. I do remember that and I believe that is the cause of his ticking, I believe they called it, his constantly moving back and forth of his head. I do remember them bringing that up.

(Exh. JJ: Transcript of Interview of Juror Harris, dated 2/23/11, at 17.)

Significantly, neither Andrews nor Harris ever told Petitioner's investigator that they or any other juror disbelieved Petitioner's testimony that he had this neurological disorder. Of equal importance is the fact that Petitioner's investigator never asked these two jurors whether they would have abandoned their subjective impressions of Petitioner as "creepy and unordinary," "fidgety," "a little odd," and as an individual with "something[] not right," had Thompson called a physician or admitted medical records to provide them with physiological explanations for Petitioner's physical appearance and involuntary head movements. Consequently, this ineffectiveness claim does not warrant habeas relief because it rests entirely upon Petitioner's speculation that the verdicts would have been different, had Thompson presented evidence regarding Petitioner's neurological condition beyond Petitioner's own testimony. See Hodge v. Haeberlin, 579 F.3d 627, 640 (6th Cir. 2009) ("Hodge's speculation that his testimony would have left a favorable impression with the jury does not demonstrate the required prejudice under *Strickland*."); Bible v. Ryan, 571 F.3d 860, 871 (9th Cir. 2009) (collecting cases holding that "speculation is not sufficient to establish prejudice" in the ineffective-assistance context).

### c.    Ground 4E

In Ground 4E, Petitioner contends that Thompson rendered ineffective assistance of trial counsel because he did not object to the admission of videotape footage of Petitioner's post-arrest interview that included references to a New York investigation that Petitioner contends were "allowed to permeate the trial," and which one juror (Joanna Rzucidlo) found "unsettling." (Doc. 1, at 16-17; Doc. 2, at 68-69; Exh. PP: Transcript of Interview of Juror Rzucidlo, dated 12/18/09, at 6-7.)

1    The State played the videotape of Petitioner's post-arrest interview during its redirect

2    examination of Detective Verdugo on the fourth day of trial without any defense objection.

3    (Exh. G: R.T. 1/8/07, at 112-13.) The videotape footage to which Thompson did not object

4    depicted Detective Verdugo confronting Petitioner about a report alleging that Petitioner had

5    been "trying to stare at some little kids at a school or a park or something" in New York on

6    an unspecified occasion in 1996. (Exh. ZZ: DVD of Petitioner's Interview [Trial Exhibit 27],

7    at 10:49-10:50.) Petitioner denied that he had ever been arrested or questioned by police in

8    New York at any time. (Id.) This exchange lasted less than 2 minutes and occurred during

9    the second half of Petitioner's hour-long post-arrest interview. (Id.)

10   One juror thereafter submitted the question, "Is it a lie that there was an instance in

11   New York?" (Exh. A: P.I., Item 145.) Because Thompson objected, the trial court did not ask

12   this question. (Exh. G: R.T. 1/8/07, at 118-21.) However, the prosecutor subsequently asked

13   Detective Verdugo whether he had "made up out of the blue" the "incident that might have

14   happened in New York," because the jurors had inquired about whether Verdugo fabricated

15   the names of the uncharged children he mentioned during the post-arrest interview and asked

16   another question asking why he lied to Petitioner during the post-arrest interview. (Id. at

17   119-20, 122; Exh. A: P.I., Items 139, 140.) Verdugo responded that the New York incident

18   "was something I referred to." (Exh. G: R.T. 1/8/07, at 122.)

19   Neither party revisited the New York incident during closing arguments or while

20   questioning the remaining trial witnesses, including Petitioner. (Exh. H: R.T. 1/9/07, at 5-74;

21   Exh. I: R.T. 1/10/07, at 5-159.)

22   Even assuming that Thompson rendered deficient performance by not objecting to the

23   videotape's brief footage concerning this 1996 New York incident, Petitioner cannot

24   demonstrate that this omission resulted in prejudice.

25   Juror Rzucidlo's post-trial interview statements do not support Ground 4E, but instead

26   demonstrate that the jury did not consider the New York incident as evidence of Petitioner's

27   guilt, because Rzucidlo told Petitioner's PCR investigator that: (1) no police officers ever

28

testified about the New York incident; (2) the judge did not answer the question she submitted about the New York incident; (3) the jurors construed the court's other-act instructions as "not letting [them] discuss [the New York incident] in the actual trial," which Rzucidlo found to be "a little wrong" because the incident was referenced during the post-arrest interview; (4) the jurors "had no idea" whether the New York incident was similar or dissimilar to the charged offenses. (Exh. PP: Transcript of Interview of Juror Rzucidlo, dated 12/18/09, at 6-7.)

Furthermore, the references to the New York incident were brief and isolated events during a trial that spanned several days. See Brecht, 507 U.S. 619, 639 (1993) (noting that prosecutor's improper remarks comprising less than two pages of a 900-page record, were infrequent, and thus "did not substantially influence the jury's verdict"); Hall v. Whitley, 935 F.2d 164, 165-66 (9th Cir. 1991) ("Put in proper context, the comments were isolated moments in a 3-day trial."). And, Thompson also elicited ample proof that New York law enforcement neither arrested nor charged Petitioner with any crime in 1996, the State called no witnesses to present testimony about this incident, and Petitioner testified that he had never been arrested before the instant case and was therefore "very much" nervous during his interview on November 9, 2005.

The Court finds that the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

### d.    Ground 4G

This ineffectiveness claim has three components, all of which concern trial counsel's conduct after Judge Stephens reported that the jurors wanted to resume deliberations following the mistrial declaration: (1) Thompson allegedly should have consulted with Petitioner to a greater extent before announcing his lack of opposition ("Ground 4G.1"); (2) Thompson allegedly should have objected to the jurors continuing to deliberate after Judge Stephens declared a mistrial, based upon the rationale that allowing the mistrial to stand was the best tactical decision ("Ground 4G.2"); and (3) Thompson failed to "make an appellate

record" when the "unsworn" jurors announced their desire to resume deliberations ("Ground 4G.3"). (Doc. 1, at 17; Doc. 2, at 70.) The Court finds that the state court's rejection of these claims was neither contrary to, nor an unreasonable application of, clearly established federal law.

•   **Ground 4G.1**

Thompson's alleged failure to consult with Petitioner before announcing a lack of opposition to the jurors decision to resume deliberations was not deficient performance. The Arizona Court of Appeals found as follows regarding Ground 4G.1:

> Similarly, the trial court correctly rejected his fourth claim—that trial counsel "did not adequately confer with [him]" before allowing the jury deliberations to continue. In rejecting this claim, the court found that counsel's decision was "a tactical and strategic decision" that cannot "form the basis for a claim of ineffective assistance." [Doc. 1-13: Minute Entry, filed on 11/10/11, at 6] But the claim also fails because May does not assert he would have made a different decision had he been consulted further. *See* [State v. Salazar, 173 Ariz. 399, 414, 844 P.2d 566, 581 (1992)] (defendant must prove prejudice; without it, court need not address counsel's performance); *see also Strickland*, 466 U.S. at 694.

(Doc.1-17: Memorandum Decision, at 8, ¶ 13.)

The Arizona Court of Appeals' first articulated rationale—the decision to allow the jurors to resume deliberating was a tactical matter exclusively within Thompson's purview—comported with clearly established federal law. Indeed, numerous courts—like the Arizona Court of Appeals in the instant case—have classified the decision to request or refuse a mistrial as a strategic matter falling within the exclusive province of defense counsel, despite a client's contrary wishes. "The Supreme Court has never suggested that decisions about mistrials are 'of such a moment' that they can be made only by the defendant himself, and every circuit to consider the question has concluded that decisions regarding mistrials belong to the attorney, not the client." U.S. v. Chapman, 593 F.3d 365, 368 (4th Cir. 2010) (collecting federal circuit cases). Courts reaching this conclusion have reasoned that "[t]he decision whether to move for a mistrial or instead to proceed to judgment with the expectation that the client will be acquitted is one of trial strategy." Galowski v. Murphy, 891

F.2d 629, 639 (7th Cir. 1989). Accordingly, these courts have held that an attorney possesses exclusive authority to decide whether to request a mistrial or not, and that the defendant's lack of consent or express opposition is of no consequence. See Chapman, 593 F.3d at 367-70.

Thus, it follows that Thompson's performance cannot be deemed deficient on the basis that he conferred only momentarily with Petitioner before announcing that the defendant had no objection to the jurors resuming their deliberations.

Alternatively, Ground 4G.1 does not warrant habeas relief because the Arizona Court of Appeals reasonably determined that Petitioner could not prove prejudice from the alleged omission because Petitioner did "not assert he would have made a different decision had he been consulted further." (Doc. 1-17: Arizona Court of Appeals' Memorandum Decision, at 8, ¶ 13.) The factual finding is supported by the record because the following passage from Petitioner's affidavit does not mention that he would have opposed the jury's request to resume deliberations, had Thompson conferred with him to a greater extent:

> 9. During trial, after the judge declared a mistrial, the jury was excused and the judge set a new trial date. The judge then told me I would remain on release until the new trial on the same terms and conditions of release previously imposed.
>
> 10. The judge then suddenly said that the jury wanted to keep deliberating. After the judge said that, Mr. Thompson and I conferred at the counsel table for a very short time, no more than twenty seconds, before he informed the court that he did not object to the jury continuing deliberations. Mr. Thompson did not discuss with me any of the legal issues underlying this decision, nor did he discuss with me the risks and possible consequences of this decision.
>
> 11. I declare under the penalty of perjury that the foregoing is true and correct.

(Exh. R: PCR Exhibits, Vol. 6, Tab 117: Petitioner's affidavit, dated February 22, 2010, at 2-3.)

Because Petitioner did not testify at the evidentiary hearing, he did not supplement this affidavit with any assertion that he would have opposed the jury's request to resume deliberations, had he and Thompson consulted for a lengthier period of time.

1    Further, Petitioner also fails to establish prejudice because he has not demonstrated

2    that Judge Stephens would have refused to let the jury continue deliberating, even had

3    Thompson decided to oppose the jury's request after a lengthy conference with Petitioner on

4    the issue. See U.S. v. Taylor, 569 F.3d 742, 748 (7th Cir. 2009) (finding that the failure to

5    oppose a mistrial request foreclosed finding prejudice because defendant offered no proof

6    that such an objection would have altered the district court's ruling).

7    Consequently, Petitioner cannot prove either deficient performance or resulting

8    prejudice.

9    • **Ground 4G.2**

10   The Court finds that Thompson's failure to object to the jurors continuing to deliberate

11   after Judge Stephens declared a mistrial was neither deficient performance nor prejudicial.

12   In her minute entry order, Judge Hoffman acknowledged that Petitioner had raised

13   Ground 4G.2 with the following statement in the "Allegations of Ineffective Assistance of

14   Counsel" section: "Michael Piccarreta opined that trial counsel Joel Thompson was

15   ineffective in … (4) not objecting to continued deliberation after a mistrial was declared."

16   (Doc. 1-13: Minute Entry, filed on November 10, 2011, at 3.) Judge Hoffman denied relief

17   on Ground 4G.2 with the following statements at the end of her order:

18   THE COURT FINDS that there is no evidence that the performance of either
     trial or appellate counsel fell below prevailing objective standards. Even if it
19   had, the Court finds no evidence of any resulting prejudice to the defendant.

20   IT IS HEREBY ORDERED denying defendant's Petition for Post-Conviction
     Relief as to all grounds raised at the evidentiary hearing.
21
     (Id. at 6-7.)
22
23   Petitioner cannot demonstrate that Thompson's consent to the jury's post-mistrial

24   request to resume deliberations constituted deficient performance. The Supreme Court

     squarely rejected the notion that a tactical decision that ultimately proved unavailing
25
     necessarily constitutes deficient performance:
26
27   Judicial scrutiny of counsel's performance must be highly deferential. It is all
     too tempting for a defendant to second-guess counsel's assistance after

28   - 80 -

conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133-34 [ ] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Strickland, 466 U.S. at 689.

Nor can Petitioner establish deficient performance, based upon the fact his legal expert, Michael Piccarreta, testified that he would have opposed the jury's request to resume deliberations and elected instead to "live and fight another day." (Exh. CC: R.T. 9/7/11, at 129.) Petitioner cannot demonstrate that no reasonable attorney in Thompson's place would have agreed to the jury's request to continue deliberating, given the fact that strategic reasons supported Thompson's determination that this course of action might prove beneficial. In his post-trial affidavit, Thompson expressed concern that if the case was retried, Petitioner would have "to go through another complete trial with the prosecution in possession of a complete transcript of his testimony from the mistried case." (Exh. R: PCR Exhibits [Tab 119], at ¶ 38.)

Moreover, the notes that the jury sent to Judge Stephens before her mistrial declaration, as well as the responses to the jury's questions, provided Thompson with reasonable grounds to conclude that allowing this group of jurors to resume deliberations would benefit Petitioner. Specifically, at 2:58 p.m., the jurors sent their next note, which declared, "We are a hung jury because the not guilty side doesn't believe there is enough evidence and the guilty side believes there is." (Exh. A: P.I., Item 218.) Despite receiving an impasse instruction and returning to the jury room for further discussion, the jurors informed Judge Stephens less than 30 minutes later that the two sides remained divided over whether reasonable doubt existed:

Part of the jury believes they have heard sufficient evidence and the evidence is of sufficient quality to resolve reasonable doubt; part of the jury believes the quantity and quality of evidence is not sufficient to resolve reasonable doubt.

1  We do not have significant dispute over the facts or the elements of law, or
2  how to apply the law to the facts. We feel we need more guidance to "proof
   beyond a reasonable doubt."

3  (Exh. A: P.I., Item 219 [filed at 3:30 p.m.].)

4      Instead of providing the jurors with a supplemental instruction clarifying the meaning

5  of reasonable doubt, Judge Stephens declared a mistrial. (Exh. J: R.T. 1/12/07, at 9-10.)

6  Under these circumstances, Thompson could reasonably conclude that this jury would give

7  Petitioner the benefit of the doubt and acquit him on all counts when they ultimately resumed

8  deliberations.

9      Nor can Petitioner demonstrate prejudice. As noted above, Petitioner cannot carry his

10  burden through self-serving speculation that Judge Stephens would have sustained any

11  objection that Thompson might have lodged to the jury's request to resume deliberations.

12      Nor can Petitioner prove a reasonable probability that the outcome on the jury's

13  request to continue deliberations would have been different, had Thompson followed the

14  courses of action Piccarreta enumerated during the evidentiary hearing, which included

15  moving Judge Stephens to: (1) poll the jurors individually about their desire to continue

16  deliberating; (2) conduct an on-the-record inquiry to explore the events or reasons that

17  prompted the jury to have the bailiff convey their desire to resume deliberations moments

18  after the mistrial declaration; and (3) question the bailiff, Mike Fucci, under oath about what

19  the jurors said to him when they asked him to relate to Judge Stephens their desire to

20  continue deliberations. (Exhibit CC: R.T. 9/7/11, at 129-30.) Petitioner improperly speculates

21  that Judge Stephens would have granted these motions.

22      Thus, Petitioner cannot demonstrate either deficient performance or resulting

23  prejudice.

24          •   **Ground 4G.3**

25      Lastly, the Court fails to find deficient performance or prejudice in counsel's failure

26  to "make an appellate record" when the "unsworn" jurors announced their desire to resume

27

28

deliberations. Petitioner's one-sentence claim relies entirely on speculation. He fails to identify – much less demonstrate – any grounds for ineffective assistance.

     **e.**  **Ground 4H**

   Petitioner next contends that Thompson rendered ineffective assistance because he "failed to introduce any evidence of [his] good character or reputation for behaving appropriately when working with children in other community activities, even though [Petitioner] and his family provided [Thompson] with names" of "non-expert witnesses who could be called to corroborate [Petitioner's] testimony about his appropriate non-sexual behavior." (Doc. 1, at 17; Doc. 2, at 73.) Petitioner attributes this alleged omission to Thompson's "erroneous[] belie[f] that character evidence was not admissible in a case such as this," despite the fact that "Arizona Rules of Evidence 404(c) and 405 provide for the admissibility of character or reputation testimony that a defendant does not possess the character trait that would cause him to commit the offense." (Id.)

   The pertinent state-court decision denying Ground 4H found as follows:

> Defendant claims his trial counsel was ineffective in failing to investigate and present testimony from expert witnesses and character witnesses. …

> Defendant claims that his trial counsel was ineffective in failing to present character witnesses at trial. He presented recorded statements from two people who worked with defendant in the past. (Hearing exhibits 38 and 39.) No character witnesses testified at the evidentiary hearing. Trial counsel testified that there was a limited network of possible character witnesses. He also gave reasons for not presenting evidence of defendant's good character and good conduct with children. (Hearing exhibit 1 at ¶¶ 25-26.) Defendant has not demonstrated that trial counsel was ineffective in failing to call character witnesses or a reasonable likelihood of a different result if he had called character witnesses.

(Doc. 1-13: Minute Entry, filed on November 10, 2011, at 5-6.) Judge Hoffman's denial of post-conviction relief on Ground 4H was neither contrary to, nor an unreasonable application of, clearly established federal law.

   During the PCR evidentiary hearing, Thompson testified that he consulted with Petitioner and his parents about whether to call character witnesses during the defense case, but only "a pretty limited number of friends and work associates …were discussed." (Exh.

1   CC: R.T. 9/7/11, at 18.) On cross-examination, Thompson explained that he did consider

2   calling character witnesses, but he did not do so because these individuals were either

3   unavailable or had been called by the prosecution in its case in chief:

> The witnesses were really not available. I can recall going over a list of potential witnesses with [Petitioner] and focused on one … one witness in particular [Linda Cano], a woman he had worked with and I believe [that she] was ultimately called by the State to testify, so we got to cross-examine her. I don't recall there being other character-type witnesses.

7   (Id. at 32-33.) Significantly, the state record reflects that on December 19, 2006, Thompson

8   filed a supplemental disclosure notice announcing his intention to call Linda as a defense

9   witness at trial. (Exh. A: P.I. Item 44.)

10      Thompson further testified that he "recalled telling [Petitioner and his parents] that

11  [they] can't bring in witnesses to testify that [Petitioner] had 15 other opportunities to molest

12  children and didn't." (Exh. CC: R.T. 9/7/11, at 19.) Petitioner never questioned Thompson

13  during the evidentiary hearing about whether Petitioner and/or his parents had ever informed

14  him that Angela Cazel-Jahn and Kelley Fitzsimmons were willing to testify about

15  Petitioner's non-sexual appropriate behavior toward children. (Id. at 5-23, 42-47.) As Judge

16  Hoffman observed in her order denying relief on Ground 4H, Petitioner did not call either

17  witness at the PCR evidentiary hearing, but instead offered their declarations in evidence.

18  (Exh. BB: R.T. 9/6/11, at 2-16; Exh. CC: R.T. 9/7/11, at 2-153; Exh. DD: R.T. 9/8/11, at

19  2-93.)

20      Here, the record reflects that Thompson had an objectively reasonable basis for not

21  calling Angela Cazel-Jahn and Kelley Fitzsimmons to testify that they had observed

22  Petitioner's interactions with children and found his behavior appropriate because such

23  evidence would have been cumulative to evidence that Thompson had already offered

24  through two other trial witnesses, namely, Linda Cano and Desiree Wells. An attorney's

25  decision to forego the presentation of cumulative evidence does not constitute deficient

26  performance. See Matylinsky, 577 F.3d at 1096-97 (counsel's failure to call 41 witnesses

27  who would have testified to defendant's good character was neither deficient performance

28                                              - 84 -

nor prejudicial because such testimony would have been cumulative to the evidence counsel had introduced to "humanize" the defendant); State v. Gerlaugh, 698 P.2d 694, 708 (Ariz. 1985) ("In particular, the decision whether to call cumulative character witnesses is precisely the kind of strategic choice that will not establish reversible error.").

On cross-examination of Linda Cano, whom Thompson had planned to call as a character witness during the defense case, Thompson elicited testimony that: (1) Linda had hired Petitioner to work in the Special Olympics program, wherein approximately 80% of the athletes were under 18 years of age; (2) Petitioner worked for Linda from October 2004 to December 2005; (3) Petitioner had not only helped coach athletes in swimming, speed skating, golf, and ice skating, but also attended basketball games and practices; and (4) Linda never received any complaints about Petitioner from any of the athletes, their parents, or other staff members who attended or participated in these events. (Exh. A: P.I. Item 44; Exh. F: R.T. 1/4/07, at 6, 10-13, 18-22.) Such testimony enabled Thompson to remind the jury during closing argument that Linda had received no complaints about Petitioner during his employment at her program. (Exh. I: R.T. 1/10/07, at 144.)

During the defense case, Thompson called a Gentry Walk resident, Desiree Wells, to testify that: (1) she allowed Petitioner to play with and give swim lessons to her 6-year-old daughter, Teagan; (2) she had watched Petitioner interact with children in the community swimming pool on many occasions, but had never seen Petitioner "focusing" on or "isolating a specific child"; (3) on more than 20 occasions, Desiree saw Petitioner playing with Taylor, Danielle, and Sheldon, and never saw "any inappropriate conduct or inappropriate touching"; and (4) Desiree noted that at least 30 people, including at least 10 adults, attended the birthday pool party at which Petitioner was accused of molesting Taylor and Danielle. (Exh. H: R.T. 1/9/07, at 5, 17-18, 29-31.) During closing argument, Thompson revisited Desiree's testimony that she never saw any Petitioner engage in any inappropriate touching with her daughter or any other child in the community pool. (Exh. I: R.T. 1/10/07, at 140.)

1    Thus, in spite of any alleged belief that Arizona's evidentiary rules precluded him

2    from offering evidence that Petitioner had not molested children on non-charged occasions,

3    Thompson succeeded in presenting such testimony Linda Cano and Desiree Wells. (Exh. F:

4    R.T. 1/4/07, at 6, 10-13, 18-22; Exh. H: R.T. 1/9/07, at 5, 17-18, 29-31; Exh. I: R.T. 1/10/07,

5    at 140, 144.)

6    The fact that Linda Cano and Desiree Wells gave testimony establishing that

7    Petitioner had not molested other children on other occasions also demonstrates that

8    Petitioner suffered no prejudice as a result of Thompson's allegedly deficient performance.

9    See Hall v. Thomas, 611 F.3d 1259, 1293 (11th Cir. 2010) (rejecting claim that trial counsel

10   rendered ineffective assistance by failing to call two character witnesses whose testimony

11   would have been cumulative to testimony given by other defense witnesses, and where

12   petitioner never demonstrated that these uncalled witnesses "would have made any difference

13   in the outcome of the trial").

14       **f.      Ground 4I**

15   This claim alleges that Thompson rendered ineffective assistance because his

16   "representation was conflicted by and corrupted by his contractual relationship with the

17   overburdened Phillips' firm." (Doc. 2, at 74-75.) Thompson testified that he entered into a

18   contract with Phillips & Associates to handle the firm's felony criminal cases something in

19   1998, and that the firm assigned him Petitioner's case in 2005. (Exh. CC: R.T. 9/7/11, at 6-9.)

20   Petitioner suggests that Thompson was overburdened during the time his case was pending

21   trial because the Arizona Supreme Court had sanctioned the principal attorney of Phillips &

22   Associates regarding the supervision of a law firm that "represented approximately 33,000

23   clients between 2004 and 2006" and "employed 250 people, including thirty-eight lawyers."

24   In re Phillips, 244 P.3d 549, 550, ¶ 2 (Ariz. 2010). Petitioner further notes that the firm did

25   not compensate Thompson for time spent during retrials on several mistried cases, and that

26   the firm manager advised him that "there wasn't a budget for experts" during a discussion

27   about Petitioner's case. (Doc. 2, at 74-76; Exh. CC: R.T. 9/7/11, at 15, 21-23.) Finally,

28

1    Petitioner cites Thompson's testimony, "I would do [the case] very differently today if it
2    [were] my case today." (Doc. 2, at 75; Exh. CC: R.T. 9/7/11, at 22.)

3          Petitioner must demonstrate that either a specific omission or a particular action by
4    Thompson constituted deficient performance that resulted in prejudice. Petitioner has not
5    sustained this burden.

6          In any event, Thompson unequivocally testified that: (1) he had "anywhere from 25
7    to 35 cases that were active at [any] one time" during the years he had a contract with
8    Phillips & Associates; (2) he "wasn't overwhelmed by the numbers" while representing
9    Petitioner; and (3) the decisions he made in the instant case were not affected by any "time
10   issue." (Exh. CC: R.T. 9/7/11, at 21.) Additionally, "[Thompson's] performance throughout
11   the trial demonstrates sufficient preparation and knowledge of the case that 'falls within the
12   wide range of reasonable professional assistance.'" Tinsley v. Borg, 895 F.2d 520, 532 (9th
13   Cir. 1990) (quoting Strickland, 466 U.S. at 689). The Court finds that the state court's
14   rejection of this claim was neither contrary to, nor an unreasonable application of, clearly
15   established federal law.

16              **g.    Ground 4J**

17         In Ground 4J, Petitioner contends that "the cumulative effect of counsel's many
18   errors" deprived Petitioner of effective assistance. (Doc. 1, at 18.) Petitioner's one-sentence
19   conclusory statement fails to provide any argument or identify any authority regarding
20   cumulative-error in the ineffective-assistance-of-counsel context.

21         Even if cumulative error constituted a violation of clearly established federal law,
22   Petitioner's claim fails because: (1) none of the acts and omissions challenged in Grounds
23   4A through 4I constituted deficient performance by Thompson, and (2) even assuming that
24   Thompson rendered deficient performance with respect two or more of these claims, the
25   resulting prejudice was insufficient to establish a constitutional violation. See Ceja v.
26   Stewart, 97 F.3d 1246, 1254 (9th Cir. 1997) (rejecting relief under cumulative-error doctrine

27

28                                      - 87 -

1    where defendant alleged numerous IAC claims that were found non-prejudicial). Thus, the

2    Court finds no error.

3    \\\

4         **5.    Grounds 6A and 4C**

5         Ground 6A and 4C will be consolidated. In Ground 6A, Petitioner alleges that he "was

6    deprived of his federal constitutional rights to due process and a fair trial based upon

7    prosecutorial misconduct," specifically by obtaining a second indictment charging Petitioner

8    with four new counts of child molestation against three additional victims (Luis A., Sheldon

9    H., and Nicholas M.) while Petitioner's motion to remand the original indictment to the grand

10   jury for a new probable-cause determination was still pending (Doc. 1, at 21; Doc. 2, at

11   106-09.) In Ground 4C, Petitioner seeks habeas relief on the basis that trial counsel rendered

12   ineffective   assistance   by   not   objecting   to   the   second   indictment   on

13   prosecutorial-vindictiveness grounds. (Doc. 1, at 16; Doc. 2, at 70-71.)

14        **a.    Ground 6A**

15        The Court finds that Ground 6A is procedurally barred because the state courts

16   explicitly found his prosecutorial-vindictiveness claim precluded, pursuant to Arizona Rule

17   of Criminal Procedure 32.2(a), as the result of Petitioner's failure to raise this claim on direct

18   appeal. In its initial ruling on Petitioner's PCR petition, the trial court ruled as follows:

19        Defendant's allegation of prosecutorial misconduct is precluded. All of the
         materials defendant relies on in support of this claim were available at the time
20       the notice of appeal was filed. Because the case was affirmed on direct appeal,
         there is a presumption that defendant's convictions were regularly obtained
21       and are valid. Defendant bears the burden or rebutting that presumption.
         *Canion v. Cole*, 210 Ariz. 598, 601, 115 P.3d 1261, 1263 (2005). Defendant
22       has made no showing that he is entitled to relief.

23   (Doc. 1-11: Minute Entry, filed on January 3, 2011, at 3.) The Arizona Court of Appeals

24   affirmed this ruling in the last-reasoned state-court decision denying post-conviction relief

25   on Ground 6A:

26       May also contends the trial court abused its discretion in rejecting his claims
         that he was entitled to relief due to prosecutorial misconduct and the court's
27       erroneous application at trial of Rule 404(b) and (c), Ariz. R. Evid. But again,

28                                          - 88 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

because May could have raised these claims on appeal and failed to do so, the court correctly found them precluded. *See* Ariz. R. Crim. P. 32.2(a)(3) (precluding Rule 32.1(a) claim "waived at trial, on appeal, or in any previous collateral proceeding").

(Doc. 1-17: Memorandum Decision, at 3, ¶ 3.) Thus, Ground 6A is procedurally defaulted because preclusion under Rule 32.2(a) constitutes as an adequate and independent procedural bar. See Stewart, 536 U.S. at 860; Smith, 241 F.3d at 1195 n.2; Ortiz, 149 F.3d at 931-32.

Petitioner has not established that any exception to procedural default applies. To the extent Petitioner attempts to establish cause by asserting ineffective assistance counsel (Ground 4C), said claim will be discussed below.

### b.    Ground 4C

The state court's rejection of Petitioner's ineffectiveness challenge to the second indictment on prosecutorial-vindictiveness grounds was neither contrary to, nor an unreasonable application, of clearly established federal law.

The following ruling constitutes the decision subject for review:

Defendant presented no evidence that a failure to raise a claim of prosecutorial vindictiveness after more charges were added when the case was remanded to the Grand Jury was unreasonable conduct under the facts of this case. As defense expert Picarretta acknowledged, "It's a difficult motion to prevail on." ([Exh. CC: R.T. 9/7/22, at 146].) He also failed to establish that there was a reasonable likelihood that he would have prevailed on the claim had it been made. *United States v. Goodwin*, 457 U.S. 368, 372-73, 381 (1982); *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978); *State v. Brun*, 190 Ariz. 505, 507, 950 P.2d 164, 166 (App. 1997).

(Doc. 1-13: Minute Entry, filed on November 7, 2011, at 4.)

Petitioner again fails to demonstrate deficient performance and/or prejudice, as he again relies on speculation and conclusory statements to support his claim. Moreover, as both Judge Hoffman and Petitioner's expert, Michael Piccareta, observed, motions to challenge prosecutorial charging decisions are "difficult … to prevail on." (Doc. 1-13: Minute Entry, filed on November 7, 2011, page 4, quoting Exh. CC: R.T. 9/7/22, at 146.)

"A criminal defendant faces a substantial burden in bringing a vindictive prosecution claim [because] [a] 'presumption of regularity' attends decisions to prosecute." U.S. v.

Johnson, 325 F.3d 205, 210 (4th Cir. 2003) (citing U.S. v. Armstrong, 517 U.S. 456, 464 (1996)). See U.S. v. Stewart, 590 F.3d 93, 122 (2nd Cir. 2009) ("The decision as to whether to prosecute generally rests within the broad discretion of the prosecutor, and a prosecutor's pretrial charging decision is presumed legitimate."). To overcome this presumption of regularity and "establish prosecutorial vindictiveness, a defendant must show through objective evidence that '(1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus.'" Johnson, 325 F.3d at 210 (quoting U.S. v. Wilson, 262 F.3d 305, 314 (4th Cir. 2001)). Stated differently, "[a] prosecutor violates due process when he seeks additional charges solely to punish a defendant for exercising a constitutional or statutory right." U.S. v. Gamez-Orduno, 235 F.3d 453, 462 (9th Cir. 2000).

As the Ninth Circuit observed, prevailing precedent affords defendants two avenues for overcoming the presumption of regularity accorded to prosecutorial charging decisions:

> A defendant may establish vindictive prosecution (1) "by producing direct evidence of the prosecutor's punitive motivation," *United States v. Jenkins*, 504 F.3d 694, 699 (9th Cir. 2007), or (2) by showing that the circumstances establish a "reasonable likelihood of vindictiveness," thus giving rise to a presumption that the Government must in turn rebut, *United States v. Goodwin*, 457 U.S. 368, 373 [ ] (1982).

U.S. v. Kent, 649 F.3d 906, 912-13 (9th Cir. 2011). "Absent direct evidence of an expressed hostility or threat to the defendant for having exercised a constitutional right …, to establish a claim of vindictive prosecution the defendant must make an initial showing that charges of increased severity were filed because the accused exercised a statutory, procedural, or constitutional right in circumstances that give rise to an appearance of vindictiveness." U.S. v. Gallegos-Curiel, 681 F.2d 1164, 1168 (9th Cir. 1982) (internal citations omitted).

Because Petitioner never proffered any direct evidence of the prosecutor's alleged animus during his PCR proceeding, he asserted an entitlement to the presumption of prosecutorial vindictiveness under the theory that the State created the "appearance of vindictiveness" by procuring an indictment charging him with four additional

1    child-molestation counts involving three new victims (Luis, Sheldon, and Nicholas) after the

2    trial court had granted Petitioner's motion to remand his case for a new probable cause

3    determination. Specifically, Petitioner's complaint was that the State had added new charges

4    in the second indictment before trial, allegedly to punish him for invoking his pretrial

5    procedural right to have the prosecutor convey to the grand jurors his request to testify before

6    returning an indictment.

7         However, the fact that Petitioner's "appearance of vindictiveness" claim rested upon

8    his exercise of a pretrial right rendered the likelihood of prevailing on such a challenge to his

9    second indictment unlikely:

10        While a prosecutor's decision to seek heightened charges after a successful
          *post*-trial appeal is enough to invoke a presumption of vindictiveness, "proof
11        of a prosecutorial decision to increase charges after a defendant has exercised
          a legal right does not alone give rise to a presumption in the *pretrial* context."
12        *United States v. Miller*, 948 F.2d 631, 633 (10th Cir. 1991) (emphasis added);
          *accord United States v. Gamez-Orduno*, 235 F.3d 453, 462 (9th Cir. 2000)
13        ("[I]n the context of pretrial plea negotiations vindictiveness will not be
          presumed simply from the fact that a more severe charge followed on, or even
14        resulted from the defendant's exercise of a right.").

15   U.S. v. Barner, 441 F.3d 1310, 1316 (11th Cir. 2006). See Stewart, 590 F.3d at 122 ("[T]his

16   court has consistently adhered to the principle that the presumption of prosecutorial

17   vindictiveness does not exist in a pretrial setting."); U.S. v. Frega, 179 F.3d 793, 801 (9th Cir.

18   1999) (collecting cases).

19        The Supreme Court has explained several reasons why no presumption of

20   prosecutorial vindictiveness should automatically arise from the governmental filing new

21   charges after the defendant's invocation of a constitutional, statutory, or procedural right

22   before trial:

23        There is good reason to be cautious before adopting an inflexible presumption
          of prosecutorial vindictiveness in a pretrial setting. In the course of preparing
24        a case for trial, the prosecutor may uncover additional information that
          suggests a basis for further prosecution or he simply may come to realize that
25        information possessed by the State has a broader significance. At this stage of
          the proceedings, the prosecutor's assessment of the proper extent of
26        prosecution may not have crystallized. In contrast, once a trial begins—and
          certainly by the time a conviction has been obtained—it is much more likely
27        that the State has discovered and assessed all of the information against an

28
                                          - 91 -

accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

In addition, a defendant before trial is expected to invoke procedural rights that inevitably impose some "burden" on the prosecutor. Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; to plead an affirmative defense; to request psychiatric services; to obtain access to government files; to be tried by jury. It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.

Thus, the timing of the prosecutor's action in this case suggests that a presumption of vindictiveness is not warranted. A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct. [Footnote omitted.] As we made clear in *Bordenkircher*, the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution.

Goodwin, 457 U.S. at 381-82. The justifications that the Supreme Court cited as reasons not to presume vindictiveness in the pretrial setting apply to the instant case.

First, Petitioner's motion to remand his case for a new probable cause determination, based upon the grand jury not receiving his request to testify at the hearing, was merely an invocation of just one of the many procedural rights that the State expects defendants to assert before trial. The Supreme Court and the Ninth Circuit have therefore found it "unrealistic to assume that the prosecutor's probable response to a defendant's successful pretrial challenge to an indictment is to seek to penalize and deter." Goodwin, 457 U.S. at 381 (listing "pretrial motions to … challenge the sufficiency and form of an indictment" as insufficient to create a presumption of vindictiveness).

Second, the presentation of evidence to the grand jury is typically brief, consuming few prosecutorial resources—yet another fact militating against the presumption that the trial court's order granting Petitioner's motion for remand engendered a vindictive response from the State. See U.S. v. Moon, 513 F.3d 527, 535 (6th Cir. 2008) ("[T]he fact that the

- 92 -

government had to return for a superseding indictment does not constitute a sufficient stake in deterring Defendant's exercise of a protected right.").

Third, the State's response to Petitioner's severance motion demonstrates that the prosecution continued to investigate Petitioner's crimes and evaluate its evidence beyond November 21, 2005, the date the grand jury returned the original indictment charging Petitioner with only the four counts of child molestation involving Taylor and Danielle. (Exh. DDD: Docket for Maricopa County Superior Court CR 2005-136958, at 2.) The following excerpt from said response states the following:

> The first 6 counts involve a total of 3 victims [involving Danielle A., Taylor S., and Sheldon H.] who were molested by the defendant in the swimming pool of their apartment complex in Mesa. Each of those 3 victims was a resident of the apartment complex, as was the defendant, when the molestations occurred. Each of those offenses came to light during the same investigation; the offenses in counts 5 and 6 [involving Sheldon H.] were also subject to a more complete investigation after the original charges were filed. Count 5 occurred when the victim had just moved into the complex; Count 6 occurred [in] the summer of 2005, when the first 4 counts occurred.
>
> The allegations in counts 7 and 8 arise from earlier investigations from Mesa or East Phoenix. Count 7 [involving Luis A.] came to light just before the crimes in the first 6 counts, but was investigated by a different police agency [the Phoenix Police Department] and therefore was not originally combined in the charges against the defendant. The crime happened on the border between Phoenix and Scottsdale. Count 8 came to light in the year 2001, when the defendant molested a child [Nicholas M.] in his care at a Mesa daycare center. Because no other significant allegations had been brought against the defendant at that time, the case was not then pursued for prosecution. The cases that arose in 2005 in Mesa caused the State to reinvestigate the allegations in Count 8.

(Exh. A: P.I., Item 73, at 2.)

The apparent reason why the prosecutor decided to add these four new charges during the 5-week interval between Petitioner's remand motion and the second grand jury presentation is that his review of Petitioner's case clarified: (1) proof that Petitioner touched Luis, Sheldon, and Nicholas' in various settings—a daycare center, a classroom, and the swimming pool—greatly diminished the plausibility of the anticipated defense that Petitioner's contact with Taylor and Danielle's was accidental; and (2) the evidence the prosecutor had to present to prove the original four charges involving Taylor and Danielle

would enhance the prospect of convicting Petitioner on the molestation charges involving the three aforementioned boys.

During oral argument on Petitioner's severance motion, the prosecutor stated:

All the counts are like that. It shows—by showing that one of these events in the trial of another event, you get [Petitioner's] intent, his putting himself into these situations where he will be able to have access to the children, so he prepares for it and makes a plan for it, Judge. He certainly, in one case involving one victim, the jury is not [sic] going to be able to say, well, this is probably a mistake. The defense would argue, well, what happened to her or what happened to him was just a mistake. What I am able to show through all of these other witnesses and other victims is that no, this is not a mistake. This is a man that puts himself into a situation where he can have access to children and do bad things to them. It's not absence [sic] of accident, and, definitely, if we need to show this is the man that did it, then we have the other victims coming in and saying he did it, he did it, he did it, and 404(b) allows for that kind of evidence, Judge, not to show that he has a character to do this, but rather to show that he had all the other intentional opportunities.

(Exh. C: R.T. 11/13/06, at 7-8.)

In light of the foregoing, because any objection or motion to dismiss regarding the second indictment on prosecutorial vindictiveness grounds would have failed, the Court finds that the state court's rejection of Ground 4C was neither contrary to, nor an unreasonable application of, <u>Strickland</u>.

### 6.    Ground 6B

Ground 6B alleges that Petitioner "was deprived of his federal constitutional rights to due process and a fair trial based upon prosecutorial misconduct," allegedly when Deputy County Attorney John Beatty met with and coached Luis A. during a recess in his trial testimony—misconduct that Petitioner alleges that enabled Luis, who failed to make an in-court identification of Petitioner on direct examination, to select a 2005 photograph of Petitioner from a 7-person photo array that the prosecutor showed Luis during redirect examination. (Doc. 1, at 21; Doc. 2, at 111-14; Exh. E: R.T. 1/3/07, at 29-34, 90-95.)

Ground 6B is procedurally barred because the state courts explicitly found this argument precluded, pursuant to Arizona Rule of Criminal Procedure 32.2(a), as the result of Petitioner's failure to raise this claim on direct appeal. In its initial ruling on Petitioner's

1    PCR petition, the trial court found this claim precluded because Petitioner could have raised

2    it on direct appeal. (Doc. 1-11: Minute Entry, filed on January 3, 2011, at 3.) The Arizona

3    Court of Appeals affirmed this ruling in the last reasoned state court decision rejecting

4    Ground 6B:

> May also contends the trial court abused its discretion in rejecting his claims
> that he was entitled to relief due to prosecutorial misconduct and the court's
> erroneous application at trial of Rule 404(b) and (c), Ariz. R. Evid. But again,
> because May could have raised these claims on appeal and failed to do so, the
> court correctly found them precluded. *See* Ariz. R. Crim. P. 32.2(a)(3)
> (precluding Rule 32.1(a) claim "waived at trial, on appeal, or in any previous
> collateral proceeding").

9    (Doc. 1-17: Memorandum Decision, 2 CA-CR 2012-0257-PR, at 3, ¶ 3.)

10        Thus, Ground 6B is procedurally defaulted because preclusion under Rule 32.2(a)

11   constitutes an adequate and independent procedural bar. See Stewart, 536 U.S. at 860; Smith,

12   241 F.3d at 1195 n.2; Ortiz, 149 F.3d at 931-32.

13        Petitioner has not established that any exception to procedural default applies.

14        **7.    Ground 7**

15        In Ground 7, Petitioner argues that: (1) Jurors Rout and Mayhew-Proeber, who

16   favored acquittal on all counts, were pressured to convict Petitioner on the five counts

17   involving Taylor S., Danielle A., and Luis A. and consequently agreed to a compromise

18   whereby the other 10 jurors agreed to acquit Petitioner on the two counts involving Sheldon

19   H. in exchange (Ground 7A); and (2) Foreman Richardson allegedly persuaded Juror

20   Mayhew-Proeber to change her verdict by opining that Petitioner would likely be imprisoned

21   for just 1-to-2 years (Ground 7B).

22        **a.    Ground 7A**

23        The last reasoned state-court decision, which was rendered by the trial court when it

24   denied post-conviction relief, was neither contrary to, nor an unreasonable application of,

25   clearly established federal law. The trial court found as follows:

> Two jurors allege vote trading. Those two jurors stated in open court that they
> agreed with the verdicts when jurors were polled after the verdicts were read
> in open court. Interviews and depositions of other jurors do not support the

28                                    - 95 -

allegation of vote trading. The court finds that the defendant has failed to prove his allegation of vote trading.

Even if defendant had proved that jurors traded votes, jurors can compromise in reaching a verdict. *United States v. Powell*, 469 U.S. 57, 65 (1984); *State v. Zakhar*, 105 Ariz. 31, 32, 459 P.2d 83, 84 (1969); *State v. McKenna*, 222 Ariz. 396, ¶ 36 n.14, 214 P.3d 1037, 1048 n.14 (App. 2009); *State v. Lewis*, 222 Ariz. 321, ¶ 10, 214 P.3d 409, 413 (App. 2009).

(Doc. 1-13: Minute Entry, filed on 11/07/11, at 2.)

As the court noted, not only is compromise in jury verdicts permitted, see, e.g., Powell, 469 U.S. at 65 ("It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense."), but (1) Jurors Rout and Proeber "stated in open court that they agreed with the verdicts when jurors were polled after the verdicts were read in open court," and (2) "[i]nterviews and depositions of other jurors do not support the allegation of vote trading." (Doc. 1-13: Minute Entry, filed on 11/07/11, at 2.)

The record reflects:

• Foreman Richardson told Petitioner's PCR investigator that: (1) no undue pressure was placed on any juror; (2) the not-guilty verdicts were attributable to the lack of sufficient evidence, not to any compromise agreement by which guilty and not guilty verdicts were exchanged; and (3) he recalled that the jurors were united on the guilty verdicts. (Exh. HH: Transcript of Foreman Richardson, dated 12/10/09, at 25-26, 29.)

• Juror Harris told Petitioner's PCR investigator that: (1) his not-guilty verdicts were attributable to his determination that Sheldon H. was not credible; and (2) he had no recollection of "vote trading," which he considered "completely unethical. (Exh. JJ, at 4, 13.)

• Juror Melton testified that: (1) he had no recollection of the jurors trading verdicts; and (2) his verdicts were attributable to the fact that "some charges had stronger evidence than others. (Exh. KK, at 9-10.)

• Juror Carey told Petitioner's PCR investigator that: (1) the jurors reviewed the evidence "piece by piece" during deliberations; and (2) his not-guilty verdicts were attributable to finding Sheldon H. less credible than the other victims. (Exh. NN, at 7-9.)

• Juror Reeves told Petitioner's PCR investigator that the jurors were not pressured in reaching their verdicts, everyone agreed with the final verdicts, and none of the jurors was upset with the trial's final outcome. (Exh. OO, at 9, 14.)

• Juror Rzucidlo told Petitioner's PCR investigator that: (1) the deliberations were "very civil and cordial"; (2) the jurors were not pressured into returning verdicts; (3) the not-guilty verdicts was attributable to the evidence on those counts being found lacking; and (4) that vote trading had "not really" occurred. (Exh. PP, at 10, 14-17.)

• Juror Spradlin told Petitioner's PCR investigator that: (1) she did not believe Sheldon and therefore voted not-guilty on those counts; (2) she had no recollection of vote trading; and (3) no juror was pressured. (Exh. QQ, at 5, 9, 20, 23.)

• Juror Lieb had no recollection of vote trading during deliberations. (Exh. LL, at 9.)

• Juror Andrews told Petitioner's PCR investigator that he did not recall "any kind" of vote trading. (Exh. MM, at 11.)

• During her first post-trial interview, Juror Mayhew-Proeber did not attribute the verdicts to vote-trading or intramural "plea bargaining" among the jurors, but instead stated that the convictions were "[b]asically because [the prosecutors] had a little bit more evidence" on those counts. (Exh. EE, at 7-8.) Not until her second interview, which occurred 18 months later, did Mayhew-Proeber attribute the guilty verdicts to a "plea bargain" engineered by Foreman Richardson, against whom she harbored animosity because her fellow jurors elected him as the foreman after she volunteered herself for that office. (Exh. FF, at 1, 16-20.)

• Juror Rout offered varying explanations for the verdicts, ultimately adopted Petitioner's PCR investigator's "trading votes" terminology during the post-verdict interview, and expressed regret that he had not "stuck to his guns." (Exh. II, at 12, 16, 18-23, 26.)

• When polled by Judge Stephens during trial, Meyhew-Proeber and Rout answered in the affirmative when asked whether they agreed with the verdicts returned in open court. (Exh. L: R.T. 1/16/07, at 5-6.)

### b. Ground 7B

The trial court found Mayhew-Proeber's allegation untrue and therefore denied post-conviction relief stating:

One juror alleged that jurors considered the possible penalty in reaching their verdicts. That juror confirmed that the court had instructed the jurors to not consider the possible penalty. The record indicates that the trial court told the jurors that they were not to consider punishment. (R.T. of Jan. 10, 2007, at 105-106.) The other jurors do not support the allegation that the jurors considered the possible punishment in reaching their verdicts. The Court finds that defendant has failed to prove his allegation that jurors considered punishment in reaching their verdicts.

(Doc. 1-13: Minute Entry, dated 11/7/11, at 3.)

The record demonstrates that Foreman Richardson denied Proeber's allegation that he made statements regarding Petitioner's potential sentence by telling Petitioner's PCR

- 97 -

1    investigator that: (1) he denied any knowledge of the sentencing range for Petitioner's

2    charged offenses; and (2) the jurors did not discuss possible penalties ("It's not our role. It's

3    not what we're being asked to do."). (Exh. I: R.T. 1/10/07, at 105-06; Exh. HH, at 27-28.)

4    Jurors Carey, Rzucidlo, Spradlin, and Lieb corroborated Foreman Richardson's assertion that

5    possible punishment was not considered during their deliberations. (Exh. LL, at 10 (Lieb:

6    "Never discussed it."); Exh. NN, at 10-11 (Carey did not know range of penalties and stated

7    that such knowledge would not have affected his verdict vote); Exh. PP, at 16-17 (Rzucidlo:

8    "I can't recall anybody saying well, I think for these charges you get this amount of time or

9    anything like that."); Exh. QQ, at 20 (Spradlin: "I don't remember a discussion like that.").)

10   Juror Melton corroborated Foreman Richardson's interview statements about the jury's lack

11   of authority to consider sentencing by testifying during his deposition that he recalled the

12   subject of punishment being "broached," but only because another juror had "piped up and

13   said, 'That's not within the scope. That's not something we're here—we're here to determine

14   what the facts are of the case and to deliberate on those facts.'" (Exh. KK: at 11-12.) Juror

15   Rout likewise had no idea what sentences Petitioner faced and recalled no discussion about

16   the prospective penalty during deliberations. (Exh. II, at 20-21.)

17        Further, as noted by the trial court, Judge Stephens instructed the jurors, "You must

18   decide whether the defendant is guilty or not guilty by determining what the facts of the case

19   are and applying these jury instructions. You must not consider the possible punishment

20   when deciding on guilt. Punishment is left to the judge." (Exh. I: R.T. 1/10/07, at 105-06.)

21   Thus, the record reveals that the jurors were aware of and intended to abide by the court's

22   instruction, notwithstanding Juror Mayhew-Proeber's interview statement to the contrary.

23   (Exh. HH, at 27-28 [Richardson]; Exh. KK, at 11-12 [Melton].) These instructions foreclose

24   habeas relief, even assuming that the jurors broached the topic of Petitioner's possible

25   sentence:

26        We share the *Silva* and *Bayramoglu* courts' concerns regarding speculation
          about sentencing by jurors, because such speculation may distort their
27        evaluation of the evidence regarding guilt. However, such speculation was also

28                                              - 98 -

the subject of the routine admonition by the judge in the instructions, "do not discuss or consider the subject of penalty or punishment. That subject must not in any way affect your verdict." Having been so admonished, the other jurors were well armed to disregard the remark, and to remind the foreman that she should not decide the case based on what she thought would happen after sentencing. We ordinarily assume that the jurors follow their instructions. The remark is much like the remarks, or, at the least, unexpressed assumptions, that jurors routinely make about punishment in criminal cases and insurance in civil cases. That is why the admonition is generally given.

Grotemeyer v. Hickman, 393 F.3d 871, 880 (9th Cir. 2004). See Bayramoglu v. Estelle, 806 F.2d 880, 888 (9th Cir. 1986) ("It is also relevant that the trial judge gave a curative instruction to the newly-constituted jury to disregard penalty or punishment when considering guilt or innocence. … We therefore conclude that [the juror's] misconduct was harmless beyond a reasonable doubt; that is, that there is not a 'reasonable possibility' that her brief introduction of the subject of penalties affected the jury's ultimate verdict of guilty of second degree murder.").

The Court finds that the state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

## 8.    Grounds 8 and 9B

Grounds 8 and 9B have been consolidated in this Recommendation. These claims seek relief on the following grounds:

Ground 8: "The trial court's failure to properly instruct the jurors, on a critical legal principle concerning how they could use evidence of other acts charged in the multi-count indictment to assess guilt or innocence, denied Stephen May his federal constitutional rights to due process and a fair trial." (Doc. 1, at 25.)

Ground 9B: The trial court's other-act-evidence instruction allegedly confused the jurors and led them to return guilty verdicts, based upon the clear-and-convincing-evidence standard. (Doc. 1, at 27; Doc. 2, at 116-21.)

On direct appeal, Petitioner failed to challenge the court's pretrial ruling on his motion to sever or the adequacy of the jury instructions as to whether evidence of the charged offenses against one victim could be considered while determining Petitioner's guilt on the charged offenses relating to other victims. (Doc. 1-2: Opening Brief, at 12-13; Doc. 1-3: Reply Brief, at 2-10; Doc. 1-4: Memorandum Decision, 1 CA-CR 07-0144, at 1-7.)

In his PCR petition, Petitioner sought post-conviction relief on the ground that "the Court did not fulfill its duty to explain, in understandable terms, the critical concept that the jury was required to consider each count separately, under the reasonable doubt standard, and not 'group it all together by clear and convincing evidence decide he must have done them all.'" (Doc. 1-9: PCR, at 34, quoting Exh. J: R.T. 1/12/07, at 7.) Citing the four corroboration-related questions the jury submitted during its deliberations and the post-verdict interview statements of Jurors Mayhew-Proeber and Rzucidlo, Petitioner asserted that Judge Stephens failed to give the jurors adequate guidance on the question of whether the testimony of one victim could be considered as "corroboration" of another's account, despite the instruction requiring that Petitioner's guilt on each count be determined separately—a contention that corresponds with Ground 8 in the instant habeas petition. (Id. at 35-39; Doc. 1, at 25.)

Petitioner raised his second instructional-error claim—one corresponding with Ground 9B of the instant habeas petition—in a different section of his PCR petition, one which he entitled, "The application of Arizona Rules of Evidence 404(b) and (c) in this case unconstitutionally lowered the State's burden of proof and allowed convictions by a non-unanimous jury." (Doc. 1-9: PCR, at 49.) Besides reiterating his previous complaint that the trial judge afforded the jury insufficient guidance on whether each count's evidence could be offered to corroborate another charge [raised here as Ground 8], this section of the PCR raised two new claims: (1) the trial court failed to determine whether clear and convincing evidence existed for each count before denying Petitioner's severance motion—an argument corresponding to Ground 9A of the pending § 2254 petition; and (2) the supplemental instruction that Judge Stephens gave the jury in response to its corroboration-related questions caused the jurors to convict Petitioner under the clear-and-convincing-evidence standard because "each of the 'other acts' was a separate crime being tried to the same jury." (Id. at 49-51; Doc. 1, at 27; Doc. 2, at 116-21.)

- 100 -

Because Petitioner had not challenged the adequacy of the jury instructions on direct appeal, the trial court found Ground 8 precluded:

> Defendant's allegation that the court failed to properly instruct the jury is precluded. This allegation was not raised on direct appeal. Defendant claims newly discovered facts arising from juror interviews. There is no showing that the jurors were unavailable for interviews following the verdict and prior to his appeal. His claim is not of sufficient magnitude that the State is required to prove that he knowingly, intelligently and voluntarily failed to raise it on appeal.

(Doc. 1-11: Minute Entry, filed on January 3, 2011, at 2.)

The trial court likewise found precluded both claims that Petitioner submitted in "Point X" of his PCR, which included the contention corresponding to Ground 9B:

> Defendant's allegation that the court improperly applied Rules 404 (b) and (c) in denying his motion to sever counts is precluded. The claim was not raised on direct appeal. Defendant claims newly discovered facts arising from juror interviews. There is no showing that the jurors were unavailable for interview following the verdict and prior to his direct appeal. His claim is not of sufficient constitutional magnitude that the State is required to prove that he knowing, intelligently and voluntarily failed to raise the issue on direct appeal.

(Id. at 3.)

The Arizona Court of Appeals affirmed the trial court's preclusion ruling in its memorandum decision stating:

> ¶ 3 May also contends the trial court abused its discretion in rejecting his claims that he was entitled to relief due to prosecutorial misconduct and the court's erroneous application at trial of Rule 404(b) and (c), Ariz. R. Evid. But again, because May could have raised these claims on appeal and failed to do so, the court correctly found them precluded. *See* Ariz. R. Crim. P. 32.2(a)(3) (precluding Rule 32.1(a) claim "waived at trial, on appeal, or in any previous collateral proceeding").

(Doc. 1-17: Memorandum Decision, at 3, ¶ 3.)

The Court finds that Grounds 8 and 9B are procedurally barred because the state courts explicitly found these other-act-related instructional challenges precluded, pursuant to Arizona Rule of Criminal Procedure 32.2(a), as the result of Petitioner's failure to raise them on direct appeal. (Doc. 1-11: Minute Entry, at 2-3; Doc. 1-17: Memorandum Decision, 2 CA-CR 2012-0257-PR, at 3, ¶ 3.) Rule 32.2(a) is an adequate and independent state-law

1   ground for denying a federal constitutional claim. See Stewart, 536 U.S. at 860; Smith, 241

2   F.3d at 1195 n.2; Ortiz, 149 F.3d at 931-32.

3       Petitioner has not established that any exception to procedural default applies.

4       **9.**    **Grounds 9A and 4D**

5       In Ground 9A, Petitioner alleges that he "was deprived of his federal constitutional

6   rights to due process and an impartial jury where Arizona Rules of Evidence 404(b) and

7   404(c) were impermissibly employed to deny a severance of the counts, lessen the State's

8   burden, and allowed evidence of each of the other alleged sexual offenses to be admitted at

9   trial as proof of the other counts," in violation of the Fifth, Sixth, and Fourteenth

10  Amendments. Petitioner states that "the trial court … allowed the … counts to be tried

11  together without making the four specific findings required to admit other-act evidence under

12  Rule 404(b)." (Doc. 1, at 27; Doc. 2, at 117-18.)

13      In Ground 4D, Petitioner asserts an ineffectiveness claim challenging trial counsel's

14  failure to object to the sufficiency of Judge Stephens' Rule 404(b) and 404(c) findings. (Doc.

15  1, at 13, 16; Doc. 2, at 72.)

16      **a.**    **Ground 9A**

17      Ground 9A is procedurally defaulted because the Arizona Court of Appeals affirmed

18  the trial court's ruling that this claim was precluded, pursuant to Arizona Rule of Criminal

19  Procedure 32.2(a), for not having been raised on direct appeal. The pertinent state-court

20  decision reads as follows:

21          May also contends the trial court abused its discretion in rejecting his claims
        that he was entitled to relief due to prosecutorial misconduct and the court's
22          erroneous application at trial of Rule 404(b) and (c), Ariz. R. Evid. But again,
        because May could have raised these claims on appeal and failed to do so, the
23          court correctly found them precluded. *See* Ariz. R. Crim. P. 32.2(a)(3)
        (precluding Rule 32.1(a) claim "waived at trial, on appeal, or in any previous
24          collateral proceeding").

25  (Doc. 1-17: Memorandum Decision, at 3, ¶ 3.) And, preclusion under Rule 32.2(a) constitutes

26  as an adequate and independent procedural bar. See Stewart, 536 U.S. at 860.

27

28                                     - 102 -

Petitioner has not established that any exception to procedural default applies. To the extent Petitioner attempts to establish cause by asserting ineffective assistance counsel (Ground 4D), said claim will be discussed below.

### b.    Ground 4D

This ineffective-assistance claim challenges Thompson's failure to object to the sufficiency of Judge Stephens' Rule 404(b) and 404(c) findings before trial. (Doc. 1, at 13, 16; Doc. 2, at 72.)

The pertinent state-court decision reads as follows:

> Defendant claims ineffective assistance of trial counsel for failing to require the trial court to make required findings for admission of evidence pursuant to Rule 404(b) and (c). He also claims ineffective assistance of appellate counsel in failing to raise this issue on direct appeal.
>
> Defendant presented nothing to show that Judge Stephens would have failed to make required findings for admission of evidence pursuant to Rule 404(b) and (c), Ariz. R. Evid., had they been requested. He has failed to show any likelihood of a different outcome if trial counsel had raised the issue with Judge Stephens.
>
> There is a presumption that trial courts know the law and apply it correctly in reaching rulings. *State v. Moody*, 208 Ariz. 424, ¶ 49, 94 P.3d 1119, 1138 (2004). Defendant's appellate counsel was aware of that presumption. (R.T. of Sept. 7, 2011, at 68-69). Had appellate counsel raised the issue on appeal, it would have been unsuccessful based on *Moody*.

(Doc. 1-13: Minute Entry, filed on 11/10/11, at 4.)

Thus, the state court concluded that Petitioner could not prove prejudice because Petitioner failed to demonstrated that Judge Stephens would have erred by refusing to make the appropriate findings, had Thompson lodged a timely objection to the sufficiency of her ruling on the severance motion. The Court finds no error. Petitioner's speculation that Judge Stephens would have erred by disregarding a timely objection resulting in a reversal of his convictions is insufficient to establish prejudice. The state court's rejection of Ground 4D was neither contrary to, nor an unreasonable application of, Strickland.

\\\

\\\

- 103 -

1

### 10.    Ground 10

2    In Ground 10, Petitioner alleges, "The cumulative effect of the errors at trial and on

3    appeal deprived Stephen May of his federal constitutional rights to due process, a fair trial

4    and the effective assistance of counsel. U.S. Const. amends. V, VI and XIV." (Doc. 1, at 29.)

5    It appears that Petitioner seeks to aggregate the errors alleged in Grounds 1, 2, 3, 4A, 4B, 4C,

6    4F, 4G, 4H, 5A, 6A, 6B, 6D, 7A, 7B, and 12B. (Doc. 1, at 29-30.)

7    Initially, the Court finds that Ground 10 is procedurally barred, in part. In his PCR

8    petition, Petitioner invoked the cumulative-error doctrine with respect to the following

9    alleged jury-related errors:

10    In this case, the verdicts against [him] were returned by an unsworn jury after
      the judge had declared a mistrial [Ground 2], were reached only through an
11    unconstitutional quid pro quo between juror factions [Ground 7A], and were
      coerced by the judge's failure to provide any instructions when allowing
12    deliberations to continue. The jurors had undocumented ex parte
      communications with the bailiff [Ground 12B], considered during their
13    deliberations information and material that was not introduced into evidence
      [Grounds 1 and 7B], and even expressed their confusion over a critical aspect
14    of their duty—the meaning of beyond a reasonable doubt standard.

15    (Doc. 1-9: PCR Petition, at 43.)

16    Because Petitioner did not raise this claim on direct appeal, the trial court found it not

17    only groundless, but also precluded, in its preliminary ruling on his PCR petition:

18    Defendant's allegation that the cumulative effect of numerous serious issued
      [errors] interfered with the impartiality of the jury is precluded. Defendant
19    claims newly discovered facts arising from juror interviews. There is no
      showing that the jurors were unavailable for interview following the verdict
20    and prior to his direct appeal. His claim is not of sufficient magnitude that the
      State is required to prove that he knowingly, intelligently and voluntarily failed
21    to raise it on appeal. In addition, Arizona does not recognize the cumulative
      error doctrine. *State v. Dickens*, 187 Ariz. 1, 21, 926 P.2d 468, 488 (1996).
22
23    (Doc. 1-11: Minute Entry, filed on January 3, 2011, at 2.)

24    Because the Arizona Court of Appeals did not expressly address Petitioner's

25    cumulative-error argument in its memorandum decision, Judge Hoffman's ruling constitutes

26    the last-reasoned state court decision for federal habeas review purposes. Accordingly,

27

28

1    Petitioner's cumulative-error claim is procedurally defaulted, at least to the extent that

2    Ground 10 is premised upon the jury-related arguments enumerated above.

3           Petitioner has not established that any exception to procedural default applies.

4           Moreover, although the Ninth Circuit has held that in some cases the cumulative effect

5    of several errors may prejudice a defendant so much that his conviction must be overturned,

6    see Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002), here, the Court has not identified

7    any constitutional errors. Indeed, the errors he lists in Ground 10 stem from claims that are

8    either procedurally defaulted or meritless. Thus, Petitioner is not entitled to relief on this

9    claim.

10          **11.    Ground 11**

11          In Ground 11, Petitioner claims that "[his] federal constitutional right to due process

12   was violated when the trial court's instructions to the jury on Arizona's child molestation

13   statute, and the defense that any touching was not sexually motivated, placed the burden of

14   proof on the Defendant [in violation of] U.S. Const. amends. V and XIV." (Doc. 1, at 31.)

15   Ground 11 alleges that Judge Stephens misconstrued A.R.S. §§ 13-1410(A) and 13-1407(E)

16   and therefore gave the jury final instructions that unconstitutionally relieved the State of its

17   statutory burden to prove an alleged element of child molestation—that any sexual contact

18   was motivated by sexual interest—by incorrectly classifying the lack of sexual motivation

19   as an affirmative defense that Petitioner had to prove by a preponderance of the evidence.

20          The Arizona Court of Appeals resolved this issue holding that motivation by sexual

21   interest is not an element of child molestation, as defined by the version of Section

22   13-1410(A) in effect when Petitioner committed his offenses, and that the defense of lack of

23   sexual motivation established by Section 13-1407(E) is an affirmative defense Petitioner was

24   required to prove by a preponderance of the evidence:

25          A. Defense of Lack of Sexual Motivation.

26          ¶ 4 May first contends the superior court erred in instructing the jury that lack
             of sexual motivation is an affirmative defense that he was required to prove by
27           a preponderance of evidence. [FN2: For purposes of this decision, we assume,

28                                          - 105 -

without deciding, that May was entitled to an affirmative defense instruction. *See State v. Gilfillan*, 196 Ariz. 396, 407, ¶ 40, 998 P.2d 1069, 1080 (App. 2000) (defendant not entitled to self-defense instruction because he denied committing the act underlying his aggravated assault charge).] May argues the State should have the burden to prove beyond a reasonable doubt that he acted with the requisite sexual motivation.

¶ 5 Under A.R.S. § 13-1410(A) (2001), "[a] person commits molestation of a child by intentionally or knowingly engaging in ... sexual contact ... with a child under fifteen years of age." "'Sexual contact' means any direct or indirect touching, fondling or manipulating of any part of the genitals, anus or female breast by any part of the body ..." A.R.S. § 13-1401(2) (2001). Pursuant to A.R.S. § 13-1407(E) (Supp. 2007), "[i]t is a defense to a prosecution pursuant to § 13-1404 or 13-1410 that defendant was not motivated by a sexual interest." [FN3: We cite a statute's current version when no changes material to this decision have occurred since the relevant date.]

¶ 6 We rejected May's argument in a recent opinion, *State v. Simpson*, 217 Ariz. 326, 173 P.3d 1027 (App. 2007), in which we held that "[t]he 'sexual interest' provision of § 13-1407(E) is not an element of the offense of child molestation, but rather creates an affirmative defense regarding motive." *Id.* at 329, ¶ 19, 173 P.3d at 1030 (internal quotation and citation omitted). We see no reason why *Simpson* does not dispose of this issue. [FN4: The fact that we reviewed the purported trial error in *Simpson* under a fundamental error analysis does not mean the holding in *Simpson* does not apply here. We concluded in *Simpson* that the superior court's failure to *sua sponte* instruct the jury that the State had the burden to prove defendant's sexual motivation was not "error, fundamental or otherwise." *Simpson*, 217 Ariz. at 330, ¶ 23, 173 P.3d at 1031.] The cases May cites do not persuade us otherwise. *State v. Brooks*, 120 Ariz. 458, 586 P.2d 1270 (1978), and *State v. Turrentine*, 152 Ariz. 61, 730 P.2d 238 (App. 1986), both addressed a prior version of § 13-1410 that made it a crime to "knowingly molest[ ]" a child. *See* 1977 Ariz. Sess. Laws, ch. 142, § 66 (1st Reg.Sess.) (amending and renumbering A.R.S. § 13-653 to § 13-1410); 1993 Ariz. Sess. Laws, ch. 255, § 29 (1st Reg. Sess.) (amending § 13-1410 to reflect its current version). Accordingly, the superior court did not abuse its discretion in instructing the jury that May had the burden to prove he was not motivated by sexual interest when he touched the victims' genitals through their clothes. *See State v. Johnson*, 212 Ariz. 425, 431, ¶ 15, 133 P.3d 735, 741 (2006) (denial of a requested jury instruction is reviewed for an abuse of discretion).

(Doc. 1-4: Memorandum Decision, at 2, ¶¶ 4-6.)

Thus, given the Arizona Court of Appeals' state-law determinations that motivation by sexual interest is not an element of child molestation under Section 13-1410(A), and that the lack of sexual motivation is an affirmative defense under Section 13-1407(E), the Court finds no error regarding the final instructions at issue since they conditioned conviction upon the State proving every element of child molestation beyond a reasonable doubt and required

Petitioner to prove the affirmative defense of lack sexual motivation by a preponderance of the evidence:

> The crime of molestation of a child requires proof that the defendant knowingly touched, directly or indirectly, the genitals of a child under the age of 15. It's a defense to child molestation that the defendant was not motivated by sexual interest.
>
> The defendant has raised the affirmative defense of lack of sexual motivation with respect to the charged offense of child molestation. The burden of proving each element of the offense beyond a reasonable doubt always remains on the State. However, the burden of proving the affirmative defense of lack of sexual motivation is on the defendant. The defendant must prove the affirmative defense of lack of sexual motivation by a preponderance of the evidence. If you find that the defendant has proved the affirmative defense of lack of sexual motivation by a preponderance of the evidence, you must find the defendant not guilty of the offense of molestation of a child.

(Exh. A: P.I., Item 165, at 8; Exh. I: R.T. 1/10/07, at 107-08.)

The state court's rejection of said claim was neither contrary to, nor an unreasonable application of, federal law.

## 12.   Ground 12

Petitioner raises four sub-claims in Ground 12:

Ground 12A: "Stephen May's federal constitutional right to an impartial jury, right to due process and guarantee against double jeopardy were violated when the trial judge permitted the jury to reconvene and deliberate further after declaring a mistrial and discharging the jurors. U.S. Const. amends. V, VI and XIV." (Doc. 1, at 34.)

Ground 12B: The jurors' communication with the bailiff constituted an ex parte communication with the court. (Id.)

Ground 12C: Judge Stephens never explored whether the jurors had been exposed to outside influences. (Id.)

Ground 12D: Judge Stephens "tacitly influenced the verdict by sending a loud and clear message that [she] wanted the jury to reach a decision" by "failing to take [the] rudimentary actions" of asking the jurors why they wanted to resume deliberations, re-charging the jurors, re-administering their oath, and ensuing that the jurors understood the acceptability of not being able to return a verdict at all. (Doc. 2, at 93.)

### a.   Ground 12A

Petitioner argues that his "federal constitutional right to an impartial jury, right to due process and guarantee against double jeopardy were violated when the trial judge permitted the jury to reconvene and deliberate further after declaring a mistrial and discharging the

jurors," in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (Doc. 1, at 34.) The following passage from the Arizona Court of Appeals' memorandum decision constitutes the pertinent state-court ruling on Ground 12A:

¶ 7 May argues the superior court erred by allowing the jury to reconvene to continue deliberating after the court had declared a mistrial. We review only for fundamental error because May failed to object when the superior court reassembled the jury and permitted it to resume deliberating. *See State v. Velazquez*, 216 Ariz. 300, 309, ¶ 37, 166 P.3d 91, 100 (2007); *see also State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005). To obtain relief under fundamental error review, May must show that error occurred, the error was fundamental and that he was prejudiced thereby. *See id.* at 567, ¶ 20, 115 P.3d at 607.

¶ 8 The only Arizona case cited to us (or which we have found) in which a jury reconvened after having been discharged is *State v. Crumley*, 128 Ariz. 302, 305-06, 625 P.2d 891, 894-95 (1981). In that case, it was discovered "almost immediately" after the jury was discharged that trial on the issue of prior convictions had been overlooked. *Id.* at 305, 625 P.2d at 894. The bailiff in short order located six of the eight jurors. The other two were reached at their homes, and all eight returned the next day to take up the prior conviction issue. Under those circumstances, our supreme court said:

Once discharged, we think this jury could not be properly recalled to further decide an issue of this case. It is simply too dangerous a practice to discharge the individual jurors from the duties and obligations of their oath, send them back into the community without admonitions or instructions, and then recall those same jurors to make a fair and impartial determination of any remaining issue connected with the case.

*Id.* at 306, 625 P.2d 891, 625 P.2d at 895.

¶ 9 The facts in this case are different—the jury reconvened only a few minutes after having been discharged. Although nothing in the record tells us the jurors did not interact with the public in the meantime, the court had invited the jurors to gather again in the jury room. In any event, we know that they did not have the extended opportunity for contact with the public that occurred in *Crumley*.

¶ 10 Although the court in *Crumley* might have announced a rule that any verdict rendered after a jury once has been discharged is null and void, it did not; instead, it reasoned that under the facts of that case, a verdict issued after the jury had been "sen[t] ... back into the community without admonitions or instructions" could not stand. [Footnote omitted.] We take from *Crumley*, therefore, that under Arizona law, structural error requiring reversal does not occur whenever a jury that has been discharged reconvenes and issues a guilty verdict. *See State v. Ring*, 204 Ariz. 534, 552, ¶ 45, 65 P.3d 915, 933 (2003) (when structural error occurs, conviction is automatically reversed); *Summers v. United States*, 11 F.2d 583, 586 (4th Cir. 1926) ("the mere announcement of their discharge does not, before they have dispersed and mingled with the

bystanders, preclude recalling" the jury); *Masters v. Florida*, 344 So.2d 616, 620 (Fla. App. 1977) (burden on defendant to prove outside influence on jury during period of discharge). *But see Blevins v. Indiana*, 591 N.E.2d 562, 563 (Ind. App. 1992) ("Any action of the jury after its discharge is null and void."); *Michigan v. Rushin*, 37 Mich.App. 391, 194 N.W.2d 718, 721-22 (Mich.App.1971) (error to reconvene jury after it had left the courtroom, "be it for two minutes or two days"); *Tennessee v. Green*, 995 S.W.2d 591, 614 (Tenn. 1998) (convictions vacated; jury may not be reconvened if it has been discharged and "outside contacts may have occurred") (internal quotation and citation omitted); *Melton v. Virginia*, 132 Va. 703, 111 S.E. 291, 294 (Va. 1922) (reversing conviction: "[i]t is sufficient that the jury had left the presence of the court"); *cf. Arnold v. Alabama*, 639 So.2d 553, 554-55 (Ala. 1993) (new trial granted when jury reconvened over defendant's objection; record did not disclose amount of time that elapsed between discharge and reconvening of jury or where jury was in the meantime).

¶ 11 May argues that we may presume that he was prejudiced when the jury was allowed to reconvene; at oral argument, for example, his counsel urged that we may take as common knowledge that jurors would reach for their cell phones to call friends or family immediately upon discharge. May points to nothing in the record that would demonstrate such prejudice, however, and, pursuant to *Henderson*, we will not presume prejudice when, by contrast to the facts in *Crumley*, the record does not disclose that the jury was "sen[t] back into the community" before reconvening. Accordingly, we may not reverse his conviction on this ground.

(Doc. 1-4: Memorandum Decision, at 3-4, ¶¶ 7-11.)

First, regarding Petitioner's contention that the continuation of deliberations after the mistrial request violated Double Jeopardy, the state-court record reflects that Judge Stephens declared a mistrial due to a hung jury: (1) the jurors had deliberated for nearly 2 days before sending a note reporting disagreement on whether the State's evidence proved Petitioner's guilt beyond a reasonable doubt; (2) Judge Stephens issued an impasse instruction and asked the jurors to consider whether agreement could be reached; and (3) less than 30 minutes later, the jurors sent another note reporting continued deadlock. (Exh. A: P.I., Items 214-19; Exh. J: R.T. 1/12/07, at 3-10.) On direct appeal, Petitioner contended that "the discharge of the jury" following this mistrial declaration constituted "a terminating event to the trial," in violation of his "double jeopardy protection." (Doc. 1-3: Reply Brief, 1 CA-CR 07-0144, at 7.) The Arizona Court of Appeals rejected this argument because the Supreme Court has never held that a mistrial based upon jury deadlock constitutes an event terminating jeopardy. Instead, the Supreme Court has "constantly adhered to the rule that a retrial following a

'hung jury' does not violate the Double Jeopardy Clause," <u>Richardson v. U.S.</u>, 468 U.S. 317, 324 (1984), based upon the rationale that "a jury's inability to reach a decision is the kind of 'manifest necessity' that permits the declaration of a mistrial and the continuation of the initial jeopardy that commenced when the jury was first impaneled." <u>Yeager v. U.S.</u>, 557 U.S. 110, 118 (2009). Because Judge Stephens' mistrial declaration was not a jeopardy-terminating event under Supreme Court precedent, the Arizona Court of Appeals reasonably concluded that Petitioner suffered no violation of the Fifth Amendment's Double Jeopardy Clause when Judge Stephens rescinded her mistrial order and allowed the jury to resume deliberations, with Petitioner's consent. The Court finds no error.

Next, Petitioner contends that allowing the jurors to resume deliberations after the mistrial declaration violated his right to an impartial jury and due process. The Court finds that the Arizona Court of Appeals' rejection of this portion of Ground 12A was objectively reasonable because the record demonstrates that no juror had entered public areas of the courthouse or had otherwise been exposed to external influences impairing their fairness: (1) after declaring a mistrial, Judge Stephens thanked the jurors for their service, reported that the attorneys wished to speak with them, and asked them "to wait back in the jury room" if they desired to talk to the lawyers; (2) the jurors left the courtroom at 3:25 p.m.; (3) while Judge Stephens, counsel, and Petitioner remained inside the courtroom to discuss a new trial date, "the bailiff ... received a communication from the jury that they do not wish to have a hung jury and wish to continue deliberating and wish to communicate that to counsel"; (4) during the ensuing discussion about the jury's request, neither Judge Stephens nor counsel reported that any juror had been observed exiting the courtroom and entering the adjacent public hallway; (5) after both parties had agreed to permit the jury continue its deliberations, Judge Stephens recessed the proceeding at 3:30 p.m.—just 5 minutes after the jury had left the courtroom; and (5) the jury took a 14-minute recess in its deliberations 3 minutes later, at 3:33 p.m. (Exh. B: M.E., Item 220; Exh. J: R.T. 1/12/07, at 9-11.)

1    The Arizona Court of Appeals' refusal to speculate that any juror was exposed to

2    external influences during this brief 5-minute-long interval comports with precedent holding

3    that the existence of error should not be presumed from a silent record. Accordingly, the

4    appellate court's rejection of this portion of Ground 12A was neither contrary to, nor an

5    unreasonable application of, clearly established federal law.

6                **b.    Ground 12B**

7    This claim seeks habeas relief on the ground that the jurors' communication with the

8    bailiff constituted an improper communication with Judge Stephens. (Doc. 1, at 34.) This

9    contention concerns two separate statements between the jury and bailiff: (1) the jury's

10   request that Judge Stephens be informed that it wished to continue deliberating; and (2) the

11   bailiff's verbal transmission of Judge Stephens' message granting that request to the jurors.

12   Ground 12B is procedurally defaulted.

13   First, Petitioner never raised this claim on direct appeal. (Doc. 1-2: Opening Brief, at

14   12-33; Doc. 1-3: Reply Brief, at 2-10; Doc. 1-3: Petition for Review, at 1-6.) Second,

15   although Petitioner's PCR petition raised the claim that "[t]he judge, through her agent the

16   bailiff, had substantive unrecorded ex parte communications with the jury" (Doc. 1-9: PCR

17   Petition, at 25), he failed to include that claim in his petition for review by the Arizona Court

18   of Appeals, wherein his sole jury-related contentions alleged that the jurors improperly

19   considered extrinsic evidence, and that the mistrial declaration and verbal discharge of the

20   jurors rendered the jury without jurisdiction to return a valid verdict. (Doc. 1-14: Petition for

21   Review by Arizona Court of Appeals, at 1-2, 4-12.) Petitioner's failure to present Ground

22   12B to the Arizona Court of Appeals on direct review and during his PCR proceedings

23   renders this claim unexhausted. See Castillo, 399 F.3d at 999; Swoopes, 196 F.3d at 1011.

24   And, any attempt to return to state court would be futile. See Ariz.R.Crim.P. 32.2(a)(3) and

25   32.4(a).

26   Petitioner has not established that any exception to procedural default applies.

27   \\\

28                                        - 111 -

### c.      Ground 12C

This claim alleges that Judge Stephens should have explored whether the jurors had been exposed to outside influences and committed reversible error by not doing so. (Doc. 1, at 34.) Ground 12C is procedurally defaulted.

Petitioner failed to present this claim on direct review, in his PCR petition, or in his petition for review to the Arizona Court of Appeals. Not until he filed his petition for review with the Arizona Supreme Court did Petitioner suggest that reversible error occurred because Judge Stephens did not explore whether an external influence motivated the jurors to make their post-mistrial request to continue deliberations. Thus, Petitioner did not fairly present this argument to the state judiciary because he raised it, for the first time, to the Arizona Supreme Court.

Petitioner's failure to present Ground 12C to the Arizona Court of Appeals on direct review and during his PCR proceedings renders this claim unexhausted. See Castillo, 399 F.3d at 999; Swoopes, 196 F.3d at 1011. And, any attempt to return to state court would be futile. See Ariz.R.Crim.P. 32.2(a)(3) and 32.4(a).

Petitioner has not established that any exception to procedural default applies.

### d.      Ground 12D

Petitioner contends that Judge Stephens "tacitly influenced the verdict by sending a loud and clear message that [she] wanted the jury to reach a decision," allegedly because of her failure to "take such rudimentary actions" like inquiring why the jurors decided to continue deliberating after the mistrial declaration, re-administering the oath to the jurors, re-charging the jury with some unspecified instructions, and reiterating the acceptability of returning no verdicts whatsoever. (Doc. 2, at 93.)

Ground 12D is procedurally defaulted. Petitioner never raised this coercion claim on direct appeal, (Doc. 1-2: Opening Brief), or in his petition for review by the Arizona Court of Appeals in his PCR proceedings, (Doc. 1-14: Petition for Review by Arizona Court of Appeals). Petitioner's failure to present Ground 12D to the Arizona Court of Appeals on

1    direct review and during his PCR proceedings renders this claim unexhausted. See Castillo,

2    399 F.3d at 999; Swoopes, 196 F.3d at 1011. And, any attempt to return to state court would

3    be futile. See Ariz.R.Crim.P. 32.2(a)(3) and 32.4(a).

4            Petitioner has not established that any exception to procedural default applies.

5    **13.    Ground 13**

6            In Ground 13, Petitioner alleges that the trial court violated the Eighth Amendment

7    by imposing consecutive 15-year prison sentences for each child-molestation conviction

8    resulting in "the cumulative effect of 75 years' imprisonment [which] violated [his] federal

9    constitutional right to be free from cruel and unusual punishment. U.S. Const. amends. VIII

10   and XIV." (Doc. 1, at 35; Doc. 2, at 132.)

11           Petitioner raised this issue on direct appeal, and the Arizona Court of Appeals found,

12   as follows:

13           Finally, May contends that the individual sentences for each count and his
             lengthy aggregate sentence constitute cruel and unusual punishment. As May
14           concedes, he did not raise this argument below. Therefore, he has waived this
             issue and we need not address it. *See State v. Navarro*, 201 Ariz. 292, 298 n.6,
15           ¶ 22, 34 P.3d 971, 977 n.6 (App. 2001) (Eighth Amendment argument that was
             not raised before the trial court is waived on appeal). Even if we were to
16           consider this argument, however, pursuant to *State v. Berger*, 212 Ariz. 473,
             476, ¶¶ 15-16, 134 P.3d 378, 381 (2006), we would be compelled to conclude
17           that his sentence is not grossly disproportionate to his crimes.

18   (Doc. 1-4: Memorandum Decision, at 5, ¶ 16.)

19           As to Petitioner's claim that the trial court erred by imposing a 15-year prison term

20   for each conviction for child molestation, the Supreme Court in Harmelin v. Michigan, 501

21   U.S. 957 (1991), set forth the framework governing Eighth Amendment challenges to the

22   length of non-capital sentences. See Graham v. Florida, 560 U.S. 48, 59-60 (2010); Ewing

23   v. California, 538 U.S. 11, 23-24 (2003). Specifically, the Court stated:

24           All of these principles—the primacy of the legislature, the variety of legitimate
             penological schemes, the nature of our federal system, and the requirement that
25           proportionality review be guided by objective factors—inform the final one:
             The Eighth Amendment does not require strict proportionality between crime
26           and sentence. Rather, it forbids only extreme sentences that are "grossly
             disproportionate" to the crime.

27

28                                                   - 113 -

1   Harmelin, 501 U.S. at 1001 (Kennedy, J., concurring). However, "outside of the context of

2   capital punishment, successful challenges to the proportionality of particular sentences [will

3   be] exceedingly rare.... Reviewing courts, of course, should grant substantial deference to the

4   broad authority that legislatures necessarily possess in determining the types and limits of

5   punishments for crimes, as well as to the discretion that trial courts possess in sentencing

6   convicted criminals." Solem v. Helm, 463 U.S. 277, 289-90 (1983). Generally, a court will

7   not overturn a sentence on Eighth Amendment grounds if the sentence does not exceed

8   statutory limits. See United States v. Zavala–Serra, 853 F.2d 1512, 1518 (9th Cir. 1988)

9   (upholding sentence of ten years' imprisonment for conspiracy to possess and distribute

10  2,000 grams of cocaine when sentence was within statutory range).

11         In analyzing an Eighth Amendment proportionality challenge, a court must determine

12  whether a "comparison of the crime committed and the sentence imposed leads to an

13  inference of gross disproportionality." United States v. Bland, 961 F.2d 123, 129 (9th Cir.

14  1992) (citing Harmelin, 501 U.S. at 1001 (finding that sentence of life imprisonment without

15  possibility of parole did not raise inference of disproportionality when imposed on a felon

16  in possession of a firearm)).

17         The objective reasonableness of the Arizona Court of Appeals' ultimate conclusion

18  that Petitioner's 15-year prison terms did not raise an inference of gross disproportionality

19  is demonstrated by Supreme Court precedent upholding far lengthier prison terms for

20  property and drug-related offenses that lack the gravity of crimes victimizing children. See

21  Lockyer v. Andrade, 538 U.S. 63, 77 (2003) (upholding two statutorily-mandated

22  consecutive prison terms of 25 years to life for two counts of petty theft under California's

23  recidivist statute); Ewing, 538 U.S. at 30-31 (upholding mandatory prison term of 25 years

24  to life for California recidivist convicted of felony grand theft); Harmelin, 501 U.S. at 1005

25  (upholding mandatory life imprisonment without parole for a first-time offender who stood

26  convicted of simple possession of 672 grams of cocaine); Hutto v. Davis, 454 U.S. 370, 375

27  (1982) (upholding two consecutive 20-year prison terms imposed for selling 3 ounces of

28                                          - 114 -

marijuana and possessing 6 ounces of marijuana for distribution); Rummel v. Estelle, 445 U.S. 263, 285 (1980) (upholding life sentence, with parole eligibility, imposed upon a Texas recidivist whose three theft-related crimes involved money and property having an aggregate worth of $229.11).

Here, the Court finds that Petitioner's mitigated 15-year sentence for each conviction was not grossly disproportionate to his crime.

Regarding Petitioner's challenge to the consecutive nature of his sentences which had "the cumulative effect of 75 years' imprisonment," the Eighth Amendment analysis "focuses on the sentence imposed for each specific crime, not on the cumulative sentence." United States v. Aiello, 864 F.2d 257, 265 (2nd Cir. 1988). As the Supreme Court has made clear, if the defendant

> has subjected himself to a severe penalty, it is simply because he has committed a great many such offenses. It would scarcely be competent for a person to assail the constitutionality of the statute prescribing a punishment for burglary on the ground that he had committed so many burglaries that, if punishment for each were inflicted on him, he might be kept in prison for life.

O'Neil v. State of Vermont, 144 U.S. 323, 331 (1892).

Even if this Court did consider Petitioner's sentence in the aggregate, the Court still finds no error. Indeed, the Supreme Court has held in several contexts that consecutive sentences do not pose a constitutional problem where the legislature has specifically provided for such sentences. See Whalen v. United States, 445 U.S. 684, 689 (1980) (noting that it is fully within the power of Congress to provide cumulative punishments, the only question was whether or not it had done so); Gore v. United States, 357 U.S. 386, 392 (1958) (holding that Congress clearly has the power to determine separate sentences for separate offenses); Carter v. McClaughry, 183 U.S. 365, 394 (1902) ("Cumulative sentences are not cumulative punishments, and a single sentence for several offenses, in excess of that prescribed for one offense, may be authorized by statute."). In addition, there is no constitutional right to receive sentences concurrently; rather, the "specification of the regime for administering multiple

sentences has long been considered the prerogative of state legislatures." <u>Oregon v. Ice</u>, 555 U.S. 160 (2009).

Therefore, Petitioner cannot establish that the state court's rejection of his Eighth Amendment claim was contrary to, or an unreasonable application of, clearly established federal law.

**14.   Ground 14**

In his final ground for habeas relief, Petitioner contends that he "is actually innocent of the charges and, but for the trial errors and constitutional violations, no reasonable juror would have found him guilty beyond a reasonable doubt," and asserts that this claim is supported by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (Doc. 1, at 37.) In the memorandum accompanying his habeas petition, Petitioner elaborates that he "is actually innocent" because the State did not have any physical evidence to corroborate the victims' allegations, the prosecutor allegedly "coached" one victim, and Petitioner turned down an advantageous plea offer because he never touched any child with sexual motivation. (Doc. 2, at 139.) Petitioner also contends that his verdict was "impaired by a number of egregious errors including: (1) being tried under a statutory scheme that shifted the burden on sexual intent from the prosecution to the defense; (2) having jurors who exploited extrinsic evidence, smuggled into the jury room, to conduct unauthorized experiments and demonstrations regarding the dispositive issue of sexual intent; and (3) having a trial lawyer who, inexplicably, failed to introduce available evidence to support [Petitioner's] critical medical defense, and failed to call or confer with other experts, among other deficiencies." (<u>Id.</u> at 140.)

Assuming that Petitioner's freestanding actual innocence claim under <u>Herrera v. Collins</u>, 506 U.S. 390 (1993) is cognizable in these proceedings,[7] the Court finds that

---

[7] The United States Supreme Court has not explicitly held that a "freestanding" claim of factual innocence, i.e., one unaccompanied by a substantive claim of constitutional error in trial proceedings, provides a basis for federal habeas relief in a non-capital case. <u>See</u> <u>Jones</u>

1   Petitioner has not met his burden under this claim. "[T]he *Herrera* majority's statement that
2   the threshold for a freestanding claim of innocence would have to be extraordinarily high,
3   contemplates a stronger showing than insufficiency of the evidence to convict." See Carriger
4   v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc) (internal citations omitted). "A habeas
5   petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt
6   about his guilt, and must affirmatively prove that he is probably innocent." Id. Petitioner has
7   not done so.

8       While the State lacked physical evidence, each victim's testimony regarding his or her
9   own sexual abuse was sufficient to support a conviction. And, the jury was not required to
10  accept as true Petitioner's self-serving testimony that any contact with the children's genitals
11  was not sexually motivated.

12                                   **CONCLUSION**

13      Having determined that Petitioner's claims are procedurally defaulted and/or fail on
14  the merits, the Court will recommend that Petitioner's Petition for Writ of Habeas Corpus be
15  denied and dismissed with prejudice.

16      **IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of
17  Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH**
18  **PREJUDICE**.

19      **IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave
20  to proceed *in forma pauperis* on appeal be **DENIED** because Petitioner has not made a
21  substantial showing of the denial of a constitutional right and because the dismissal of the
22  Petition is justified by a plain procedural bar and jurists of reason would not find the
23  procedural ruling debatable.

24

25  _____

26  v. Taylor, 763 F.3d 1242, 1246 (9th Cir. 2014) ("We have not resolved whether a freestanding
27  actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital
    context, although we have assumed that such a claim is viable.").

28                                   - 117 -

1    This recommendation is not an order that is immediately appealable to the Ninth

2    Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

3    Appellate Procedure, should not be filed until entry of the district court's judgment. The

4    parties shall have fourteen days from the date of service of a copy of this recommendation

5    within which to file specific written objections with the Court. See 28 U.S.C. § 636(b)(1);

6    Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen

7    days within which to file a response to the objections. Pursuant to Rule 7.2, Local Rules of

8    Civil Procedure for the United States District Court for the District of Arizona, objections

9    to the Report and Recommendation may not exceed seventeen (17) pages in length. Failure

10   timely to file objections to the Magistrate Judge's Report and Recommendation may result

11   in the acceptance of the Report and Recommendation by the district court without further

12   review. See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure

13   timely to file objections to any factual determinations of the Magistrate Judge will be

14   considered a waiver of a party's right to appellate review of the findings of fact in an order

15   or judgment entered pursuant to the Magistrate Judge's recommendation. See Rule 72,

16   Federal Rules of Civil Procedure.

17   DATED this 15th day of September, 2015.

18

19

20   _____
     Michelle H. Burns
21   United States Magistrate Judge

22

23

24

25

26

27

28